David A. Cortman, AZ Bar No. 029490*
Ryan J. Tucker, AZ Bar No. 034382*
Katherine L. Anderson, AZ Bar No. 033104*
Jeremiah J. Galus, AZ Bar No. 030469*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
dcortman@adflegal.org
rtucker@adflegal.org
kanderson@adflegal.org
jgalus@adflegal.org
*Pro hac vice applications forthcoming

Sonja Redmond, AK Bar No. 0605022
LAW OFFICE OF SONJA REDMOND
35865 Sunset Park St.
Soldotna, Alaska 99669
(907) 262-7846
sredmond@greatlandjustice.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| THE DOWNTOWN SOUP KITCHEN d/b/a DOWNTOWN HOPE CENTER, | |
| Plaintiff, | |
| v. | Case No. |
| MUNICIPALITY OF ANCHORAGE, ANCHORAGE EQUAL RIGHTS COMMISSION, and MITZI BOLAÑOS ANDERSON, in her Official Capacity as the Executive Director of the Anchorage Equal Rights Commission, | **VERIFIED COMPLAINT** (42 U.S.C. § 1983) |
| Defendants. | |

## INTRODUCTION

1.     This lawsuit challenges Anchorage's most recent attempt to force Downtown Hope Center to allow biological men to stay overnight at its women's homeless shelter.

2.     Hope Center is a private, nonprofit religious organization that provides free shelter, food, showers, clothing, laundry services, job-skills training, and religious instruction to Anchorage's homeless.

3.     Hope Center serves everybody. Over the past 30+ years, Hope Center has extended a helping hand to thousands of individuals and families from all walks of life, regardless of race, color, religion, national origin, age, sex, sexual orientation, gender identity, marital status, disability, or any other characteristic. Each month, Hope Center provides over 9,000 cups of soup, 1,200 showers, and over 22,800 loads of laundry to those in need—*all for free*.

4.     One group that Hope Center helps is homeless women who have suffered rape, sex trafficking, physical abuse, and domestic violence, primarily at the hands of men. Each night, its women's shelter serves as a sanctuary for 50 women, providing them with meals, showers, laundry, and a safe place to lie down, shut their eyes, and sleep.

5. Hope Center's religious beliefs compel it to care for Anchorage's hungry and homeless. *See, e.g*, James 1:27, NIV ("Religion that God our Father accepts as pure and faultless is this: to look after orphans and widows in their distress and to keep oneself from being polluted by the world."); Matthew 25:40, NIV ("The King will reply, 'Truly I tell you, whatever you did for one of the least of these brothers and sisters of mine, you did for me.'").

6. Yet Defendants insist Hope Center's religious beliefs—specifically, its beliefs about sexuality and gender—are discriminatory and deserving of punishment. In Defendants' view, providing charitable shelter exclusively to vulnerable women is unlawful sex and gender-identity discrimination under Anchorage Municipal Code (AMC) §§ 5.20.020 and 5.20.050—laws that respectively prohibit discrimination "in the sale, rental or use of real property" and "in places of public accommodation."

7. And Defendants will not stop trying to impose their views on Hope Center. In fact, three years ago, Defendants tried to punish Hope Center for allegedly not allowing a biological man who identifies as a woman to stay overnight at its women's shelter. (The individual had been injured from an altercation elsewhere, so Hope Center paid for a cab ride to the hospital.) Even though AMC §§ 5.20.020 and 5.20.050 did not apply to Hope Center because the ordinances at the time exempted homeless shelters,

Defendants aggressively pursued discrimination complaints against Hope Center based on the incident.

8. That earlier attempt to punish Hope Center for its beliefs culminated in a lawsuit being filed with this Court in 2018. And this Court wisely stepped in to protect Hope Center and the women it serves. Granting a preliminary injunction, this Court held that neither AMC § 5.20.020 nor AMC § 5.20.050 applied because those sections either expressly incorporated an exemption for homeless shelters set out in Anchorage's Fair Housing Act (AMC, chapter 5.25) or should be interpreted consistently with that exemption. Defendants chose not to appeal that ruling, and instead resolved the litigation with a court-approved Joint Consent Decree.

9. But Defendants have once again targeted Hope Center. On May 25, 2021, the Anchorage Assembly passed AO2021-30, an ordinance crafted and advocated for by the Anchorage Equal Rights Commission and its Executive Director. Designed to avoid the Court's prior preliminary injunction ruling and Joint Consent Decree, the new ordinance: (1) repeals the homeless-shelter exemption; and (2) expands the law's definition of "public accommodation" to cover homeless shelters like Hope Center.

10.     A true and correct copy of AO2021-30 is attached as **Exhibit 1**, and a true and correct copy of the related Assembly Memorandum is attached as **Exhibit 2**.

11.     As a result of Defendants' actions, Hope Center is no longer exempted from AMC §§ 5.20.020 and 5.20.050 and therefore faces liability if it continues to follow its religious beliefs about whether to admit biological males into its women's shelter.

12.     What is more, both AMC § 5.20.020 and AMC § 5.20.050 make it illegal for Hope Center to post, publish, or otherwise communicate its admissions policy and religious beliefs about sexuality and gender. So, to avoid additional liability, Hope Center has stopped posting its admissions policy on its grounds and on its website. AMC §§ 5.20.020 and 5.20.050 have therefore chilled Hope Center's constitutionally protected speech.

