David A. Cortman, *Pro Hac Vice*
Ryan J. Tucker, *Pro Hac Vice*
Katherine L. Anderson, *Pro Hac Vice*
Jeremiah J. Galus, *Pro Hac Vice*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
dcortman@adflegal.org
rtucker@adflegal.org
kanderson@adflegal.org
jgalus@adflegal.org

Sonja Redmond, AK Bar No. 0605022
LAW OFFICE OF SONJA REDMOND
35865 Sunset Park St.
Soldotna, Alaska 99669
(907) 262-7846
sredmond@greatlandjustice.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| THE DOWNTOWN SOUP KITCHEN d/b/a DOWNTOWN HOPE CENTER,<br><br>     Plaintiff,<br><br>v.<br><br>MUNICIPALITY OF ANCHORAGE, ANCHORAGE EQUAL RIGHTS COMMISSION, and MITZI BOLAÑOS ANDERSON, in her Official Capacity as the Executive Director of the Anchorage Equal Rights Commission,<br><br>     Defendants. | Case No. 3:21-cv-00155-SLG<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Fed. R. Civ. P. 65**<br><br>**Oral Argument Requested** |

# TABLE OF CONTENTS

Table of Authorities ........................................................................................... iii

Introduction........................................................................................................ 1

Statement of Facts ............................................................................................ 2

    A.    Hope Center and its Religious Beliefs ............................................. 2

    B.    The Prior Litigation: Anchorage's First Attempt to
         Force Men into Hope Center's Shelter............................................ 4

    C.    AO2021-30: Anchorage Again Targets Hope Center .................... 6

Legal standard .................................................................................................. 7

Argument........................................................................................................... 7

I.    Hope Center is likely to succeed on the merits of its claims. ................. 7

    A.    The public accommodation and real property laws violate
         the right to intimate or private association. ................................. 8

    B.    The laws violate Hope Center's free exercise of religion. ............ 10

         1.    The laws are neither neutral nor generally applicable. .... 10

         2.    The laws also interfere with Hope Center's
             internal affairs and religious autonomy............................ 14

    C.    The laws violate Hope Center's freedom of speech
         because they restrict speech based on content and viewpoint. .... 16

    D.    The laws fail strict scrutiny as applied to
         Hope Center's women's shelter. .................................................... 18

II.    The remaining factors favor a preliminary injunction. ........................ 19

Conclusion ...................................................................................................... 20

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

# TABLE OF AUTHORITIES

**Cases**

*Barr v. American Association of Politcal Consultants, Inc.*,
140 S. Ct. 2335 (2020) ................................................................. 17

*Board of Directors of Rotary International v. Rotary Club of Duarte*,
481 U.S. 537 (1987) ....................................................................... 8

*Brown v. Entertainment Merchants Association*,
564 U.S. 786 (2011) ..................................................................... 18

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ........................................................... 12, 13, 18

*Craig v. Boren*,
429 U.S. 190 (1976) ....................................................................... 8

*Downtown Soup Kitchen v. Municipality of Anchorage*,
406 F. Supp. 3d 776 (D. Alaska 2019) ............................... 1, 5, 6, 11

*Elrod v. Burns*,
427 U.S. 347 (1976) ..................................................................... 19

*Employment Division Department of Human Resources v. Smith*,
494 U.S. 872 (1990) ................................................................. 10, 14

*Fair Housing Council of San Fernando Valley v. Roommate.com*,
666 F.3d 1216 (9th Cir. 2012) ............................................. 8, 9, 20

*Fulton v. City of Philadelphia*,
141 S. Ct. 1868 (U.S. June 17, 2021) ................................. 11, 14, 19

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006). ................................................................... 18

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*,
565 U.S. 171 (2012) ................................................................. 14, 15

*Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America*,
344 U.S. 94 (1952) ....................................................................... 15

*Lyng v. Northwest Indian Cemetery Protective Association,*
  485 U.S. 439 (1988) ................................................................. 10

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
  138 S. Ct. 1719, 1722  (2018) .............................................. 12, 13

*McCullen v. Coakley,*
  573 U.S. 464 (2014) ................................................................. 16

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ................................................................. 16

*Rosenberger v. Rector & Visitors of University of Virginia,*
  515 U.S. 819 (1995) ................................................................. 17

*Sammartano v. First Judicial District Court,*
  303 F.3d 959 (9th Cir. 2002) ................................................... 20

