Ruth Botstein
Meagan Carmichael
Assistant Municipal Attorney
Municipal Attorney's Office
P.O. Box 196650
Anchorage, Alaska 99519-6650
Phone: (907) 343-4545
Fax: (907) 343-4550
Email: uslit@muni.org

Attorneys for Defendants
Municipality of Anchorage, Anchorage Equal Rights Commission,
And Mitzi Bolaños Anderson

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| THE DOWNTOWN SOUP KITCHEN d/b/a DOWNTOWN HOPE CENTER, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) ) |
| MUNICIPALITY OF ANCHORAGE, ANCHORAGE EQUAL RIGHTS COMMISION, and MITZI BOLAÑOS ANDERSON, in her Official Capacity as the Executive Director of the Anchorage Equal Rights Commission, | ) ) ) ) ) ) ) |
| Defendants. | ) Case No. 3:21-cv-00155 SLG ) |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

In this facial challenge to Anchorage, Alaska's recently revised non-discrimination ordinance, plaintiff Downtown Hope Center has filed for a preliminary injunction. Hope Center argues that the ordinance unconstitutionally requires its homeless shelter to admit

transgender women.  But the Municipality of Anchorage has not applied the ordinance to

Hope Center and has no plans or intention to do so.  Recent Supreme Court jurisprudence

makes clear that Downtown Hope Center's homeless shelter is not a "public

accommodation" under the language of the newly revised ordinance; its operations

therefore fall outside of the nondiscrimination provisions about which Hope Center

complains.  Because the ordinance is facially constitutional and is not being applied to

Hope Center, plaintiff lacks standing to seek injunctive relief in this lawsuit, and there is

neither a legal basis nor any practical reason for this court to enjoin the challenged

ordinance.

STATEMENT OF FACTS

**A.      Downtown Hope Center's shelter operations.**

Downtown Hope Center is a non-profit religious ministry located in Anchorage,

Alaska.  Hope Center provides meals, showers, laundry services, clothing, job training,

and religious instruction to homeless and low-income families; it also operates an

overnight shelter for homeless women.  Docket 1 at ¶ 2; Docket 15-4 at ¶¶ 3-4, 6. Not all

women may stay at the shelter, however; Hope Center's published policies explain that

"[b]ecause of limited resources and limited space and because of its mission to serve and

empower those most in need, the Center cannot accept everyone, a large portion of the

public, or even a large portion of those in need of transient overnight housing."  Docket

1-3 at 4.  Hope Center's three-page "admissions criteria" require shelter guests to meet

numerous requirements to gain admission to the shelter.  Docket 1-3 at 4-6.  These

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 2 of 35

policies also specify which potential shelter guests have priority in admission when bed space is limited. Docket 1-3 at 5-6.

To qualify for admission, guests must be homeless, at imminent risk of homelessness, or fleeing domestic violence; be 18 or older; and present as female and have been assigned a female gender identity at birth (i.e., not be transgender). Docket 1-3 at 4-5. Residents must be able to "function in the shelter environment without serious disruption" or posing danger to others; must meet enumerated medical, functional limitation, and hygiene requirements; and must be clean and sober. Docket 1-3 at 4-5. Guests must also agree to perform chores at the shelter; abide by shelter policies, including a curfew; and be open to receiving Christian ministry and Christian teachings that are provided to residents by Hope Center, including group prayer, Bible study, and group devotions. Docket 1-3 at 4-6; Docket 15-4 at 1 ¶¶ 15-17, 20. Women who want to stay at the Hope Center shelter must apply for admission, agree in writing to follow Hope Center policies, and receive advance approval from staff before they can be admitted. Docket 1-3 at 6. Hope Center investigates a person's eligibility under its published criteria and makes admissions decisions based on factors including the personal observations of staff, statements of other shelter guests, medical records, and government records and reports. Docket 1-3 at 6.

**B.      Prior litigation.**

In 2018, a transgender woman filed a complaint with the Anchorage Equal Rights Commission, the municipal body charged with investigation, enforcement, and

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 3 of 35

adjudication of the Municipality's nondiscrimination laws.  AMC § 5.10.020, .040.  The

complainant alleged that she was turned away from Hope Center's shelter because she

was transgender, and that Hope Center thereby violated Anchorage's nondiscrimination

ordinance, which forbade "public accommodations" from discriminating on the basis of

sex or gender identity.  AERC's then-executive director aggressively litigated the case,

even filing a second action against the Hope Center and its legal counsel.

The 2018 matter resulted in federal litigation before this Court. *Downtown Soup

Kitchen v. Municipality of Anchorage*, No. 3:18-cv-00190-SLG. At the time, the

municipal nondiscrimination code was confusingly drafted and organized.  In particular,

the code's Fair Housing Act section contained a provision purporting to exempt homeless

shelters and other institutional businesses from the nondiscrimination code—but because

of the structure of the code, it was unclear how, or if, that exception actually applied to

public accommodations, since the exception was not located in and appeared not to

related to the "public accommodations" provisions.

In preliminary injunction proceedings, looking at the language of Anchorage's

nondiscrimination ordinance, this Court found that despite the unclear structure of the

statute, the homeless shelter exception should apply, and therefore that "Hope Center is

not an 'owner or operator of a public accommodation' within the meaning of

Anchorage's code." *Downtown Soup Kitchen v. Municipality of Anchorage*, 406 F. Supp

3d 776, 796-97 (D. Alaska August 9, 2019). On that basis, this Court issued an order

granting Hope Center's motion for a preliminary injunction against the Municipality. *Id.*

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 4 of 35

The order temporarily enjoined the Municipality from enforcing AMC § 5.20.050 and § 5.20.020 as applied to the provision of overnight living space to homeless persons by Hope Center and its agents, including its right to post its desired and to open its overnight shelter only to persons who were determined to be female at birth. *Id*. at 800. The order also enjoined the Municipality from enforcing AMC § 5.20.050(A)(2)(b) as applied to the right of the Hope Center to post and discuss its desired policies with respect to its overnight homeless shelter. *Id*.