13.     To stop this imminent irreparable harm and violation of Hope Center's constitutional rights, Hope Center asks this Court to again enjoin enforcement of AMC §§ 5.20.020 and 5.20.050 and to declare those sections unconstitutional as applied to Hope Center so that it can freely speak its beliefs, freely exercise its faith, and freely serve hurting and vulnerable women who deserve a safe place to sleep.

## JURISDICTION AND VENUE

14. This civil rights action raises federal questions under the United States Constitution and federal law, particularly the First and Fourteenth Amendments and 42 U.S.C. § 1983.

15. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

16. This Court has authority to issue the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57; the requested injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65; the requested damages under 28 U.S.C. § 1343; and reasonable attorney's fees and costs under 42 U.S.C. § 1988.

17. Venue is proper in this Court under 28 U.S.C. § 1391(b) because all events giving rise to the claims occurred within the District of Alaska and because all Defendants reside in the District of Alaska.

## PARTIES

18. Plaintiff The Downtown Soup Kitchen d/b/a Downtown Hope Center ("Hope Center") is a non-profit, religious entity organized under the laws of the State of Alaska, with a principal place of business at 240 E. 3rd Avenue, Anchorage, Alaska 99501.

19.     Defendant Municipality of Anchorage is a home rule municipality organized under the laws of the State of Alaska with the power to sue and be sued, to appoint members to the Anchorage Equal Rights Commission, and to enact and enforce the ordinances challenged in this lawsuit.

20.     Defendant Anchorage Equal Rights Commission ("Commission") is an administrative agency within the Municipality of Anchorage. The Commission was established in the Anchorage Charter in 1975 and is the municipal law enforcement agency charged with administering and enforcing the ordinances challenged in this lawsuit.

21.     Defendant Mitzi Bolaños Anderson is a citizen of Alaska and the Commission's Executive Director. Her authority is delegated to her by the Commission. She is sued in her official capacity as Executive Director.

## FACTUAL BACKGROUND

### Hope Center's History

22.     Hope Center began with the vision of a few Anchorage church leaders who wanted to share God's love with Anchorage's homeless.

23.     Formed over thirty years ago, Hope Center today provides women's shelter services, daily meals, hot showers, laundry services, clean clothing, and culinary and bakery job-skills training to Anchorage's hungry and homeless.

24.     Hope Center started in a little red house on Fourth Avenue in downtown Anchorage, where it provided nearly 300 free cups of soup each day to homeless and low-income families. It also offered free hot showers, laundry services, and clean clothing in a yellow A-frame building next door to the soup kitchen.

25.     In 2012, Hope Center moved into its new facility on Third Avenue in downtown Anchorage.

26.     After moving into its new facility, Hope Center expanded its religious mission to help a nearby homeless shelter that often could not accommodate everyone needing shelter and that faced the difficult challenge of providing a safe shelter environment for homeless women, many of whom had been physically or sexually abused by men on the streets or otherwise.

27.     Hope Center agreed to take in and provide safe shelter to the overflow of homeless women.

28.     Originally, the other shelter checked individuals in and then Hope Center would transport the overflow women to its facility.

29.     But Anchorage's homeless community eventually learned of Hope Center's shelter, and homeless women began appearing at Hope Center directly.

*The Downtown Soup Kitchen v. Municipality of Anchorage*

30. Today, all women served at Hope Center's shelter appear at or are referred to Hope Center directly.

31. Most of the women served by Hope Center's shelter have suffered rape, physical abuse, or domestic violence or are fleeing sex trafficking.

## Hope Center's Religious Beliefs

32. Hope Center's mission statement is: "Inspired by the love of Jesus, we offer those in need support, shelter, sustenance, and skills to transform their lives."

33. Its motto is: "Hope Restored ● Hearts Renewed ● Lives Transformed."

34. Hope Center fulfills its religious mission and purpose both through acts of service and through teaching Christian beliefs and values.

35. Hope Center provides its guests with Christian counseling, teaching, and advice.

36. Thus, all Hope Center guests must be willing to be exposed to Hope Center's Christian beliefs and to not disrupt meetings where those beliefs are shared and taught.

37. Such activities include, but are not limited to, group prayer before meals, Bible studies, group devotions, Christian music and television, signs and decor with Christian messages, teachings, and symbols.

9

*The Downtown Soup Kitchen v. Municipality of Anchorage*

38.     Hope Center encourages its guests to put their faith in Jesus Christ, whose love brings spiritual salvation and freedom from destructive situations, habits, and addictions.

39.     As a Christian organization, Hope Center believes and follows the Bible's teachings.

40.     Hope Center believes the Bible teaches that:

- It should cherish, respect, and protect women and should care for women who lack shelter;

- God creates people male or female;

- A person's sex (male or female) is an immutable God-given gift;

- It is wrong for a person to deny his or her God-given sex;

- Providing shelter to homeless women plays a critical role in their understanding of God's design for them;

- It must convey and promote truthful messages about God's creation of each unique individual, whether male or female, and must not convey conflicting messages;

- It must be loving, upfront, and honest in its interactions with others.

41.     Hope Center teaches and expresses its religious beliefs, including its beliefs about sexuality and gender, throughout its Bible studies, group devotions, and other programs and activities that it offers to guests.