*Serbian Eastern Orthodox Diocese v. Milivojevich,*
  426 U.S. 696 (1976) ................................................................. 15

*Shell Offshore, Inc. v. Greenpeace, Inc.,*
  709 F.3d 1281 (9th Cir. 2013) ................................................... 7

*Tandon v. Newsom,*
  141 S. Ct. 1294 (2021) ............................................................. 13

*Thomas v. Review Board of the Indiana Employment Security Division,*
  450 U.S. 707 (1981) ................................................................. 10

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
  137 S. Ct. 2012 (2017) ............................................................. 14

*Tucker v. California Departmentt of Education,*
  97 F.3d 1204 (9th Cir. 1996) ................................................... 17

*Werft v. Desert Southwest Annual Conference of United Methodist Church,*
  377 F.3d 1099 (9th Cir. 2004) ................................................. 15

*Winter v. Natural Resources Defense Council, Inc.,*
  555 U.S. 7 (2008) ..................................................................... 7

## Statutes

Anchorage Municipal Code § 5.25.030.............................................................. 18

Anchorage Municpal Code § 5.20.020............................................. 5, 13, 14, 17

Anchorage Municpal Code § 5.20.050............................................. 5, 13, 16, 17

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

## INTRODUCTION

Can the government force women to sleep next to men? The answer should be an obvious no. No one disputes that the government could not force a woman to share her home, apartment, hotel room, or any other living space with someone else, whether male or female. Even Anchorage agrees—*unless* the woman is homeless and relies on others for shelter. In that scenario, Defendants say that Anchorage's nondiscrimination ordinances kick in. No women-only shelters are allowed.

This Court rejected that precise argument two years ago when Defendants tried to force Downtown Hope Center to allow men into its women-only shelter. *Downtown Soup Kitchen v. Mun. of Anchorage*, 406 F. Supp. 3d 776 (D. Alaska 2019). This Court found that Anchorage's laws at the time exempted homeless shelters. But since then, Defendants have enacted a new law deleting the homeless-shelter exemption and redefining "public accommodation" to ensure that the laws' prohibitions of sex and gender identity discrimination apply to homeless shelters. These changes, of course, target Hope Center. Defendants have admitted as much. They repeatedly pointed at Hope Center and the prior litigation as justification for the new law. And right after it was passed, Anchorage's Assembly Chair paused to criticize Hope Center's religious beliefs about sexuality and gender as "misinformed."

But Defendants' second attempt to force men into Hope Center's shelter fares no better than their first. This Court should again issue a preliminary injunction to protect Hope Center and the women it serves.

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

### STATEMENT OF FACTS

#### A. Hope Center and its Religious Beliefs

Hope Center started over thirty years ago because a few Anchorage church leaders wanted to share God's love with Anchorage's homeless. Decl. of Sherrie Laurie ¶¶ 4,5 ("Laurie Decl."). Operating first out of a red house in downtown Anchorage, Hope Center provided nearly 300 free cups of soup each day to homeless and low-income families. *Id.* ¶ 6. It also offered free hot showers, laundry services, and clean clothing. *Id.*

In 2012, Hope Center moved to a new facility. *Id.* ¶ 7. And three years later, Hope Center expanded its ministry to help a nearby homeless shelter accommodate an overflow of homeless women. *Id.* ¶ 9. The other shelter was facing the difficult challenge of providing safe shelter for women, many of whom had been abused by men. *Id.* So Hope Center stepped in. *Id.* ¶ 10.

Hope Center's purpose is religious. "Inspired by the love of Jesus, [it] offer[s] those in need support, shelter, sustenance, and skills to transform their lives." *Id.* ¶ 11. Hope Center fulfills this religious mission through acts of service and the inculcation of Christian beliefs and values. *Id.* ¶¶ 12-17. Those beliefs include that God creates people male or female, that a person's sex is an immutable God-given gift, and that a person should not deny his or her God-given sex. *Id.* ¶ 19. Hope Center also believes that women should be cherished, respected, and protected. *Id.* Providing shelter to needy women is an exercise of that belief; it also plays a critical role in developing the women's understanding of God's design for them. *Id.*

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

Hope Center expresses its religious beliefs, including its beliefs about sexuality and gender, throughout its programs and activities. *Id.* ¶ 20. Hope Center offers Bible studies and group devotions, as well as Christian counseling, teaching, and advice. *Id.* By loving, serving, and teaching homeless women in this environment, Hope Center seeks to encourage them to put their faith in Jesus Christ and free themselves from destructive addictions, habits, or situations. *Id.* ¶ 17.