Although Hope Center had argued that the challenged municipal code provisions were unconstitutional as applied to its constitutionally protected activities, this Court did not reach or consider Hope Center's constitutional arguments because it resolved the matter on statutory interpretation. *Id*. at 794. Shortly after the Court ordered the injunction, the parties settled the case; they stipulated to and the court ordered a consent decree in which the Municipality agreed not to enforce the challenged statutory provisions against Hope Center. The Municipality also paid Hope Center $1.00 in damages and $100,000.00 in attorneys' fees and costs. Docket 102, Case No. 3:18-cv-00190-SLG.

**C.  Anchorage's revision of its nondiscrimination code**

The 2018 litigation and resulting consent decree not only resulted in municipal liability in excess of $100,000.00. The proceedings also made clear that part of the problem was that Anchorage's code was poorly and confusingly structured and drafted. After all, the code as then written contained a homeless shelter exception that had a

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 5 of 35

confusing and unclear function because of where it was located within the code, leading

to invalid enforcement efforts and a court ruling adverse to the Municipality. Another

problem identified by the Municipality was the code's lack of sufficient checks and

controls on the AERC Executive Director. (By this time, the AERC director involved in

the 2018 Hope Center litigation was no longer employed by the Municipality.) To

resolve these problems, the Municipality revised Title V, the nondiscrimination title of

the Anchorage Municipal Code.

 The code revision process began in 2019 and was completed in 2021. Docket 1-2

at 1; Affidavit of Mitzi Bolaños Anderson ¶ 2. The revision included both substantive

and procedural changes. The bulk of the changes were procedural, overhauling the

AERC's conciliation, litigation, and hearing procedures. Docket 15-2; Anderson Aff. ¶¶

3-4. Notable changes included increased Commission oversight over the AERC's

Executive Director; with the changes, the AERC director now must seek approval from a

panel of three commissioners before filing a director's charge against a particular

respondent and before commencing a general investigation of a particular respondent.

Anderson Aff. ¶ 4. The revised code includes new procedures for motion practice,

discovery, public hearings, and subpoenas that should significantly improve the AERC

process. Docket 15-2; Anderson Aff. ¶ 3.

 There were substantive changes as well. One significant substantive change was

the deletion of an entire chapter of the old code, the Fair Housing Act. This language

originally had been adopted pursuant to a workshare agreement between the AERC and

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 6 of 35

the U.S. Department of Housing and Urban Development, but the agreement did not materialize. Anderson Aff. ¶ 6. The chapter contained provisions that the federal government wanted to include in local law had the workshare proceeded, but the resulting chapter was not utilized by the AERC and was duplicative and related confusingly to other parts of the code—a structural problem that this Court identified in the prior *Hope Center* litigation. Anderson Aff. ¶ 6. Because the homeless shelter exception—which exempted from the housing code an "establishment of a hospital, convent, monastery, shelter, asylum, or residential facility for the care and lodging of persons in need of special medical, rehabilitative, social, or psychological support, including, but not limited to half-way houses, drug treatment centers, detoxification facilities, and shelters for the homeless, " former AMC 5.25.030A.9—was located within the wholly repealed chapter, it was eliminated as part of that process. Anderson Aff. ¶ 6.  To compensate for deletion of that exception, new exemption language was added to the housing chapter: "This section also does not apply to places which are institutional in nature and for which housing is merely incidental to a broader purpose, such as rehabilitation or medical care. Such institutional places may still be covered under section 36 5.20.050."  Docket 15-2 at 8; *see also* May 25, 2021 Assembly Meeting at 2:48:03, 3:32:18.

Some of Title 5's definitions also were updated, including the definition of "public accommodation." Docket 15-2 at 6; Anderson Aff. ¶ 7. Previously, "public accommodation" was defined to mean "any business or professional activity that is open to, accepts or solicits the patronage of, or caters or offers goods or services to the general

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 7 of 35

public, subject only to the conditions and limitations established by law and applicable alike to all persons."  Former AMC § 5.20.010.  This definition was expanded to include organizations that accept public funds that include contractual obligations to abide by the Municipality's nondiscrimination code.  The word "general" was also added before "public"; one Assembly Member believed that this addition might narrow the category. Docket 15-2 at 6; May 25, 2021 Assembly Meeting at 2:42:19.[1]  The new definition of "public accommodation" is "a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, (1) whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or made available to the general public, or (2) that accepts public funds with non-discrimination contractual requirements."  Docket 15-2 at 6.

Because the code revision was motivated in part by this Court's adverse rulings during the prior Hope Center lawsuit and the resulting liability to the Municipality, the legislative history of the code revision included discussion of both the prior litigation and how the new Code might affect Hope Center going forward.  The Assembly Memorandum introducing the legislation explained that the Code revision would "address legal issues raised by the Downtown Soup Kitchen litigation, which resulted in a $100,001.00 settlement paid by the Municipality."  Docket 1-2 at 3.

---

[1]     The video recording of the Anchorage Assembly's May 25, 2021 meeting—at which the Title 5 code revisions were adopted—is a public record available at https://www.youtube.com/watch?v=cX06vb-mq2Y .  For the Court's convenience, this pleading cites to specific timestamps on the recording.

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 8 of 35

But the legislative history does not reflect an intention to penalize or prosecute Hope Center. Anderson Aff. ¶ 8. To the contrary, during Hope Center Director Sherrie Laurie's Assembly testimony, one Assembly Member went so far as to apologize to her for the prior enforcement action, stating that the 2018 complaints should never have been brought against Hope Center, that part of the problem was the director's excessive discretion, and that the Code revision would correct that problem.  May 25, 2021 Assembly Meeting at 5:22:55.  Another Assembly member similarly assured Ms. Laurie that the procedural changes to the Code would help Hope Center and constitute a step up from the "tenuous" protections in the old Code; he also stated that under the language of the new Code, he believed that Hope center was neither a public accommodation nor covered under the housing discrimination section of the new code.  May 25, 2021 Assembly Meeting at 5:19:19.  With respect to the deletion of the homeless shelter exception, the new AERC director explained that it was removed from the new Code because it was not used and therefore was no longer needed.  She explained that new language exempting institutional actors from the revised housing code would do the work of the former exception. May 25, 2021 Assembly Meeting at 2:48:03, 3:32:18.