## Hope Center Women's Shelter

42.     Hope Center first opened its women's shelter in December 2015 as a cold-weather shelter.

43.     Since then, Hope Center has become a safe haven for Anchorage's homeless women.

44.     Each night, it houses 50 women.

45.     The women's shelter not only gives women a safe place to sleep at night, but it also provides them with dinner, breakfast, and access to showers, laundry facilities, and basic toiletries.

46.     Although all women must first check in and meet certain conditions to gain entry to the shelter, Hope Center gives priority to the elderly and disabled.

47.     Hope Center's guidelines prohibit smoking, fighting, and wandering to off-limits areas of the facility, among other things.

48.     To stay at the shelter, Hope Center requires the women to sign up for a chore, assist with clean-up, and adhere to a schedule.

49.     No shelter guest is allowed to stay in the shelter without complying with Hope Center's policies and procedures.

50.     True and correct copies of Hope Center's shelter policies are attached as **Exhibits 3** and **4**.

51.     The women who stay overnight at Hope Center's shelter are given a mat, a sheet, and blankets.

52.     Because space is limited, the women must set up their sleeping areas, side-by-side, on the floor of a single room; they sleep three to five feet from each other:



53.     Many women who stay overnight at the shelter can be seen changing their clothes or in various states of undress.

54.     Because of its religious beliefs and desire to create a safe and secure environment, Hope Center allows only biological women to stay overnight at the shelter.

55.     Allowing a biological man to sleep with and disrobe next to abused and battered women threatens the women's safety, privacy, and sense

of security and therefore interferes with Hope Center's ministry to those women.

56.    No Hope Center policy prohibits biological women who identify as men from accessing the shelter, and Hope Center has previously allowed biological women who identify as men to access its shelter.

57.    Hope Center previously posted and published the following admissions policy for its women's shelter:

> The Downtown Hope Center believes that all people deserve love and respect. Our mission states 'Inspired by the love of Jesus we offer those in need support, shelter, sustenance and skills to transform their lives. Because of our desire to provide a safe and warm environment for women, guests of the shelter must be biological females. It is against our policy for biological males to spend the night at our women only facility, however we may be able to assist you in finding an alternative place to stay the night. Please contact one of our staff members if you need assistance.

58.    Hope Center posted and published this policy for two main reasons: (1) to provide clarity and peace of mind to the women seeking refuge from the harsh conditions of homeless life; and (2) to follow its religious beliefs about being upfront and honest with those seeking access to the shelter.

59. But as explained in more detail below, Hope Center has been forced to remove this admissions policy from its website and to otherwise refrain from posting or publishing the policy anywhere else.

## The Anchorage Municipal Code

60. Title 5 of the Anchorage Municipal Code (AMC) prohibits sex and gender identity discrimination "in the sale, rental or use of real property" and "in places of public accommodation." AMC §§ 5.20.020 & 5.20.050.

61. "Sex discrimination" is defined as "differential or preferential treatment shown toward a person because of one's sex, pregnancy or parenthood." AMC § 5.20.010.

62. "Gender identity" is defined as "the gender with which a person identifies, and also includes the person's appearance, mannerisms, behavior, expression, or other characteristics of the person that are or are perceived to be related to gender, regardless of the individual's designated sex at birth or identified in documents." Ex. 1 at 4 (AMC § 5.20.010).

63. Under AMC § 5.20.050 (the public accommodation law), it is unlawful for a place of public accommodation to:

- "Refuse, withhold from or deny to a person any of its accommodations, advantages, facilities, benefits, privileges, services or goods" based on the person's sex or gender identity;

- "Publish, circulate, issue, display, post or mail a written or printed communication, notice or advertisement which states or implies" that any of its "services, goods, facilities, benefits,

accommodations, advantages or privileges" will be "refused" or "denied" based on the person's sex or gender identity; and

- "Publish, circulate, issue, display, post or mail a written or printed communication, notice or advertisement which states or implies" that the "patronage or presence" of a person belonging to a particular sex or gender identity is "unwelcome, not desired, not solicited, objectionable or unacceptable."

AMC § 5.20.050(A)(1) and (2).

64. Before it was amended, the public accommodation law applied only to certain "business[es]" or "professional activit[ies]," and thus did not apply to nonprofit homeless shelters like Hope Center.

65. Defendants amended the definition of "public accommodation" to include, among other things, an "accommodation . . . facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages or accommodations are made available to the general public."

66. Many of the law's terms and phrases are undefined, including "implies that," "unwelcome," "not desired," "not solicited," "objectionable," and "unacceptable."

67. For alleged violations of the public accommodation law, the Commission "may order any equitable relief, including but not limited to restoration to membership in a place of public accommodation, or admission to or service in a place of public accommodation." AMC § 5.70.130(D)(3).

68.     Under AMC § 5.20.020 (the real property law), it is "unlawful for the owner, lessor, manager, agent, brokerage service, or other person having the right to sell, lease, rent, [or] advertise" to:

- "Refuse to sell, lease or rent, or to otherwise make unavailable, the real property to a person because of" the person's sex or gender identity;

- "Discriminate against a person because of" the person's sex or gender identity "in a term, condition or privilege relating to the use, sale, lease or rental of real property"; and

- "Circulate, issue or display, make, print or publish, or cause to be made or displayed, printed or published, any communication, sign, notice, statement or advertisement with respect to the use, sale, lease or rental of real property that indicates any preference, limitation, specification or discrimination based on" sex or gender identity.