Because Hope Center shelters many homeless women who have been raped, beaten, trafficked, and threatened by men, it believes that biological men should not sleep with and disrobe next to women. *Id.* ¶¶ 26-27. This makes sense, especially since space is sparse: just 50 women can stay at Hope Center each night, and the women must set up their sleeping areas in a single room, side-by-side, three to five feet away from each other. *Id.* ¶ 24. Although Hope Center accepts only biological women at its overnight shelter to protect their physical, psychological, and emotional safety, *id.* ¶¶ 25-27, it provides its free day services to men too, *id.* ¶ 8, including meals, laundry services, showers, and job skills training. *Id.* ¶ 6. It merely refers men looking for a place to sleep to other nearby shelters, *id.* ¶¶ 33.

Hope Center desires to post and publish its admissions policy so that women seeking refuge will know of the protection and care Hope Center provides. *Id.* ¶¶ 34-35. It also wants to follow its religious belief about being upfront and honest with others. *Id.* Hope Center used to do this, but the new law now makes it illegal. *Id.* ¶ 37. So Hope Center has stopped posting its policy to avoid exposing itself to additional liability. *Id.* ¶ 36.

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

### B. The Prior Litigation: Anchorage's First Attempt to Force Men into Hope Center's Shelter

In 2018, Anchorage police officers dropped "Jessie Doe" off at Hope Center. *Id.* ¶ 40. Doe smelled strongly of alcohol, acted agitated and aggressive, and had an open wound above the eye. *Id.* ¶ 42. Sherrie Laurie, Hope Center's Executive Director, was called to assess the situation. *Id.* ¶ 41. Because Hope Center was a sober shelter, Laurie explained that Doe could not stay. *Id.* ¶ 43. Laurie instead recommended that Doe go to the hospital to receive medical care. *Id.* ¶ 44. After much resistance, Doe agreed. Laurie paid for a cab to take Doe to the emergency room. *Id.* Laurie prayed with Doe; Doe hugged Laurie; and Laurie put Doe in the cab. *Id.* ¶ 45. Hope Center did not see Doe again that evening. *Id.* ¶ 47.

The next day (a Saturday), Doe again tried to access the women's shelter. *Id.* ¶ 49. But Doe had not stayed the previous evening, a condition to Saturday admission, and Doe sought entry at a time when Hope Center was not even accepting new guests. *Id.* ¶ 50. Doe left Hope Center that day, but later filed a complaint with the Anchorage Equal Rights Commission claiming sex and gender identity discrimination under Anchorage's public accommodation law. Verified Compl. (VC) ¶ 89.

In response, Hope Center's then-legal counsel sent a letter to the Commission informing it that Hope Center was not a place of public accommodation, that Doe had not been turned away based on sex or gender identity, and that Hope Center had a constitutional right to operate its shelter consistently with its religious beliefs. *Id.* ¶ 90. But the Commission

refused to dismiss the complaint and continued its "investigation" by sending Hope Center intrusive discovery requests. *Id.* ¶ 91.

In fact, rather than dismissing, the Commission filed *its own* complaint against Hope Center for statements made by Hope Center's legal counsel about the incident. *Id.* ¶¶ 92–94. This second complaint alleged sex and gender identity discrimination under both AMC § 5.20.050 (the public accommodation law) and AMC § 5.20.020 (the real property law). *Id.* ¶ 93.[1]

Facing these complaints and intrusive "investigations," Hope Center filed a civil-rights complaint in this Court in August 2018. *Id.* ¶ 98. Hope Center asked this Court to stop Anchorage from enforcing AMC §§ 5.20.050 and 5.20.020 against it and to declare those ordinances unconstitutional as applied to Hope Center. *Id.* ¶ 99.