The AERC director stopped short of pre-judging theoretical future complaints and definitively opining that a complaint against Hope Center under the new code would or would not be legally viable; she stated that it was unclear whether Hope Center would qualify as a "public accommodation" under the new Code and that determination would likely depend on the specific facts about the shelter's operations at the time.  May 25,

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 9 of 35

2021 Assembly Meeting at 2:49:04. She pointed instead to the public funds language of the new Code as a way to bring homeless shelters within the nondiscrimination umbrella. May 25, 2021 Assembly Meeting at 2:48:38.

At the time that the new Code was adopted on May 25, 2021, courts were divided on whether homeless shelters fell within the category of "public accommodation," and little published case law existed on the subject.[2] *Compare, e.g.*, *Hunter ex rel. A.H. v. D.C.*, 64 F. Supp. 3d 158, 177 (D.D.C. 2014) (homeless shelter is a public accommodation under D.C. code) and *Boykin v. Gray*, 895 F. Supp. 2d 199, 217 n.16 (D.D.C. 2012) ("place of public accommodation" would seem to include homeless shelters) with *Abdus-Sabur v. Hope Village, Inc.*, 221 F. Supp. 3d 3 (D.D.C. 2016) (halfway house is not a public accommodation under D.C. code); *Vega v. United States*, No. C11–632–RSM, 2012 WL 5384735, at *1 (W.D. Wash. Nov. 1, 2012), vacated in part on reconsideration, 2013 WL 1333978, at *1 (W.D. Wash. Apr. 1, 2013) (residential treatment center not a place of public accommodation) and *Intermountain Fair Hous. Council v. Boise Rescue Mission Ministries*, 717 F. Supp. 2d 1101, 1109 (D. Idaho 2010), *aff'd on other grounds*, 657 F.3d 988 (9th Cir. 2011) (homeless shelter is not a dwelling under the FHA).[3] Against this backdrop of conflicting case law, the Ninth Circuit

---

[2] Whether or not a specific entity qualifies as a "public accommodation" in any jurisdiction depends on the specific definition of the term "public accommodation" in that jurisdiction; although most definitions have common core elements, there is no universal definition of "public accommodation" at the local, state, or federal level.

[3] Further adding to the confusion is the fact that Title III of the American with Disabilities Act (ADA) specifically includes homeless shelters in its definitions of public accommodations for purposes of preventing unlawful disability discrimination. 42

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 10 of 35

declined to decide the issue. *Community House, Inc. v. City of Boise* (490 F.3d 1041, 1048 n.2 (9th Cir. 2007) ("We have never squarely addressed the issue of whether all temporary shelters fit within the [Fair Housing] Act's definition of 'dwelling,'. . . nevertheless, we decline to do so here.")

**D.     The United States Supreme Court's decision in *Fulton v. City of Philadelphia*.**

On June 17, 2021, three weeks after the Municipality adopted its revised nondiscrimination code, the United States Supreme Court decided *Fulton v. City of Philadelphia*, 141 U.S. 1868 (2021). Philadelphia had attempted to enforce its nondiscrimination ordinance against Catholic Social Services, a foster care agency that for religious reasons refused to certify same-sex couples as foster parents. *Id.* at 1874-76. The High Court resolved the matter on statutory interpretation, holding that CSS's licensing scheme was not a "public accommodation" within the meaning of the law, placing it outside of the reach of the nondiscrimination law. The Philadelphia ordinance defined "public accommodation" to mean "[a]ny place, provider or public conveyance, whether licensed or not, which solicits or accepts the patronage or trade of the public or whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or otherwise made available to the public." (This is more or less a standard definition; Anchorage's new code similarly defines "public accommodation" in part as "a

_____

U.S.C. § 12181(7)(k).  Finally, the Department of Housing and Urban Development ("HUD"), the federal agency responsible for enforcing the Fair Housing Act, has promulgated a regulation which explicitly identifies "sleeping accommodations in shelters intended for occupancy as a residence for homeless persons" as an example of a "dwelling unit." 24 C.F.R. § 100.201.  *Hunter ex rel. A.H.*, 64 F. Supp. 3d at 175.

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 11 of 35

business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, [] whose goods, services, facilities, privileges, advantages or accommodations are made available to the general public." Docket 15-2 at 6.)

To qualify as a public accommodation under this definition, the court explained, a business "must provide a benefit to the general public allowing individual members of the general public to avail themselves of that benefit if they so desire." *Id.* at 1880 (quotation marks omitted). Classic examples include hotels, restaurants, public transportation, and swimming pools. *Id.* Foster care licensing did not qualify because it was not readily accessible to the public; instead, CSS conducted "a customized and selective assessment that bears little resemblance to staying in a hotel, eating at a restaurant, or riding a bus," including a home study, background check, and inquiries into the applicants' physical and mental health. *Id.* This "uniquely selective nature of the certification process . . . must inform the applicability of the ordinance." *Id.* at 1881. For these reasons, the Court held that the licensing scheme was not a public accommodation, placing CSS outside the reach of Philadelphia's nondiscrimination ordinance. *Id.* at 1880-81. Having so decided, the Court did not reach or adjudicate CSS's claim that the nondiscrimination ordinance was unconstitutional. *Id.* at 1881.

The AERC has not received any complaints against Hope Center under the new code, nor has it initiated any proceedings against Hope Center. Anderson Aff. ¶ 11. There are no pending or threatened enforcement matters. *Id.* Furthermore, the

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 12 of 35

Municipality believes that *Fulton* compels the conclusion that, like Catholic Social

Service's foster care licensing, the Hope Center's provision of overnight shelter services

is not a "public accommodation" within the meaning of the Anchorage Municipal Code.

*Id.* ¶¶ 9, 10, 12. Hope Center rigorously screens applicants for admission—including

reviewing medical records, government records, and conducting witness interviews—and

Hope Center does not admit applicants unless they meet numerous specified criteria,

including being homeless, meeting medical and psychological screening requirements,

and agreeing to participate in Christian ministry, prayer, and Bible study. Docket 1-3 at

4-6. The AERC wants to comply with the law, and therefore has no intention of

prosecuting Hope Center as a public accommodation. Anderson Aff. ¶ 12.