AMC § 5.20.020A(1), (2), and (7).

69.     Before it was amended, the real property law contained exemptions for homeless shelters and same-sex dormitories, among others.

70.     But as detailed below, Defendants have eliminated these exemptions from the real property law.

71.     Even so, Anchorage still grants an exemption "where the renter or lessee shares common living areas in an individually or privately owned home or dwelling unit with the owner, lessor, manager, agent or other person and the owner, lessor, manager, agent actually occupies the home or dwelling unit as a resident." AMC § 5.20.020(B). In that scenario, discrimination is

16

*The Downtown Soup Kitchen v. Municipality of Anchorage*

always allowed. Anchorage doesn't care if you discriminate based on race, religion, sex, gender, sexual orientation, gender identity, or anything else.

72. In addition, the amended real property law adds an exemption for "places which are institutional in nature and for which housing is merely incidental to a broader purpose, such as rehabilitation or medical care." Ex. 1 at 7 (AMC § 5.20.020(B)). However, that exemption makes clear "[s]uch institutional places may still be covered under section 5.20.050"—i.e., the public accommodation law. *Id.*

73. For alleged violations of the real property law, the Commission "may order any equitable relief, including but not limited to the sale, lease or rental of the housing accommodation to the aggrieved person if it is still available." AMC § 5.70.130(D)(2).

74. Any person who believes he or she has been discriminated against in violation of the public accommodation or real property laws may file a written complaint with the Commission. AMC § 5.40.010(A).

75. The Commission's Executive Director may also file a discrimination complaint on behalf of any person or group of persons that the Executive Director believes has been discriminated against. AMC § 5.40.010(B).

76.     Whether filed by an individual or the Executive Director, the Commission *must* "promptly" investigate every filed complaint and "convene a fact finding conference." AMC §§ 5.50.010 and 5.50.020(A).

77.     And even when a complaint has not been filed, the Commission or its Executive Director may "initiate a general investigation to determine the extent to which an individual, group, corporation, business, industry, agency, or organization is complying with the [law's nondiscrimination] provisions." AMC § 5.50.060(A).

78.     Such an investigation "may be as broad in scope as may be necessary to effectuate the purposes of title 5." AMC § 5.50.060(C).

### The "Doe" Incident & Prior Commission Complaints

79.     In January 2018, "Jessie Doe"[1] was dropped off at Hope Center by Anchorage police officers.

80.     Sherrie Laurie, Hope Center's Executive Director, was called to the dining hall, which also serves as the sleeping area for the women's shelter, to determine how best to help Doe.

81.     Doe smelled strongly of alcohol, had an open eye wound, and seemed agitated and aggressive.

---

[1] Doe's real name is not disclosed here for privacy reasons.

*The Downtown Soup Kitchen v. Municipality of Anchorage*

82. Because Hope Center did not admit individuals who are inebriated, under the influence of alcohol or drugs, Doe could not stay at Hope Center.

83. Laurie instead recommended that Doe seek medical treatment and paid for Doe's cab ride to the hospital.

84. Laurie prayed with Doe; Doe hugged Laurie; and Laurie put Doe in the cab.

85. Hope Center did not see Doe again that evening.

86. Laurie later learned that Doe had started a fight at another shelter and that the police had been called to handle the situation, resulting in Doe's temporary ban from that shelter.

87. The next day (a Saturday), Doe again arrived at Hope Center and asked to be admitted to the women's shelter.

88. Hope Center declined admission because Doe had not stayed at the shelter the previous evening, a condition for Saturday admission, and because Hope Center was not accepting new shelter guests at that time.

89. Doe later filed a discrimination complaint with the Commission, alleging that Hope Center declined admission based on sex and gender identity in violation of AMC § 5.20.050, the public accommodation law.

*The Downtown Soup Kitchen v. Municipality of Anchorage*

90.     In response, Hope Center's then-legal counsel sent a letter to the Commission informing it that: (a) Hope Center was not a place of public accommodation; (b) Doe was turned away the first time because Doe was under the influence of alcohol and had been involved in a fight; (c) Doe was turned away the second time because Doe arrived when Hope Center was not accepting new guests; and (d) in any event, Hope Center has a First Amendment right to operate its women's shelter consistently with its religious beliefs and to provide charitable shelter exclusively to vulnerable women.

91.     The Commission refused to dismiss the complaint and continued its "investigation" by issuing intrusive discovery requests to Hope Center.

92.     In fact, rather than dismissing, the Commission filed a *second* complaint against Hope Center and its legal counsel.

93.     The second complaint alleged that Hope Center, through its alleged "spokesperson" (i.e., its attorney) published "a communication which states or implies that the use of Downtown Hope Center's real property and/or services or facilities will be refused to or denied to a person because of their sex and/or gender identity, in violation of Anchorage Municipal Code § 5.20.020(A)(7) and/or Anchorage Municipal Code § 5.20.050(A)(2)."

*The Downtown Soup Kitchen v. Municipality of Anchorage*

94. The second complaint was based on statements that Hope Center's attorney made in various media, which, according to the Commission, indicated that Hope Center would not allow biological men who identify as transgender women to stay overnight at its women's shelter.