The Court granted a preliminary injunction in August 2019, holding (1) that Hope Center was not a "public accommodation" under the public accommodation law, AMC § 5.20.050, and (2) that the real property law, AMC § 5.20.020, did not apply to homeless shelters. *Downtown Soup Kitchen*, 406 F. Supp 3d at 794-97. At that time, the real property law incorporated an exemption for homeless shelters set out in Anchorage's Fair Housing Act, AMC chapter 5.25. *Id.* at 795. And while the public accommodation law did not explicitly exempt homeless shelters, the Court determined that the law

---

[1] Title 5 of the Anchorage Municipal Code (AMC) prohibits sex and gender identity discrimination "in places of public accommodation," AMC § 5.20.050, and "in the sale, rental or use of real property," AMC § 5.20.020.

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

should be interpreted consistently with the real property law, which did exempt homeless shelters. *Id.* at 796.

### C. AO2021-30: Anchorage Again Targets Hope Center

Since the prior litigation, Defendants have renewed their effort to force Hope Center to admit men into its women's shelter. On May 25, 2021, the Anchorage Assembly enacted AO2021-30, an ordinance developed and advocated for by the Commission and its Executive Director. *See* AO2021-30, Ex.1. AO2021-30 changed existing law in two critical ways.

*First*, it repealed the exemption for homeless shelters incorporated into the real property law—and relied on by this Court in its prior preliminary-injunction ruling. Ex. 1 at 6, 8. *Second*, it expanded the definition of "public accommodation" so that the public accommodation law now applies to homeless shelters like Hope Center. *Id.* at 5.

Because of these changes, Hope Center is no longer exempted from Anchorage's public accommodation or real property laws. And that was the whole point. Defendants have admitted to getting rid of the homeless-shelter exemption because of Hope Center and the prior litigation. VC ¶¶ 113–16; *see also* Ex. 2 at 2. In fact, after passing the new law, Anchorage's Assembly Chair denounced Hope Center's beliefs about sexuality and gender as "misinformed," "really disappointing," and a "mischaracterization[] of who transgender individuals are in the community." VC ¶116

But Hope Center cannot comply with AMC §§ 5.20.050 or 5.20.020. It cannot admit biological men into its women-only shelter since doing so would jeopardize the physical, mental, and emotional wellbeing of vulnerable

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

women and violate Hope Center's sincerely held religious beliefs. Laurie Decl. ¶ 39; Decl. of J.A. at ¶¶ 4-8; Decl. of M.I. at ¶¶ 4-11; Decl. of T.E. at ¶¶ 6-10.

## LEGAL STANDARD

A preliminary injunction should issue if the plaintiff shows that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of an injunction; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Because the Ninth Circuit weighs these factors on a sliding scale, a preliminary injunction may also issue even when there are just "serious questions going to the merits," so long as "the balance of hardships tips sharply in the plaintiff's favor" and the other preliminary-injunction factors are met. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013). Hope Center meets all these elements.

## ARGUMENT

### I.  Hope Center is likely to succeed on the merits of its claims.

Hope Center raises free-exercise, free-speech, and intimate-association claims in support of its request for a preliminary injunction. Although Hope Center is likely to succeed on the merits of each claim, just one is enough for the requested relief.

7

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

## A. The public accommodation and real property laws violate the right to intimate or private association.

There is more at stake than just Hope Center's free-speech and free-exercise rights. The homeless women who stay at the shelter have rights too; Anchorage cannot force them to share private sleeping spaces with men.[2]

"[T]he freedom to enter into and carry on certain intimate or private relationships is a fundamental element of liberty protected by the Bill of Rights." *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987). While this right of intimate or private association extends to "marriage, child bearing, child rearing and cohabitation," "the right isn't restricted exclusively to family." *Fair Hous. Council of San Fernando Valley v. Roommate.com*, 666 F.3d 1216, 1220 (9th Cir. 2012). Rather, whether a particular relationship is protected depends on the "size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship." *Id.* at 1220–21.

According to the Ninth Circuit, the "roommate relationship easily qualifies." *Id.* at 1221. In *Roommate.com*, the Ninth Circuit held that nondiscrimination provisions in state and federal housing laws did not apply to "roommate selection" and "the sharing of living units." *Id.* at 1222. There, the government sued an internet-based business that helped people find roommates. The government alleged violations of the state and federal Fair

---

[2] Hope Center can raise the constitutional rights of women staying at its shelter. *See Fair Hous. Council of San Fernando Valley v. Roommate.com*, 666 F.3d 1216, 1222 (9th Cir. 2012) ("While Roommate itself has no intimate association right, it is entitled to raise the constitutional claims of its users.") (citing *Craig v. Boren*, 429 U.S. 190, 195 (1976)).