## ARGUMENTS

**A.** **Hope Center lacks standing to seek a preliminary injunction because there is no credible threat of enforcement against it.**

A threshold question is whether Hope Center has standing to seek a preliminary

injunction at all. Because the Municipality has not enforced the new code against Hope

Center and has no intention of doing so, the answer is no. For this reason alone, the

Court should deny the injunction motion.

"[T]he core component of standing is an essential and unchanging part of the case-

or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

560 (1992). The federal court lacks jurisdiction unless the plaintiffs present an actual

"case or controversy." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1152 (9th Cir. 2000) (citing

*Allen v. Wright*, 468 U.S. 737, 750 (1984)). "The party invoking federal jurisdiction

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 13 of 35

bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. "At the preliminary injunction stage, plaintiffs must make a clear showing of each element of standing." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013) (citing *Lujan*, 504 U.S. at 561); *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010).

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560. A plaintiff must show an injury in fact, meaning "an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; a causal connection between the injury and the defendant's conduct; and that "the injury will likely be redressed by a favorable decision." *Townley*, 722 F.3d at 1133 (citing *Lujan*, 504 U.S. at 560–61)).

The AERC has not received any complaints against Hope Center under the newly revised municipal code, nor has it initiated any proceedings against Hope Center. There are no pending or threatened enforcement matters against Hope Center. Anderson Aff. ¶ 11. Thus, this is a pre-enforcement challenge to the law. "[W]hen plaintiffs seek to establish standing to challenge a law or regulation that is not presently being enforced against them, they must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1152 (9th Cir. 2000); *Bland v. Fessler*, 88 F.3d 729, 736–37 (9th Cir.1996) (both quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). The challenger seeking relief must show that it "intends to engage in a course of conduct arguably affected with a constitutional interest and that there is a credible threat that the challenged

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 14 of 35

provision will be invoked against the plaintiff." *LSO*, 205 F.3d at 1154-55 (internal

citations and quotations omitted). "[P]ersons having no fears of state prosecution except

those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs.'"

*LSO* at 1155 (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)).

First Amendment challenges like this one "present unique standing considerations

because of the 'chilling effect of sweeping restrictions' on speech," significantly tilting

the inquiry in favor of standing. *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1171 (9th

Cir. 2018) (quoting *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002,

1006 (9th Cir. 2003)). But even in a First Amendment challenge, plaintiff must show a

credible threat of enforcement. *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010);

*LSO*, 205 F.3d at 1155. To determine the existence of a credible enforcement threat, the

court analyzes three factors: "1) the likelihood that the law will be enforced against the

plaintiff; 2) whether plaintiff has shown, with some degree of concrete detail, that she

intends to violate the challenged law; and 3) whether the law even applies to the

plaintiff." *Italian Colors*, 272 F.3d at 1171-72 *(*citing *Lopez*, 630 F.3d at 786) (internal

quotes omitted). Hope Center cannot make the required showing here.

> **1. AMC § 5.20.050 does not apply to Hope Center's shelter because it is not a public accommodation.**

Looking first to the third factor, *cf Italian Colors*, 272 F.3d at 1172, Hope Center

lacks standing because the laws it wishes the Court to enjoin—newly revised AMC §§

5.20.020 and 5.20.050—do not even apply to its conduct. "[P]laintiffs' claims of future

harm lack credibility when the challenged speech restriction by its terms is not applicable

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 15 of 35

to the plaintiffs." *Lopez*, 630 P.3d at 778. This is so because, "[i]n the free speech context, such a fear of prosecution will only inure if the plaintiff's intended speech arguably falls within the statute's reach." *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003). A plaintiff also does not "demonstrate the necessary injury in fact where the enforcing authority expressly interpreted the challenged law as not applying to the plaintiffs' activities." *Id.* The court may consider whether the law is inapplicable "either by its terms or as interpreted by the government." *Id.* at 786. Both are the case here.

Anchorage Municipal Code § 5.20.050 makes it unlawful, among other things, for a "public accommodation" to discriminate on the basis of sex or gender identity; to publish or circulate a written communication indicating an intent to discriminate on these bases; or to inquire as to protected categories in connection with access or use of facilities and services.[4] But the law only applies to "public accommodations," now defined as ""a

---

[4] AMC § 5.20.050 was not revised in the 2021 Title 5 revision. It reads:
It is unlawful for a person, whether the owner, operator, agent or employee of an owner or operator of a public accommodation, to:
    1.    Refuse, withhold from or deny to a person any of its accommodations, advantages, facilities, benefits, privileges, services or goods of that place on account of race, color, sex, sexual orientation, gender identity, religion, national origin, marital status, age or physical or mental disability.
    2.    Publish, circulate, issue, display, post or mail a written or printed communication, notice or advertisement which states or implies that:
        a.    Any of the services, goods, facilities, benefits, accommodations, advantages or privileges of the public accommodation will be refused, withheld from or denied to a person of a certain race, color, sex, sexual orientation, gender identity, religion, national origin, marital status, age, or physical or mental disability; or
        b.    The patronage or presence of a person belonging to a particular race, color, sex, sexual orientation, gender identity, religion, national origin, marital

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 16 of 35

business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, (1) whose goods, services, facilities, privileges, advantages or accommodations are [extended, offered, sold, or made available to the general public, or (2) that accepts public funds with non-discrimination contractual requirements." Docket 15-2 at 6. The United Supreme Court's recent decision in *Fulton v. City of Philadelphia*, 141 U.S. 1868 (2021), makes clear that Hope Center is not a public accommodation, and this is the AERC's express interpretation of the law—depriving Hope Center of standing in this pre-enforcement challenge.

Even before *Fulton* was issued, it was doubtful that Hope Center's shelter operations fell within the category of public accommodation—indeed, this Court found under the old code that they did not so qualify. *Downtown Soup Kitchen*, 406 F. Supp 3d at 796-97. Further, the legislative history of the 2021 Title V revision also supports the view that the Assembly did not intend for homeless shelters to be considered public accommodations under the revised definition. May 25, 2021 Assembly Meeting at 2:42:19, 2:48:03, 2:52:00, 3:32:18, 5:19:19. But *Fulton* eliminates any doubt, making clear that Hope Center is not a public accommodation and therefore not subject to AMC § 5.20.050.

---

status, age, or physical or mental disability is unwelcome, not desired, not solicited, objectionable or unacceptable.