95. In response to the second complaint, Hope Center filed a motion for lack of jurisdiction, arguing that the Commission had failed to properly plead a claim against Hope Center under either AMC § 5.20.020 or AMC § 5.20.050 and that homeless shelters were exempted from those provisions.

96. The Commission refused to rule on Hope Center's motion for lack of jurisdiction, continuing instead with its "investigations" of both the first and second complaints.

97. The discrimination complaints and investigations were baseless. While Hope Center runs a women-only homeless shelter, it provides its day services to any and every one regardless of sex, gender identity, or any other characteristic. In fact, before filing the first complaint, "Jessie Doe" visited Hope Center seeking food and a shower, and Hope Center happily provided Doe with free food and a free shower—as it does for anyone who comes in seeking those services. Hope Center served Doe then, and Hope Center would serve Doe or anyone else in the future.

## The Prior Litigation

98.    Facing these complaints and intrusive "investigations," Hope Center filed a civil-rights complaint in this Court in August 2018, naming as defendants the Municipality of Anchorage, the Commission, and the Commission's then-Executive Director.

99.    The complaint asked this Court to stop Anchorage from enforcing AMC §§ 5.20.020 and 5.20.050 against Hope Center and to declare those ordinances unconstitutional to the extent that they interfered with Hope Center's constitutionally protected activities, including its right to post its desired policies and to open its women's shelter to biological women only.

100.    This Court granted a preliminary injunction in August 2019, holding that Hope Center was likely to succeed on the merits of its claims that (1) the real property law, AMC § 5.20.020, did not apply to homeless shelters like Hope Center, and (2) Hope Center was not a "public accommodation" within the meaning of the public accommodation law, AMC § 5.20.050. *Downtown Soup Kitchen v. Municipality of Anchorage*, 406 F. Supp. 3d 776, 794–97 (D. Alaska 2019).

101.    This Court determined that the real property law exempted homeless shelters because it expressly incorporated the exemptions contained

in Anchorage's Fair Housing Act, AMC chapter 5.25, which referenced "shelters for the homeless." *Id.* at 795.

102.   And while the public accommodation law did not explicitly exempt homeless shelters, this Court reasoned that "Alaska's rules of statutory interpretation and the structure of the Anchorage Municipal Code as a whole suggest that homeless shelters are not public accommodations as defined in AMC § 5.20.050." *Id.* at 796. Interpreting "public accommodation" to include Hope Center, the Court explained, would wrongly cause the real property law's exemption for homeless shelters to "have no effect." *Id.*

103.   Shortly after the preliminary injunction ruling, Anchorage resolved the litigation with a Joint Consent Decree and agreed to pay Hope Center's attorney's fees and costs.

### AO2021-30: Anchorage Again Comes After Hope Center

104.   Since the prior litigation, Defendants have regrouped and renewed their effort to force Hope Center to allow biological males to stay overnight at its women's shelter.

105.   On May 25, 2021, the Anchorage Assembly enacted AO2021-30, which was developed and advocated for by the Commission and its Executive Director. *See* Ex. 1.

106.   AO2021-30 amended existing law in two critical ways.

107.   First, it repealed the homeless-shelter exemption that was incorporated into the real property law and relied on by this Court in granting the prior preliminary injunction. *See* Ex. 1 at 6, 8.

108.   Second, it amended the definition of "public accommodation" to extend the public accommodation law's sex and gender-identity nondiscrimination provisions to homeless shelters like Hope Center. Ex. 1 at 5. The chart below shows the revised definition:

| Old Definition | New Definition |
|---|---|
| *Public accommodation* means any business or professional activity that is open to, accepts or solicits the patronage of, or caters or offers goods or services to the general public, subject only to the conditions and limitations established by law and applicable alike to all persons. | *Public accommodation* means a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, (1) whose goods, services, facilities, privileges, advantages or accommodations are made available to the general public, or (2) that accepts public funds with non-discrimination contractual requirements. |

109.   Because of these changes, Hope Center is no longer expressly exempted from AMC §§ 5.20.020 and 5.20.050 and thus subject to their provisions.

110.   Defendants revised the definition of "public accommodation," and interpret that new definition, to encompass Hope Center's women's shelter.

111.   But Hope Center's women's shelter should not be considered a "public" accommodation; rather, it is a private, religious entity that ministers

*The Downtown Soup Kitchen v. Municipality of Anchorage*

to a select group of people—homeless women who have suffered physical and sexual abuse at the hands of men.

112. Defendants specifically designed and enacted AO2021-30 to target Hope Center in an attempt to force it to admit biological males to its women's shelter, in violation Hope Center's religious beliefs.

113. The Assembly Memorandum accompanying AO2021-30 directly referenced Hope Center's prior litigation as a reason for eliminating the homeless-shelter exemption. *See* Ex. 2.

114. The Assembly Memorandum stated that:

> Chapter 5.25 [the Fair Housing Act] includes nine different categories of exceptions in its "lawful practices" section and these exceptions are currently incorporated into Section 5.20.020 by reference. Included in the exceptions is shelters for the homeless. Plaintiffs in *Downtown Soup Kitchen v. MOA et al.* argued that the homeless shelter exception in the housing provision of title 5 should apply to the public accommodation provision as well. In an August 9, 2019 Order granting a preliminary injunction, the United States District Court for the District of Alaska found that Downtown Soup Kitchen was likely to prevail in this argument. *See Downtown Soup Kitchen v. MOA et al. Case No. 3:18-cv-00190-SLG.*

> The [proposed] changes . . . address legal issues raised by the *Downtown Soup Kitchen* litigation, which resulted in a $100,001 settlement paid by the Municipality.