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

Housing Acts because the business allowed its users to limit potential roommates by sex, sexual orientation, familial status, and other characteristics. *Id.* at 1218. Although the court acknowledged those laws possibly applied to shared living situations and the selection of roommates, *id.* at 1220, 1222, it adopted a narrower statutory construction to avoid "substantial constitutional concerns," *id.* at 1223.

The Ninth Circuit explained that, apart from an immediate family member or a romantic partner, it is "hard to imagine a relationship more intimate than that between roommates, who share living rooms, dining rooms, kitchens, bathrooms, even bedrooms." *Id.* at 1221. Sharing such spaces, the court held, "implicates significant privacy and safety considerations." *Id.* Among other things, roommates see each other in "various stages of undress," "learn intimate details" about each other, and have access to each other's "person" and "physical belongings." *Id.* The court therefore accepted as uncontroversial that "women will often look for female roommates," since a woman "may not want to walk around in her towel in front of a boy" or "worry about unwanted sexual advances." *Id.* Accordingly, restricting a woman's ability to be selective in her choice of roommates "would be a serious invasion of privacy, autonomy and security." *Id.* The same analysis applies here. The women who stay overnight at Hope Center's shelter have a right to intimate or private association, given the shelter's "size, purpose, [and] selectivity." *Id.* at 1220. Indeed, the shelter *exclusively* serves homeless women, most of whom have suffered rape, sex trafficking, physical abuse, or domestic violence. Laurie Decl. ¶ 22. And space

9

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

is limited—only 50 women can stay each night, and all of them sleep together in one room, side-by-side, just three to five feet away from each other. *Id.* at ¶ 23. Because the women have nowhere else to go, many of them return to Hope Center night after night. Decl. of J.A. at ¶¶ 4-8; Decl. of M.I. at ¶¶ 4-11; Decl. of T.E. at ¶¶ 6-10. In other words, they share common, intimate areas with each other and have direct access to one another's person and physical belongings—just like roommates.

Yet Defendants would have the women staying at Hope Center's shelter sleep directly next to men. Because this violates their right to intimate or private association, the laws cannot stand.

### B. The laws violate Hope Center's free exercise of religion.

As applied to Hope Center, the challenged laws violate the Free Exercise Clause for two independent reasons. First, the laws substantially burden Hope Center's religious exercise and are neither neutral nor generally applicable. Second, they interfere with Hope Center's internal affairs and religious autonomy. Strict scrutiny applies for either reason.

#### 1. The laws are neither neutral nor generally applicable.

A law that burdens religious exercise is subject to strict scrutiny under the Free Exercise Clause if it is neither "neutral" nor "generally applicable." *Emp. Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 878–82 (1990).[3]

---

[3] The laws burden Hope Center's religious exercise by "coerc[ing] [Hope Center] into acting contrary to [its] religious beliefs," *Lyng v. N.W. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988), and by exerting "substantial pressure on [Hope Center] to modify [its] behavior and to violate [its] beliefs," *Thomas v. Review Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707, 717–18 (1981).

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

Because neutrality and general applicability are separate concepts, the failure to satisfy just one triggers strict scrutiny. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (U.S. June 17, 2021). The challenged laws here, however, fail to meet either requirement.

**Neutrality.** Starting with neutrality, the "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Id.*

Yet that is what Defendants have done. Indeed, this Court has once before stopped Defendants from forcing men into Hope Center's women-only shelter. *See Downtown Soup Kitchen v. Municipality of Anchorage*, 406 F. Supp. 3d 776, 799 (D. Alaska 2019). But instead of abiding by that ruling—and respecting Hope Center's religious beliefs and ministry—Defendants have schemed to do what the Constitution forbids. They deliberately eliminated the exemption for homeless shelters and redefined "public accommodation" to encompass Hope Center, even though Hope Center is a private, religious organization whose shelter serves a select group of people. *See Fulton*, 141 S. Ct. at 1881 (noting "incongruity in deeming a private religious foster agency a public accommodation").