3.      Make a written or oral inquiry concerning the race, color, sex, sexual orientation, gender identity, religion, national origin, marital status, age, or physical or mental disability of an individual in connection with the solicitation, reservation, booking, sale or dispensing of its accommodations, advantages, facilities, benefits, privileges, services or goods.

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 17 of 35

In *Fulton*, the Supreme Court considered whether a foster care licensing scheme was a "public accommodation" under very similar definition of the term to Anchorage's. To qualify, the court explained, a business "must provide a benefit to the general public allowing individual members of the general public to avail themselves of that benefit if they so desire." *Id.* at 1880 (quotation marks omitted). Classic examples include hotels, restaurants, public transportation, and swimming pools. *Id.* The foster care licensing scheme there at issue did not qualify because it was not readily accessible to the public; instead of opening its doors to the general public, CSS conducted "a customized and selective assessment that bears little resemblance to staying in a hotel, eating at a restaurant, or riding a bus," including a home study, background check, and inquiries into the applicants' physical and mental health. *Id.* For these reasons, the Court held that the licensing scheme was not a public accommodation, placing CSS outside the reach of Philadelphia's nondiscrimination ordinance. *Id.* at 1880-81.

Hope Center too conducts "a customized and selective assessment" of all potential shelter guests before they are allowed to stay at its overnight shelter. Its three-page admissions policies require shelter guests to meet numerous requirements as a prerequisite to admission. Docket 1-3 at 4-6. Hope Center screens guests to ensure they are homeless, at imminent risk of homelessness, or fleeing domestic violence; over the age of 18; and present as female and have been assigned a female gender identity at birth (i.e., not be transgender). Docket 1-3 at 4-5. Hope Center evaluates potential guests to ensure that they can "function in the shelter environment without serious disruption" or

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 18 of 35

posing danger to others; are medically and psychiatrically stable and have adequate functional capacity to be self-sufficient in the shelter environment; and are sober. Docket 1-3 at 4-5. As a condition of admission, guests must also agree to perform chores at the shelter; abide by shelter policies, including a curfew; and be open to receiving Christian ministry and Christian teachings that are provided to residents by Hope Center, including group prayer, Bible study, and group devotions. Docket 1-3 at 4-6; Docket 15-4 at 1 ¶¶ 15-17, 20. Women who want to stay at the Hope Center shelter must apply for admission, agree in writing to follow Hope Center policies, and receive advance approval from staff before they can be admitted. Docket 1-3 at 6.

Although this process is likely less onerous than a foster care home study, it has much more in common with the foster care certification process described in *Fulton* than it does with first-come, first-serve, open access to a public bus or swimming pool. Hope Center shelter admission is *not* "readily accessible to the public" and does not "provide a benefit to the general public allowing individual members of the general public to avail themselves of that benefit if they so desire." *Fulton*, 141 U.S. 1880. Instead, shelter admission is available only to a small subset of the public who meet specified housing status, medical, psychological, gender, religious, and other criteria. Further, unlike a bus, park, or swimming pool that is open to all who arrive, Hope Center actively investigates a person's eligibility under its published criteria and restricts access based on factors including the personal observations of staff, statements of other shelter guests, medical records, and government records and reports. Docket 1-3 at 6. A group that requires

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 19 of 35

access to medical and government records and housing status information, and conducts medical, psychological, sobriety, and fitness evaluations before allowing entry into its facility and access to its services is conducting "a customized and selective assessment that bears little resemblance to staying in a hotel, eating at a restaurant, or riding a bus" and therefore is not a public accommodation. *Fulton*, 141 U.S. 1880.

Because § 5.20.050 applies only to public accommodations, and Hope Center's homeless shelter is not a public accommodation, the law does not apply to Hope Center and therefore does not burden or limit Hope Center's conduct or its First Amendment rights. "[P]laintiffs' claims of future harm" therefore "lack credibility [because] the challenged speech restriction by its terms is not applicable to the plaintiffs." *Lopez*, 630 P.3d at 778.

Similarly, Hope Center lacks standing because "the enforcing authority [has] expressly interpreted the challenged law as not applying to the plaintiffs' activities." *Id.* The AERC's new director explains that she reads *Fulton* "to narrow the category of 'public accommodation' to exclude services that are not readily accessible to the public and instead utilize a customized and selective application or certification process." Anderson Aff. ¶ 9. She concludes that Hope Center is not a public accommodation under Anchorage's code:

> Based on the numerous criteria for admission, the selective nature of the shelter's admission policies, and the required pre-approval process for all potential shelter residents, my view is that, unless it opts to receive public funds with a nondiscrimination requirement, or new federal guidance on the scope of public accommodations is

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 20 of 35

issued, Downtown Hope Center's homeless shelter is not a "public accommodation" under the revised Anchorage Municipal Code.

Anderson Aff. § 10.[5]  Ultimately, under current law, "[b]ecause Hope Center's services fall outside of the scope of the public accommodations category as described by *Fulton*, the AERC has no basis to and does not intend to enforce Title 5's gender identity or sex discrimination provisions against Hope Center's overnight shelter operations."  Anderson Aff. § 12.  These sworn statements illustrate that the AERC has "expressly interpreted the challenged law as not applying to [Hope Center's] activities," depriving it of standing.

> **2.    Because the statute does not apply to Hope Center, it has not and cannot shown that its actions will be in violation of the law.**

The second standing factor is whether Municipality concedes that Hope Center has "shown, with some degree of concrete detail, that she intends to violate the challenged law." *Italian Colors*, 272 F.3d at 1171-72 *(*citing *Lopez*, 630 F.3d at 786).  Hope Center's briefing does describe with concrete detail the conduct it intends to continue at its shelter—including discriminating against transgender women in admissions and posting its discriminatory policies.  These actions would violate AMC § 5.20.050 if Hope Center's shelter were a public accommodation.  But while it has provided detailed descriptions of its conduct, Hope Center has not made any showing that it "intends to

---

[5]    Because this is a pre-enforcement challenge, there is no factual record regarding whether Hope Center has sought or received public funds that would operate to classify it as a public accommodation under the public funds prong of the new public accommodations, but the Municipality does not believe that Hope Center has done so. Hope Center retains control over whether it enters into contracts that obligate it to comply with municipal nondiscrimination requirements.