Ex. 2 at 2.

115. Anchorage Assembly Members and the Commission's Executive Director repeatedly referenced Hope Center and the prior litigation during

their one-hour "Worksessions" about AO2021-30 on May 14 and 21, as well as during their regular Assembly Meeting on May 25.

116. And, on May 25, after the Assembly passed AO2021-30 and heard testimony from Hope Center's Executive Director about the negative effect the amendments would have on Hope Center's ministry to homeless women, the Assembly Chair said this:

> It's just really disappointing when I hear such misinformed comments, either from members of the body or members of the public, that really are misinformed and mischaracterizations of who transgender individuals are in our community. You know, it's 2021. And I would hope that we can move along in our collective education of what it means to be a transgender individual in our society.

117. Hope Center cannot and will not comply with AMC §§ 5.20.020 and 5.20.050 to the extent that those laws require Hope Center to admit biological males into its women's shelter, since doing so would jeopardize the safety and security of vulnerable women and violate Hope Center's sincerely held religious beliefs.

118. Women who use the shelter have told Hope Center officials that they would not feel safe if they had to sleep and/or undress next to biological men.

119.   For example, when "Jessie Doe" asked to stay at the women's shelter, several women told Laurie that they would have left the shelter that night had Hope Center allowed Doe to stay.

120.   Other women have told Hope Center officials that given past trauma they would rather sleep outside, without any shelter, than sleep in the same area as a biological man.

121.   Hope Center's religious beliefs require it to continue its policy of allowing only biological females into its women's shelter.

122.   But AMC §§ 5.20.020 and 5.20.050 make it illegal for Hope Center to follow its beliefs.

123.   Hope Center faces a credible threat and substantial risk that it will receive requests from biological males to stay overnight at its women's shelter.

124.   In addition to the incidents detailed above involving "Jessie Doe," Hope Center has received additional requests from biological men to stay overnight at its women-only shelter.

125.   Other homeless shelters in the Anchorage area accept biological men.

126.   Hope Center has and will continue to direct any biological men who seek access to its women's shelter to those other shelters.

*The Downtown Soup Kitchen v. Municipality of Anchorage*

127. Because of its religious beliefs, Hope Center desires to make its admissions policy clear by posting it on its grounds and on its website.

128. To avoid additional risk of liability, however, Hope Center has stopped posting its admissions policy on its grounds and on its website.

129. If not for AMC §§ 5.20.020 and 5.20.050, Hope Center would immediately repost its admissions policy on its grounds and on its website.

130. Hope Center's women's shelter is not a business or commercial enterprise; it is a private, religious entity that ministers to a select group of people and operates exclusively on a charitable basis. It receives private donations from individuals, other non-profits, businesses, foundations, and churches.

131. Having no option that does not violate its faith or the law, Hope Center has no choice but to challenge AMC §§ 5.20.020 and 5.20.050 for violating the United States Constitution as applied to it.

## ALLEGATIONS OF LAW

132. At all times relevant to this Complaint, each and every one of the alleged acts are attributable to Defendants, who acted under color of a statute, regulation, custom, ordinance, or usage of the Municipality of Anchorage.

*The Downtown Soup Kitchen v. Municipality of Anchorage*

133. Hope Center currently suffers imminent and irreparable harm because of AMC §§ 5.20.020 and 5.20.050 and Defendants' unconstitutional actions.

134. Hope Center has no adequate or speedy remedy at law for the loss of its constitutional rights.

135. Hope Center will continue to suffer irreparable harm in the absence of an injunction.

## FIRST CAUSE OF ACTION
### First Amendment: Free Exercise of Religion

136. Hope Center incorporates by reference paragraphs 1–135.

137. The First Amendment's Free Exercise Clause protects Hope Center's right to exercise its religion and operate its ministry in accordance with its religious beliefs. It also protects Hope Center's right to speak, to not speak, to associate, and to not associate in accordance with its religious beliefs.

138. The First Amendment also protects Hope Center from having special disabilities imposed on the basis of stating disfavored religious views, being targeted for its religious beliefs, and being punished for exercising its religious beliefs.

139. Hope Center exercises its religion under the First Amendment when it operates its ministry, including its women's shelter, in accordance

*The Downtown Soup Kitchen v. Municipality of Anchorage*

with biblical teachings and when it shares and explains its beliefs to the public and those Hope Center serves.

140.   As applied to Hope Center, AMC §§ 5.20.020 and 5.20.050 substantially burden Hope Center's sincerely held religious beliefs by requiring it to operate its women's shelter in ways that violate its religious beliefs or to stop its ministry to vulnerable women in violation of its religious beliefs.

141.   As applied to Hope Center, AMC §§ 5.20.020 and 5.20.050 also substantially burden Hope Center's sincerely held religious beliefs by preventing it from being open and honest with prospective shelter guests about its religiously based admissions policy.