So this is not a case where Hope Center's beliefs about sexuality and gender have been "incidentally burden[ed]." *Id.* at 1876. Quite the opposite: Defendants have *intentionally* burdened those beliefs. As admitted in the memorandum accompanying AO2021-30, Defendants ditched the homeless-shelter exemption in direct response to Hope Center. Ex. 2 at 2 (stating that the revisions "address legal issues" raised by Hope Center in the prior

litigation). And the Assembly Members and Commission's Executive Director repeatedly referenced Hope Center and this Court's prior preliminary injunction ruling as justification for the new law. VC ¶¶ 115–16; *accord, e.g.*, Video Recording: Municipality of Anchorage Assembly Regular, at 3:23:40–3:25:40; 3:44:00–3:45:30, (May 25, 2021), https://bit.ly/3ijZjzX. The Free Exercise Clause, however, bars even "subtle departures from neutrality." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). Yet the departure here was "overt"—indeed, Hope Center "was the object of the ordinance[]." *Id.*

What is more, after passing AO2021-30, the Assembly Chair denounced Hope Center's religious opposition to the new law as "misinformed," "really disappointing," and a "mischaracterization[] of who transgender individuals are in our community." VC ¶ 116; *accord* Mun. of Anchorage Assembly Regular, 5:27:25–5:27:40. "[I]t's 2021," he said, so everyone ought to "move along in our collective education of what it means to be a transgender individual in our society." *Id.*; *accord* Mun. of Anchorage Assembly Regular, 5:27:40–5:27:55. And another Assembly Member went so far as to suggest that opponents of the new law were using "transgender individuals as a whipping post." *accord* Mun. of Anchorage Assembly Regular, 3:47:25–3:47:40. Far from being a "neutral and respectful consideration" of Hope Center's religious beliefs, Defendants' actions here were "neither tolerant nor respectful." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1722, 1731 (2018). Strict scrutiny applies for this reason as well. Such

"hostility was inconsistent with the First Amendment's guarantee that our laws be applied in a manner that is neutral toward religion." *Id.* at 1732.

 ***General Applicability.*** Strict scrutiny also applies because the challenged laws are not generally applicable.

 In *Lukumi*, the Supreme Court struck down an ordinance that prohibited ritual animal sacrifice but allowed animal killings in several other contexts. In doing so, the Court explained that a law is not generally applicable if it exempts *non*-religious conduct that undermines the government's purported interests "in a similar or greater degree than [religious conduct] does." 508 U.S. at 543.

 Just one exemption is enough. As the Supreme Court recently explained, government regulations are not generally applicable "whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam).

 Here, Anchorage allows at least two exemptions for secular reasons. It allows discrimination in housing "where the renter or lessee shares common living areas . . . with the owner, lessor, manager, agent or other person and the owner, lessor, manager, agent actually occupies the home or dwelling unit as a resident." AMC § 5.20.020(B). And it allows housing discrimination in "places which are institutional nature and for which housing is merely incidental to a broader purpose, such as rehabilitation or medical care." *Id.* In both scenarios, a person may be excluded from housing based on race, religion, sex, gender, sexual orientation, gender identity, or anything else. Yet the city allows no exceptions for Hope Center.

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

But consider the existing exemptions. Under Anchorage's ordinances, a woman looking for a roommate to share space in her condo unit could (rightly) exclude men. *See* AMC § 5.20.020(B). But if that same woman were homeless and found shelter at Hope Center, Defendants say men *must* be allowed to sleep next to her.

The Constitution forbids the double standard. A law is not generally applicable, and thus triggers strict scrutiny under the Free Exercise Clause, "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877. That is what Anchorage's laws do. Strict scrutiny applies.

Besides lacking neutrality and general applicability, the laws also trigger strict scrutiny under *Smith* because they burden religious exercise along with other constitutional rights, as detailed below. *See Smith*, 494 U.S. at 881–82 (strict scrutiny applies in such "hybrid situation[s]").

### 2. The laws also interfere with Hope Center's internal affairs and religious autonomy.

Although courts often evaluate free-exercise claims under *Smith*'s general rule, that case does not always apply. In fact, the Supreme Court has rejected the idea that "any application" of a neutral and generally applicable law is "necessarily constitutional under the Free Exercise Clause." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 n.2 (2017). And *Smith* often does not apply when, as here, a religious organization's internal affairs are at stake. *E.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 184–85 (2012) (First

Amendment establishes a "scrupulous policy . . . against a political interference with religious affairs"); *Werft v. Desert Sw. Ann. Conf. of United Methodist Church*, 377 F.3d 1099, 1102 (9th Cir. 2004) (applying compelling-interest test after *Smith*); *Bollard v. Cal. Province of Soc'y of Jesus*, 196 F.3d 940, 948 (9th Cir. 1999) (same).