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 21 of 35

violate the challenged law"—because, as described above, AMC § 5.20.050 does not even apply to Hope Center, since it is not a public accommodation.

3. **Hope Center cannot demonstrate a likelihood that that § 5.20.050 will be enforced against Hope Center.**

Nor can Hope Center show a "likelihood that the law will be enforced against the plaintiff." *Italian Colors*, 272 F.3d at 1171-72 (citing *Lopez*, 630 F.3d at 786). "In evaluating the genuineness of a claimed threat" of government enforcement, the court considers "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000). These factors do not favor Hope Center.

As discussed above, the public accommodations law does not apply to Hope Center and for that reason, Hope Center has not articulated any concrete plan to violate it. Far from communicating a specific threat to enforce against Hope Center, the AERC's new director has clearly indicated the opposite: an intent *not* to prosecute. Anderson Aff. ¶¶ 9-10, 12. This disavowal of prosecutorial intent deprives Hope Center of a "specific and credible" threat of enforcement. *Lopez*, 630 F.3d at 786-87.

Hope Center is not being prosecuted or targeted under the new code. The AERC has not received any complaints against Hope Center under the new code, nor has it initiated any proceedings against Hope Center. There are no pending or threatened enforcement matters. Anderson Aff. ¶ 11. Hope Center will surely point to the

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 22 of 35

enforcement actions leading to the 2018 litigation as evidence of prosecutorial intent; there admittedly is a past enforcement history with the AERC. But the Ninth Circuit has cautioned that the historical enforcement factor should be given "little weight" where, as here, "the challenged law is relatively new and the record contains little information as to enforcement or interpretation." *California Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021) (internal quotes omitted). This caution applies here. Anchorage's Title 5 revision is less than three months old, and there have been no enforcement attempts against Hope Center under it. Anderson Aff. ¶ 11. Furthermore, the leadership of the AERC has changed and the new director has disavowed the intent to prosecute Hope Center under the new code. The governing law on public accommodations too has shifted. All these factors combine to significantly diminish the relevance and weight that the Court should afford pre-2018 enforcement efforts. Hope Center therefore has no standing to seek a preliminary injunction in this pre-enforcement challenge to AMC § 5.20.050.

> **4.**  **Similarly, Hope Center also lacks standing to challenge AMC § 5.20.020 because the ordinance does not apply to Hope Center's overnight shelter.**

Hope Center similarly lacks standing to challenge the constitutionality of AMC § 5.20.020 or obtain an injunction enjoining this law. This ordinance, titled "Unlawful practices in the sale, rental or use of real property," in relevant part makes it unlawful for property owners to, on the basis of a protected class (including sex and gender identity), "1. Refuse to sell, lease or rent, or to otherwise make unavailable, the real property to a

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 23 of 35

person"; "2. Discriminate against a person . . . in a term, condition or privilege relating to the use . . . of real property"; or "7. Circulate, issue or display, make, print or publish, or cause to be made or displayed, printed or published, any communication, sign, notice, statement or advertisement with respect to the use . . . of real property that indicates any preference, limitation, specification or discrimination." Docket 15-2 at 7-8. The substantive provisions of this ordinance were not altered in the 2021 code revision other than to add "familial status" to the list of protected classes. But an additional exception was added to the applicability of this section: AMC § 5.20.020B now provides that "This section also does not apply to places which are institutional in nature and for which housing is merely incidental to a broader purpose, such as rehabilitation or medical care. Such institutional places may still be covered under section 5.20.050 [public accommodations]."

Like AMC § 2.20.050, this ordinance does not apply to Hope Center, and for this reason it faces no credible enforcement threat and lacks standing. This Court has already found that, as a matter of statutory construction, this section does not apply to Hope Center's shelter activities. In the 2018 Hope Center litigation, this Court found that "Hope Center is [] likely to succeed as to its contention that AMC § 5.20.020 does not apply to Hope Center's homeless shelter." *Downtown Soup Kitchen*, 406 F. Supp. 3d. at 795. One basis for that holding was the homeless shelter exception previously codified at AMC § 5.25.030. The homeless shelter exception has been repealed along with the rest of Chapter 5.25, so obviously that aspect of the court's prior no longer is relevant. But

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 24 of 35

this Court also set forth an alternative basis for its statutory holding, one that is unaffected by the code's revision: Citing and quoting *Swanner v. Anchorage Equal Rights Comm'n*, 874 P.2d 274, 280 (Alaska 1994), this Court held that "the Alaska Supreme Court has concluded that '[t]he purpose of AMC 5.20.020 . . . is to prohibit discrimination in the rental housing market.' Applying the provision's prohibitions to Hope Center's homeless shelter would not further this purpose." 406 F. Supp. 3d. at 795. This alternative holding continues to apply with full force to the revised code, compelling the same conclusion: AMC § 5.20.020 does not apply to Hope Center's overnight shelter.

The Assembly's addition of an additional exception to the ordinance –it now does "not apply to places which are institutional in nature and for which housing is merely incidental to a broader purpose, such as rehabilitation or medical care"—illustrates the legislative body's continuing intent to restrict the reach of this law to "discrimination in the retail housing market." And although the record in this pre-enforcement challenge does not include many facts regarding to what extent Hope Center's homeless sheltering is "incidental" to the other aspects of its religious ministry, the exception also may well apply directly to Hope Center. Thus, as with the public accommodation non-discrimination ordinance, Hope Center's "claims of future harm lack credibility [because] the challenged speech restriction by its terms is not applicable to the plaintiffs." *Lopez*, 630 P.3d at 778. Because Hope Center's shelter is not covered by the residential real property nondiscrimination ordinance, the above analysis regarding lack of showing of

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 25 of 35

intent to violate the law and lack of credible enforcement threat applies with equal force to this statute as well.

For all these reasons, this Court should find that Hope Center lacks standing to move for an injunction in its facial, pre-enforcement challenge to AMC § 5.20.020 and 5.20.050. It should deny the motion for preliminary injunction.