142.   AMC §§ 5.20.020 and 5.20.050 coerce Hope Center into changing or violating its religious beliefs.

143.   AMC §§ 5.20.020 and 5.20.050 are not neutral or generally applicable, are hostile towards religion, target and show favoritism towards certain religious beliefs, and impose special disabilities on Hope Center due to its religious beliefs.

144.   AMC §§ 5.20.020 and 5.20.050 are not neutral or generally applicable because they contain categorical exemptions, yet Defendants have not granted a religious exemption to Hope Center.

*The Downtown Soup Kitchen v. Municipality of Anchorage*

145.   AMC §§ 5.20.020 and 5.20.050 are also not neutral or generally applicable because they are enforced through a system of individualized assessments. For example, AMC § 5.20.050 contains the undefined, vague, and overbroad terms "unwelcome," "not solicited," "objectionable," and "unacceptable" to describe what is prohibited. Anchorage officials must determine—without any guidance and based on their own subjective determinations—whether any of these prohibitions apply.

146.   AMC §§ 5.20.020 and 5.20.050 are also not neutral or generally applicable because they do not punish the religious beliefs of homeless shelters who hold favored and government-approved religious beliefs about gender and sexuality.

147.   AMC §§ 5.20.020 and 5.20.050 also violate Hope Center's free-exercise rights under the hybrid-rights doctrine because they implicate other constitutional rights, such as the rights to free speech, expressive association, due process, and equal protection.

148.   AMC §§ 5.20.020 and 5.20.050 also violate the First Amendment because they interfere with Hope Center's power to order its own internal affairs, including on matters of faith, doctrine, and administration.

149.   As applied to Hope Center, AMC §§ 5.20.020 and 5.20.050 also violate the First Amendment because they go far beyond the government's

*The Downtown Soup Kitchen v. Municipality of Anchorage*

stated purpose of prohibiting discrimination in services provided to the general public by interfering with a private, religious entity's ministry to a select group of people.

150.   AMC §§ 5.20.020 and 5.20.050 do not serve any compelling or legitimate governmental interests in a narrowly tailored way.

151.   Accordingly, as applied to the Hope Center, AMC §§ 5.20.020 and 5.20.050 violate the Free Exercise Clause.

**SECOND CAUSE OF ACTION**
**First Amendment: Freedom of Speech**

152.   Hope Center incorporates by reference paragraphs 1–151.

153.   The First Amendment Free Speech Clause protects Hope Center's ability to speak freely, to create speech, to publish speech, and to distribute speech.

154.   The First Amendment also protects Hope Center's right to be free from content and viewpoint discrimination, overbroad restrictions on speech, and vague laws allowing unbridled discretion by enforcement officials.

155.   Hope Center's religiously based admissions policy, and all activities associated with that policy, are forms of protected speech; Hope Center has published and wishes to continue publishing this speech to the public.

156.    AMC §§ 5.20.020 and 5.20.050 prohibit Hope Center from posting, publishing, or otherwise communicating about its religiously based admissions policy.

157.    Hope Center has refrained from engaging in protected speech to avoid violating AMC §§ 5.20.020 and 5.20.050 and to avoid incurring any penalties for violating those provisions.

158.    Were it not for AMC §§ 5.20.020 and 5.20.050, Hope Center and its agents would immediately engage in protected speech, including but not limited to posting and publishing its admissions policy on its grounds and on its website.

159.    As applied to Hope Center, AMC §§ 5.20.020 and 5.20.050 are content-based and viewpoint-based regulations that ban, chill, and burden Hope Center's desired speech and publication of speech.

160.    Moreover, because AMC § 5.20.050(A)(2)(b) prohibits communications stating or implying that a person is "unwelcome, not desired, not solicited, objectionable or unacceptable" based on that person's protected class, that provision is also facially unconstitutional in that it is vague, overbroad, and allows Defendants unbridled discretion to evaluate speech and then discriminate based on content and viewpoint in determining whether to apply the provision.

*The Downtown Soup Kitchen v. Municipality of Anchorage*

161. Hope Center is currently suffering ongoing harm because of AMC §§ 5.20.020 and 5.20.050.

162. Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing on Hope Center's free speech.

163. Accordingly, as applied to Hope Center, AMC §§ 5.20.020 and 5.20.050 violates the First Amendment's protections for free speech.

164. And AMC § 5.20.050(A)(2)(b) facially violates the First Amendment's protections for free speech.

## THIRD CAUSE OF ACTION
### First Amendment: Freedom of Expressive Association

165. Hope Center incorporates by reference paragraphs 1–164.

166. The First Amendment protects the right of people to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

167. The First Amendment bars the government from compelling people to associate with others in an association expressing messages.

168. The First Amendment also prohibits the government from banning people from associating with others in an association expressing messages.

169. Hope Center is an expressive association because people with likeminded beliefs, including those on staff and volunteers at its shelter, are

*The Downtown Soup Kitchen v. Municipality of Anchorage*

joining together to teach and serve the homeless in Anchorage and express their religious beliefs about the differences between men and women.

170.   The volunteers and staff at Hope Center's women's shelter advocate the position that vulnerable women deserve dignity and respect and a safe space to sleep away from biological men. AMC §§ 5.20.020 and 5.20.050 undermine Hope Center's ability to express that view.

171.   By compelling the Hope Center to expressively associate with biological males in its women's only shelter, AMC §§ 5.20.020 and 5.20.050 force Hope Center to expressively associate in a way that communicates messages contrary to its desired messages and religious beliefs.