To be sure, many such cases involve a religious organization's "selection of its ministers." *Hosanna-Tabor*, 565 U.S. at 183. But the First Amendment broadly protects the power of religious organizations "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). So this religious-autonomy doctrine "applies with equal force" to matters of "church administration," *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710 (1976), and matters generally affecting the religious organization's "faith and mission." *Hosanna-Tabor*, 565 U.S. at 190.

Here, Anchorage's laws impermissibly interfere with Hope Center's internal affairs and ministry decisions. They dictate who Hope Center must minister to and when, transforming a women's ministry into a co-ed one. And they forbid Hope Center from not just following its religious beliefs about sexuality and gender, but from *teaching* them as well. So regardless of whether the challenged laws are neutral or generally applicable, this is one of those times when "the burden on religious liberty is simply too great to be permissible." *Werft*, 377 F.3d at 1102.

## C.    The laws violate Hope Center's freedom of speech because they restrict speech based on content and viewpoint.

To evaluate laws restricting speech, courts use a two-step inquiry. First, a law is content-based if "on its face [it] draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015) (cleaned up). Second, a facially content-neutral law may still regulate content as applied if it "cannot be justified without reference to the content of the regulated speech," or if the government adopted the law because it disagrees with the speaker's message. *Id.* (cleaned up); *see also McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (application content-based "if it required 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred"). Anchorage's laws falter at both steps.

To start, the laws are facially content-based. The public accommodation law makes it unlawful to "[p]ublish . . . a written or printed communication" that "states or implies": (a) any of the public accommodation's "services, goods, facilities, benefits, accommodations, advantages or privileges . . . will be refused, withheld from or denied to a person of a certain" sex or gender identity; or (b) that the "patronage or presence of a person belonging to a particular" sex or gender identity "is unwelcome, not desired, not solicited, objectionable or unacceptable." AMC § 5.20.050(A)(2)(a) & (b). Likewise, the real property law makes it unlawful to "print or publish . . . any communication, sign, notice, statement or advertisement with respect to the use . . . of real property that indicates any preference, limitation, specification, or discrimination based on" sex or gender identity. AMC §

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

5.20.020(A)(7). So statements saying, "trans women are women" are allowed; those saying, "only biological women are women" are forbidden. "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020).

The laws also restrict Hope Center's desired speech based on content as applied. Hope Center wants to publish its admissions policy on its website and on its grounds—to make its religious beliefs about sexuality and gender known and to assure women fleeing abuse of their safety. But Anchorage's laws forbid the posting of that policy based on its content: that there are meaningful differences between biological men and women.

In fact, Anchorage's public accommodation and real property laws act as viewpoint-based restrictions. As noted, the laws would allow Hope Center to post a website statement affirming that transgender women are the same as biological women, but the laws forbid even a suggestion that there might be differences. AMC § 5.20.050(A)(2)(b) (unlawful to "state[] or impl[y]" that the "patronage or presence of a person belonging to a particular . . . gender identity . . . is unwelcome, not desired, not solicited, objectionable or unacceptable"); AMC § 5.20.020(A)(7) (unlawful to "indicate[] any preference, limitation, specification, or discrimination based on . . . gender identity"). These restrictions favor particular views over others. That is viewpoint discrimination. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1216 (9th Cir. 1996) (viewpoint discrimination to ban sign saying "gay marriage is a sin" but allow sign advocating "person's right to choose whatever mate he or she wishes").

**D. The laws fail strict scrutiny as applied to Hope Center's women's shelter.**

Because the challenged laws violate the constitutional rights of Hope Center and the women it serves, Defendants must prove they are narrowly tailored to serve a compelling state interest. *Lukumi*, 508 U.S. at 546. Defendants cannot do so.

As for a compelling interest, Defendants may say they have an interest in stopping discrimination. But courts must "look[] beyond broadly formulated interests" and consider "the asserted harm[]"of granting "specific exemptions to particular . . . claimants." *Fulton,* 141 S. Ct. at 1877. And here, Hope Center does not discriminate. It freely provides all its day services— food, showers, laundry, clothing, job-skills training—to thousands of individuals and families each year, regardless of sex, gender identity, or any other characteristic. Hope Center simply cannot allow men to stay overnight and sleep directly next to women who have suffered physical and sexual abuse. That's not discrimination; that's common sense.