**B.      Even if the Court finds that Hope Center has standing to seek an injunction, it should deny the motion because no injunction is warranted.**

Hope Center's lack of standing is jurisdictional; in the absence of a live case or controversy, this Court can and should grant no relief. But even if the Court does find that Hope Center has standing, it should nevertheless deny the request for an injunction. Hope Center is not entitled to injunctive relief under the applicable standards.

**1.      Preliminary injunction standards.**

A party seeking preliminary injunctive relief under Federal Rule of Civil Procedure 65 must establish that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20, (2008)).

"Under the sliding scale approach to preliminary injunctions observed in [the Ninth Circuit], the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another."

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 26 of 35

*Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (citation and internal quotation marks omitted). Even with the sliding-scale approach, "plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." *All. for the Wild Rockies*, 632 F.3d at 1131 (citing *Winter*, 555 U.S. at 22) (emphasis in original)).

The primary purpose of a preliminary injunction is to preserve the *status quo* until the action can be decided on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). It is an extraordinary and drastic remedy that should not be granted unless the movant carries its burden of persuasion by a clear showing. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quotation omitted). Courts therefore should exercise their power to issue preliminary injunctions sparingly. *Id.*

> **2.** **The Court need not and should not reach the merits of Hope Center's constitutional claims because it can and should resolve the issues on statutory interpretation, finding that the revised municipal code does not apply to Hope Center's overnight shelter.**

Hope Center asks this Court to find unconstitutional portions of the Anchorage Municipal Code and enjoin the Municipality from enforcing them. But the doctrine of constitutional avoidance teaches that courts should refrain from rendering a constitutional ruling if a limiting construction of the statute would eliminate the constitutional concerns. "When a federal court is dealing with a federal statute challenged as overbroad, it should, of course, construe the statute to avoid constitutional problems, if the statute is subject to such a limiting construction." *New York v. Ferber*, 458 U.S. 747, 769 n.24 (1982) (citing numerous cases).

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 27 of 35

As discussed above, the AERC has adopted exactly such a limiting construction here: Hope Center's homeless shelter operations do not fall within the reach of the challenged statutory provisions, because Hope Center is not a public accommodation and is not involved with residential real estate transactions. In its 2019 ruling in the prior Hope Center litigation, this Court correctly recognized and applied this principle, limiting its analysis to statutory interpretation in recognition that "[i]t is a well-established principle governing the prudent exercise of [the federal court's] jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Downtown Soup Kitchen*, 406 F. Supp. 3d at 794 (quoting *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) and *Escambia County v. McMillan*, 466 U.S. 48, 51 (1984). It should do the same here, finding that Hope Center is not burdened by the challenged ordinances, resolving the matter on that basis, and therefore declining to reach or decide unnecessary constitutional claims.

3. **Hope Center is not likely to succeed on the merits of its facial constitutional challenge to AMC §§ 5.20.050 and 5.20.020.**

Even if the Court were to reach the constitutional claims, it should find that Hope Center is not likely to succeed on the merits. This is a facial challenge to Anchorage's newly revised nondiscrimination law. The challenge is facial because it looks to the constitutionality of the law in the abstract; it is undisputed that there have been no complaints against Hope Center under the newly revised code, nor is there a pending or

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 28 of 35

threatened enforcement action against Hope Center. Anderson Aff. ¶ 11. Therefore, there is no specific set of facts related to enforcement of the law for this Court to review. Facial challenges are disfavored, *Epona v. County of Ventura*, 876 F.3d 1214, 1220 (9th Cir. 2017), and they are considerably more difficult for plaintiffs to win. But Hope Center fails to acknowledge, let alone satisfy, the more demanding legal standards that apply to facial constitutional challenges.

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully . . . ." *United States v. Salerno*, 481 U.S. 739, 745 (1987). "Normally, a plaintiff bringing a facial challenge must establish that no set of circumstances exists under which the [law] would be valid, or show that the law lacks "a plainly legitimate sweep." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (quoting *Salerno*, 481 U.S. at 745 and *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (citations and internal quotation marks omitted). In First Amendment challenges, courts have recognized "a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Bonta*, 141 S. Ct. at 2387 (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation marks omitted). The overbreadth doctrine is "strong medicine" that is to be used "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). A law is constitutional unless it is "substantially overbroad." *Id*. at 615. To succeed in its challenge, Hope Center must

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 29 of 35

demonstrate from the text of the ordinance and from actual fact that a substantial number of instances exist in which the law cannot be applied constitutionally. *Id.* Hope Center has not and cannot meet these burdens.

Hope Center's briefing focuses exclusively what it sees as constitutional problems that would result from enforcing AMC § 5.20.050 and 5.20.020 against its homeless shelter. But because its challenge is facial, Hope Center cannot succeed without looking beyond the narrowest, most problematic, theoretical applications of the statute. Instead, it must look at the entire universe of possible ways the law could be applied and show that "a substantial number of its applications are unconstitutional." *Id.* Hope Center makes no effort to meet this burden, and cannot do so.

Hope Center focuses on the perceived conflict between its religious freedom, speech, and associational rights and the code's protections against gender identity discrimination. But there are many possible applications of Anchorage's nondiscrimination law that would not impinge upon or even relate to religious freedom, speech, or other First Amendment concerns. It is well-settled black letter law that public accommodation laws applied neutrally[6] are constitutional efforts by states to eliminate unlawful discrimination. *See, e.g., Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Boston*, 515 U.S. 557, 572 (1995) ("Provisions like these are well within the State's usual power to enact when a legislature has reason to believe that a given group is

---

[6]     Hope Center's suggestion that Anchorage's code revision is not neutral is based on its misleading and unsupported view of the legislative history in this case. PI Motion at 11. In any case, in a facial challenge like this one, plaintiff must do more than point to one potentially unconstitutional application of the law.

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 30 of 35

the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments."); *New York State Club Assn., Inc. v. City of New York*, 487 U.S. 1, 11–16 (1988); *Roberts v. United States Jaycees*, 468 U.S., at 624–626; *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 258–262 (1964); *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719,1728 (2018) ("It is unexceptional that Colorado law can protect gay persons, just as it can protect other classes of individuals, in acquiring whatever products and services they choose on the same terms and conditions as are offered to other members of the public. And there are no doubt innumerable goods and services that no one could argue implicate the First Amendment.").