172.   Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing on Hope Center's freedom of expressive association.

173.   Accordingly, as applied to the Hope Center, AMC §§ 5.20.020 and 5.20.050 violate the Hope Center's right to expressive association protected by the First Amendment.

## FOURTH CAUSE OF ACTION
## Fourteenth Amendment: Freedom of Private Association

174.   Hope Center incorporates by reference paragraphs 1–173.

175.   The freedom to enter into and carry on intimate or private relationships is a fundamental element of liberty protected by the Fourteenth Amendment. This right to association also implies a right not to associate.

176.   The homeless women who stay overnight at Hope Center's shelter are protected by the right to intimate or private association, and Hope Center is entitled to raise this claim on their behalf.

177.   Hope Center's women's shelter provides a place of safety and refuge for homeless women who have suffered rape, physical abuse, and domestic violence or who are fleeing sex trafficking.

178.   The women's shelter is selective in that only 50 women can stay at the shelter, and those staying must first check in and meet certain conditions to gain entry.

179.   The women's shelter also has limited space, requiring the women to sleep in the same room just three to five feet away from each other.

180.   Women staying at Hope Center's shelter therefore share common, intimate areas with the other guests and have immediate access to one another's personal belongings and persons.

181.   Women decide to stay at Hope Center's shelter because it is a women-only shelter.

*The Downtown Soup Kitchen v. Municipality of Anchorage*

182. AMC §§ 5.20.020 and 5.20.050, however, would require Hope Center to admit biological males to its women's shelter and thus allow biological men to associate with and sleep directly next to the women.

183. Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing on the women's right to intimate or private association.

184. Accordingly, as applied to the women at Hope Center's women's shelter, AMC §§ 5.20.020 and 5.20.050 violate the right to intimate or private association protected under the Fourteenth Amendment.

## FIFTH CAUSE OF ACTION
### Fourteenth Amendment: Procedural Due Process

185. Hope Center incorporates by reference paragraphs 1–184.

186. The Fourteenth Amendment's Due Process Clause forbids the government from censoring speech using vague standards that grant unbridled discretion to government officials to arbitrarily prohibit some speech and that fail to give speakers sufficient notice about whether their desired speech violates the law.

187. AMC § 5.20.050(A)(2)(b) uses undefined and overbroad terms and phrases such as "unwelcome," "not desired," "not solicited," "objectionable," and "unacceptable" to describe the speech that is prohibited.

*The Downtown Soup Kitchen v. Municipality of Anchorage*

188.   Plaintiffs, Defendants, and third parties of ordinary intelligence cannot know what communications made on a public accommodation's website, made on a public accommodation's social media sites, or made directly to prospective clients or guests indicate a person's "patronage or presence" at a place of public accommodation is "unwelcome, not desired, not solicited, objectionable or unacceptable."

189.   Defendants can use this vagueness, and the unbridled discretion it provides, to apply AMC § 5.20.050(A)(2)(b) in a way that discriminates against certain content, viewpoints, and actions that Defendants disfavor.

190.   Accordingly, facially and as applied to Hope Center, AMC § 5.20.050(A)(2)(b) violates the Fourteenth Amendment's Due Process Clause.

## PRAYER FOR RELIEF

Hope Center respectfully requests that this Court enter judgment against Defendants and order the following relief:

(A)   A preliminary and permanent injunction to stop Anchorage and any person acting in concert with it from enforcing AMC §§ 5.20.020 and 5.20.050 against the constitutionally protected activities of Hope Center and its agents, including its right to post its desired policies and to open its women's homeless shelter to biological women only;

(B)    A declaration that AMC §§ 5.20.020 and 5.20.050 violate Hope Center's free exercise, free speech, expressive association, private association, and due process rights under the First and Fourteenth Amendments to the U.S. Constitution.

(C)    A declaration that AMC § 5.20.050(A)(2)(b) also facially violates the Free Speech and Due Process Clauses of the U.S. Constitution;

(D)    Compensatory and nominal damages;

(E)    Court costs and expenses, including reasonable attorney's fees; and

(F)    Any other and further relief to which Hope Center may be entitled.

Respectfully submitted this 30th day of June 2021.

s/ *Ryan J Tucker*
David A. Cortman, AZ 029490*
Ryan J. Tucker, AZ 034382*
Katherine L. Anderson, AZ 033104*
Jeremiah J. Galus, AZ 030469*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
dcortman@adflegal.org
rtucker@adflegal.org
kanderson@adflegal.org
jgalus@adflegal.org

Sonja Redmond, AK Bar No. 0605022
LAW OFFICE OF SONJA REDMOND
35865 Sunset Park St.
Soldotna, Alaska 99669
(907) 262-7846
sredmond@greatlandjustice.com

***Pro hac vice** application forthcoming*

*Attorneys for Plaintiff*

## VERIFICATION OF COMPLAINT

I, Sherrie Laurie, a citizen of the United States and a resident of the State of Alaska, hereby declare under penalty of perjury that I have read the foregoing Verified Complaint and the factual allegations contained therein, and the facts as alleged are true and correct.

Executed this __30__ day of __June____, 2021, in Anchorage, Alaska.


_Sherrie Laurie_
_____
Sherrie Laurie