Even Anchorage knew this until recently. Indeed, the city's Fair Housing Act expressly exempted homeless shelters and same-sex dormitories from its prohibitions of sex and gender-identity discrimination. AMC §§ 5.25.030(8) and (9). Defendants decided to jettison those common-sense exemptions only after this Court thwarted their initial attempt to force men into Hope Center's women's shelter.

Yet Defendants have not identified an "actual problem" that justifies their targeting of Hope Center. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). Nor could they. Many homeless shelters in Anchorage have the

space to accommodate men, and Hope Center gladly refers such men to those shelters. VC ¶¶ 125–26. In contrast, Hope Center's space is severely limited. Each night, its shelter is *maxed out* with 50 women sleeping on the floor, side-by-side, just three to five feet away from each other. There is no reason, let alone a compelling one, to kick women out of Hope Center's shelter just to replace them with men who already have other places to stay.

In any event, the existing exemptions to the challenged laws "undermine[] the City's contention that its non-discrimination policies can brook no departures." *Fulton*, 141 S. Ct. at 1882. Anchorage can offer "no compelling reason why it has a particular interest in denying an exception to [Hope Center] while making them available to others." *Id.*

Because Hope Center is likely to succeed on the merits of one or more of its claims, a preliminary injunction is warranted.

## II. The remaining factors favor a preliminary injunction.

The remaining preliminary-injunction factors also favor Hope Center. First, Hope Center has established an irreparable injury because the challenged laws violate Hope Center's free-exercise and free-speech rights, as well as the private associational rights of the women it serves. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (the loss of constitutional rights, "for even minimal periods of time, unquestionably constitutes irreparable injury").

Second, the equities weigh heavily in Hope Center's favor. For years, Hope Center has, in accordance with its religious convictions, provided a place of safety and refuge for homeless women who have suffered rape, sex trafficking, physical abuse, and domestic violence. A preliminary injunction

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

will simply preserve the status quo while this litigation proceeds, allowing Hope Center to continue this critical ministry for women who need it. Meanwhile, a temporary injunction will not harm Defendants at all. As noted, other homeless shelters have space to accommodate men. And Anchorage, of course, is free to establish its own programs to care for those who need of shelter.

Third, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002) (abrogated on other grounds). This is especially so for First Amendment freedoms. *See id.* ("Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles.").

## CONCLUSION

The Ninth Circuit was not the first or last to recognize that "[t]here's no place like home." *Roommate.com*, 666 F.3d at 1218. But what if you have no home? Where do you go to "take off your coat, kick off your shoes, let your guard down and be completely yourself"? *Id.* For the homeless women of Anchorage who have been abused, battered, and beaten, the answer is "Hope Center." But Defendants are attempting, once again, to strip away what makes Hope Center so special. This need not be. Other homeless shelters have space for men. Anchorage's homeless women ask only for a place to call their own, a place where—for one night at least—they can feel safe and secure. That's what they have in Hope Center. And it is worth protecting.

Respectfully submitted this 16th day of July, 2021.

s/ Ryan J. Tucker
David A. Cortman, *Pro Hac Vice*
Ryan J. Tucker, *Pro Hac Vice*
Katherine L. Anderson, *Pro Hac Vice*
Jeremiah J. Galus, *Pro Hac Vice*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
dcortman@adflegal.org
rtucker@adflegal.org
kanderson@adflegal.org
jgalus@adflegal.org

Sonja Redmond, AK Bar No. 0605022
LAW OFFICE OF SONJA REDMOND
35865 Sunset Park St.
Soldotna, Alaska 99669
(907) 262-7846
sredmond@greatlandjustice.com

*Attorneys for Plaintiff*

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document will be personally served upon the following:

Municipality of Anchorage
623 W. 6th Avenue, Suite 730
Anchorage, AK 99501

Anchorage Equal Rights Commission
632 W. 6th Avenue, Suite 110
Anchorage, AK 99501

Mitzi Bolaños Anderson
Executive Director
Anchorage Equal Rights Commission
632 W. 6th Avenue, Suite 110
Anchorage, AK 99501

Respectfully submitted this 16th day of July, 2021.

*s/ Ryan J. Tucker*
Ryan J. Tucker

*Attorney for Plaintiff*