AMC § 5.20.050A.2 and AMC § 5.20.20A.7 do directly govern speech. AMC § 5.20.050A.2 prohibits public accommodations from publishing communications stating or implying that a person is "unwelcome, not desired, not solicited, objectionable or unacceptable" based on that person's protected class, including gender identity; AMC § 5.20.20A.7 similarly prevents such communications with respect to residential real property.  In general, businesses or organizations that fall within the jurisdiction of the AERC are prohibited from expressing an intent to deny services based on gender identity because the First Amendment does not protect unlawful sex discrimination. Thus, these provisions merely prohibits communication promoting unlawful activity, including unlawful discrimination.  Hope Center's facial challenge to AMC § 5.20.050(A)(2)(b) fails. *See Pittsburgh Press*, 413 U.S. at 389 (commercial advertising is not protected

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 31 of 35

where "the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity").

Nor is AMC § 5.20.050A unconstitutionally overbroad, because its "application to protected speech [is not] substantial . . . relative to the scope of the law's plainly legitimate applications." *Virginia v. Hicks*, 539 U.S. 113, 119–20 (2003) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 615 (1973)). Even assuming this provision, when read alone or applied to Hope Center, might unconstitutionally restrict speech, when the ordinance is read as a whole, it is primarily focused on access to goods and services. *See, e.g., 303 Creative LLC v. Elenis*, __ F. 4th __, No. 19-1413, 2021 WL 3157635, at *17 (10th Cir. July 26, 2021). Thus, in a case like the one here, "whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Broadrick*, 413 U.S. at 615–16. Any alleged First Amendment violations that may occur at some point in the future are better addressed on their own facts, and do not warrant the "strong medicine" of the overbreadth doctrine. *Broadrick*, 413 U.S. at 613.

Indeed, as discussed above, the ordinances that Hope Center challenges do not even apply to its overnight shelter because it is neither a public accommodation nor involved in residential real estate transactions. Accordingly, Hope Center has not identified *any* public accommodations for whom the antidiscrimination provisions will impair their ability to associate together or to advocate public or private viewpoints—not even itself. Hope Center has not shown that AMC § 5.20.050A.2 threatens to undermine

**Commented [A1]:** FYI

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 32 of 35

the associational or expressive purposes of any public accommodation, let alone a substantial number of them.  This provision is therefore not substantially overbroad; "whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied."  *Broadrick*, 413 U.S. at 615–16.

Anchorage's nondiscrimination ordinance is not unusual in any obvious way.  It does not, on its face, target speech or discriminate on the basis of its content, the focal point of its prohibition being rather on the act of discriminating against individuals in the provision of publicly available goods, privileges, and services on the proscribed grounds. *See Hurley*, 515 U.S. at 572.  This Court should decline to fine Anchorage's nondiscrimination laws facially unconstitutional.

Finally, Although the AERC may not be empowered to consider the constitutionality of the ordinance under which it operates, under accepted legal principles it would be quite unusual if the Commission "could not construe its own statutory mandate in the light of federal constitutional principles."  *Ohio Civil Rights Comm'n v. Dayton Christian Schools*, 477 U.S. 619, 629 (1986).  And even if this were also true, nothing in the ordinance purports to preclude judicial review of constitutional claims that may be raised on appeal from the administrative enforcement proceedings. *See id.* at 629. These opportunities for public accommodations to contest the constitutionality of the ordinance as it may be applied against them are adequate to assure that any overbreadth under the ordinance will be curable through case-by-case analysis of specific facts.

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 33 of 35

For all of the above reasons, AMC §05.20.050 and AMC § 5.20.020 are constitutional on their face and should be upheld in their entirety.

**C.     The balance of the equities favors the Municipality.**

Finally, the balance of equities favors the Municipality.  Because the challenged ordinances do not apply to Hope Center and the AERC therefore has committed not to enforce them against Hope Center, plaintiff is not threatened with any injury, irreparable or otherwise.  It is exempt from the provisions about which it complains and thus its speech, religious, and associational rights are not limited or chilled.

Because there is no enforcement threat, an injunction is not necessary to protect Hope Center or preserve the status quo, and would serve no purpose.  In contrast, needlessly enjoining Anchorage's neutral and generally applicable nondiscrimination ordinances would strongly disserve the public interest.  The city has a compelling interest in eliminating sex discrimination and protecting all Anchorage residents from invidious discrimination in public accommodations and in housing.  *E.g., Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) ("We are persuaded that Minnesota's compelling interest in eradicating discrimination against its female citizens justifies the impact that application of the statute to the Jaycees may have on the male members' associational freedoms.").  It would do a terrible disservice to all of Anchorage for the Court to disallow the AERC from continuing to protect the public from discrimination—because of a theoretical constitutional problem that has not and will not come to pass given that plaintiff is exempt from the law about which it complains.

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG

## CONCLUSION

There is no problem for the Court to solve here. The Municipality has made no efforts to apply its revised nondiscrimination code to the Hope Center and has no plans to do so, because it believes that the law does not even apply to Hope Center's shelter operations as a matter of statutory construction. For this reason, Hope Center lacks standing to seek the injunction. Even if it had standing, it cannot succeed on the merits of its facial constitutional claims because there are numerous constitutional applications of the law. Nor would the public interest be served by an order preventing the Municipality from continuing to combat discrimination. This Court should deny plaintiff's motion for a preliminary injunction.

Respectfully submitted this 16th day of August, 2021.

PATRICK N. BERGT
Municipal Attorney

By: s/Ruth Botstein, s/ Meagan Carmichael
    Ruth Botstein (AK Bar No. 9906016)
    Meagan Carmichael (AK Bar No. 1011071)
    Assistant Municipal Attorneys
    Municipal Attorney's Office
    P.O. Box 196650
    Anchorage, Alaska 99519-6650
    Phone: (907) 343-4545
    Fax: (907) 343-4550
    Email: uslit@muni.org

Certificate of Service
The undersigned hereby certifies that on August 16, 2021, a true and correct copy of the foregoing was served by electronic means through the ECF system.

s/ Amber J. Cummings
Amber J. Cummings, Legal Secretary
Municipal Attorney's Office

Opposition to Motion for Preliminary Injunction
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 35 of 35