Ruth Botstein
Meagan Carmichael
Assistant Municipal Attorney
Municipal Attorney's Office
P.O. Box 196650
Anchorage, Alaska 99519-6650
Phone: (907) 343-4545
Fax: (907) 343-4550
Email: uslit@muni.org

Attorneys for Defendants Municipality of Anchorage, Anchorage Equal Rights
Commission, and Mitzi Bolaños Anderson in her Official Capacity as the Executive
Director of the Anchorage Equal Rights Commission

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| THE DOWNTOWN SOUP KITCHEN d/b/a DOWNTOWN HOPE CENTER, <br><br> Plaintiff, <br><br> vs. <br><br> MUNICIPALITY OF ANCHORAGE, ANCHORAGE EQUAL RIGHTS COMMISION, and MITZI BOLAÑOS ANDERSON, in her Official Capacity as the Executive Director of the Anchorage Equal Rights Commission, <br><br> Defendants. | Case No. 3:21-cv-00155 SLG |

## <u>DEFENDANTS' 12(b)(1) MOTION TO DISMISS FOR LACK OF STANDING</u>

Plaintiff Downtown Hope Center has filed a facial, pre-enforcement challenge to
Anchorage, Alaska's recently revised non-discrimination ordinance. Hope Center's
complaint alleges that the ordinance unconstitutionally requires its homeless shelter to

admit transgender women. But defendants Municipality of Anchorage, Anchorage Equal Rights Commission, and Mitzi Bolaños Anderson in her Official Capacity as the Executive Director of the Anchorage Equal Rights Commission (collectively, Municipality or MOA) have not applied the ordinance to Hope Center and have no plans or intention to do so. Recent Supreme Court jurisprudence makes clear that Downtown Hope Center's homeless shelter is not a "public accommodation" under the language of the newly revised ordinance; its operations therefore fall outside of the nondiscrimination provisions about which Hope Center complains. Because there is no credible threat that this law will be enforced against it, plaintiff lacks Article III standing to sue, and this Court should dismiss the case.

## STATEMENT OF FACTS[1]

### A.     Downtown Hope Center's shelter operations

Downtown Hope Center is a non-profit religious ministry located in Anchorage, Alaska. Hope Center provides meals, showers, laundry services, clothing, job training, and religious instruction to homeless and low-income families; it also operates an overnight shelter for homeless women. Docket 1 at ¶ 2; Docket 15-4 at ¶¶ 3-4, 6. Not all women may stay at the shelter, however; Hope Center's published policies explain that "[b]ecause of limited resources and limited space and because of its mission to serve and

---

[1]     The legal and factual analysis contained in this 12(b)(1) motion is extremely similar to the standing argument in defendants' recently-filed opposition to motion for preliminary injunction at Docket 27. Although it is admittedly somewhat duplicative, Defendants are restating their pertinent arguments here in order to ensure there is a clear and complete record on both motions and to avoid the need for extensive cross-references between pleadings.

empower those most in need, the Center cannot accept everyone, a large portion of the public, or even a large portion of those in need of transient overnight housing." Docket 1-3 at 4. Hope Center's three-page "admissions criteria" require shelter guests to meet numerous requirements to gain admission to the shelter. Docket 1-3 at 4-6. These policies also specify which potential shelter guests have priority in admission when bed space is limited. Docket 1-3 at 5-6.

To qualify for admission, guests must be homeless, at imminent risk of homelessness, or fleeing domestic violence; be 18 or older; and present as female and have been assigned a female gender identity at birth (i.e., not be transgender). Docket 1-3 at 4-5. Residents must be able to "function in the shelter environment without serious disruption" or posing danger to others; must meet enumerated medical, functional limitation, and hygiene requirements; and must be clean and sober. Docket 1-3 at 4-5. Guests must also agree to perform chores at the shelter; abide by shelter policies, including a curfew; and be open to receiving Christian ministry and Christian teachings that are provided to residents by Hope Center, including group prayer, Bible study, and group devotions. Docket 1-3 at 4-6; Docket 15-4 at 1 ¶¶ 15-17, 20. Women who want to stay at the Hope Center shelter must apply for admission, agree in writing to follow Hope Center policies, and receive advance approval from staff before they can be admitted. Docket 1-3 at 6. Hope Center investigates a person's eligibility under its published criteria and makes admissions decisions based on factors including the personal

Defendants' 12(b)(1) Motion To Dismiss For Lack Of Standing
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 3 of 29

Case 3:21-cv-00155-SLG   Document 28   Filed 08/23/21   Page 3 of 29

observations of staff, statements of other shelter guests, medical records, and government records and reports. Docket 1-3 at 6.

## B. Prior litigation

In 2018, a transgender woman filed a complaint with the Anchorage Equal Rights Commission, the municipal body charged with investigation, enforcement, and adjudication of the Municipality's nondiscrimination laws. AMC § 5.10.020, .040. The complainant alleged that she was turned away from Hope Center's shelter because she was transgender, and that Hope Center thereby violated Anchorage's nondiscrimination ordinance, which forbade "public accommodations" from discriminating on the basis of sex or gender identity. AERC's then-executive director aggressively litigated the case, even filing a second action against the Hope Center and its legal counsel.

The 2018 matter resulted in federal litigation before this Court. *Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:18-cv-00190-SLG. At the time, the municipal nondiscrimination code was confusingly drafted and organized. In particular, the code's Fair Housing Act section contained a provision purporting to exempt homeless shelters and other institutional businesses from the nondiscrimination code—but because of the structure of the code, it was unclear how, or if, that exception actually applied to public accommodations, since the exception was not located in and appeared not to related to the "public accommodations" provisions.

In preliminary injunction proceedings, looking at the language of Anchorage's nondiscrimination ordinance, this Court found that despite the unclear structure of the

Defendants' 12(b)(1) Motion To Dismiss For Lack Of Standing
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 4 of 29

Case 3:21-cv-00155-SLG   Document 28   Filed 08/23/21   Page 4 of 29

statute, the homeless shelter exception should apply, and therefore that "Hope Center is not an 'owner or operator of a public accommodation' within the meaning of Anchorage's code." *Downtown Soup Kitchen v. Municipality of Anchorage*, 406 F. Supp 3d 776, 796-97 (D. Alaska August 9, 2019). On that basis, this Court issued an order granting Hope Center's motion for a preliminary injunction against the Municipality. *Id.* The order temporarily enjoined the Municipality from enforcing AMC § 5.20.050 and § 5.20.020 as applied to the provision of overnight living space to homeless persons by Hope Center and its agents, including its right to post its desired and to open its overnight shelter only to persons who were determined to be female at birth. *Id*. at 800. The order also enjoined the Municipality from enforcing AMC § 5.20.050(A)(2)(b) as applied to the right of the Hope Center to post and discuss its desired policies with respect to its overnight homeless shelter. *Id*.

Although Hope Center had argued that the challenged municipal code provisions were unconstitutional as applied to its constitutionally protected activities, this Court did not reach or consider Hope Center's constitutional arguments because it resolved the matter on statutory interpretation. *Id.* at 794. Shortly after the Court ordered the injunction, the parties settled the case; they stipulated to and the court ordered a consent decree in which the Municipality agreed not to enforce the challenged statutory provisions against Hope Center. The Municipality also paid Hope Center $1.00 in damages and $100,000.00 in attorneys' fees and costs. Docket 102, Case No. 3:18-cv-00190-SLG.

Defendants' 12(b)(1) Motion To Dismiss For Lack Of Standing
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 5 of 29

Case 3:21-cv-00155-SLG   Document 28   Filed 08/23/21   Page 5 of 29

**C.      Anchorage's revision of its nondiscrimination code**

The 2018 litigation and resulting consent decree not only resulted in municipal liability in excess of $100,000.00.  The proceedings also made clear that part of the problem was that Anchorage's code was poorly and confusingly structured and drafted. After all, the code as then written contained a homeless shelter exception that had a confusing and unclear function because of where it was located within the code, leading to invalid enforcement efforts and a court ruling adverse to the Municipality.  Another problem identified by the Municipality was the code's lack of sufficient checks and controls on the AERC Executive Director.  (By this time, the AERC director involved in the 2018 Hope Center litigation was no longer employed by the Municipality.)   To resolve these problems, the Municipality revised Title V, the nondiscrimination title of the Anchorage Municipal Code.

The code revision process began in 2019 and was completed in 2021.  Docket 1-2 at 1; Docket 27-1 (Affidavit of Mitzi Bolaños Anderson) ¶ 2.  The revision included both substantive and procedural changes.   The bulk of the changes were procedural, overhauling the AERC's conciliation, litigation, and hearing procedures. Docket 15-2; Docket 27-1 ¶¶ 3-4. Notable changes included increased Commission oversight over the AERC's Executive Director; with the changes, the AERC director now must seek approval from a panel of three commissioners before filing a director's charge against a particular respondent and before commencing a general investigation of a particular respondent. Docket 27-1 ¶ 4. The revised code includes new procedures for motion

practice, discovery, public hearings, and subpoenas that should significantly improve the AERC process. Docket 15-2; Docket 27-1 ¶ 3.

There were substantive changes as well. One significant substantive change was the deletion of an entire chapter of the old code, the Fair Housing Act. This language originally had been adopted pursuant to a workshare agreement between the AERC and the U.S. Department of Housing and Urban Development, but the agreement did not materialize. Docket 27-1 ¶ 6. The chapter contained provisions that the federal government wanted to include in local law had the workshare proceeded, but the resulting chapter was not utilized by the AERC and was duplicative and related confusingly to other parts of the code—a structural problem that this Court identified in the prior *Hope Center* litigation. Docket 27-1 ¶ 6. Because the homeless shelter exception—which exempted from the housing code not only homeless shelters, but any "establishment of a hospital, convent, monastery, shelter, asylum, or residential facility for the care and lodging of persons in need of special medical, rehabilitative, social, or psychological support, including, but not limited to half-way houses, drug treatment centers, detoxification facilities, and shelters for the homeless, " former AMC 5.25.030A.9—was located within the wholly repealed chapter, it was eliminated as part of that process. Docket 27-1 ¶ 6. To compensate for deletion of that exception, new exemption language was added to the remaining housing chapter: "This section also does not apply to places which are institutional in nature and for which housing is merely incidental to a broader purpose, such as rehabilitation or medical care. Such institutional places may still be

covered under section 36 5.20.050." Docket 15-2 at 8; *see also* May 25, 2021 Assembly Meeting at 2:48:03, 3:32:18.[2]

Some of Title 5's definitions also were updated, including the definition of "public accommodation." Docket 15-2 at 6; Docket 27-1 ¶ 7. Previously, "public accommodation" was defined to mean "any business or professional activity that is open to, accepts or solicits the patronage of, or caters or offers goods or services to the general public, subject only to the conditions and limitations established by law and applicable alike to all persons." Former AMC § 5.20.010. This definition was expanded to include organizations that accept public funds that include contractual obligations to abide by the Municipality's nondiscrimination code. The word "general" was also added before "public"; one Assembly Member believed that this addition might narrow the category. Docket 15-2 at 6; May 25, 2021 Assembly Meeting at 2:42:19. The new definition of "public accommodation" is "a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, (1) whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or made available to the general public, or (2) that accepts public funds with non-discrimination contractual requirements." Docket 15-2 at 6.

---

[2] The video recording of the Anchorage Assembly's May 25, 2021 meeting—at which the Title 5 code revisions were adopted—is a public record available at https://www.youtube.com/watch?v=cX06vb-mq2Y (last visited Aug. 20, 2021). For the Court's convenience, this pleading cites to specific timestamps on the recording.

Defendants' 12(b)(1) Motion To Dismiss For Lack Of Standing
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 8 of 29

Case 3:21-cv-00155-SLG   Document 28   Filed 08/23/21   Page 8 of 29

Because the code revision was motivated in part by this Court's adverse rulings during the prior Hope Center lawsuit and the resulting liability to the Municipality, the legislative history of the code revision included discussion of both the prior litigation and how the new Code might affect Hope Center going forward. The Assembly Memorandum introducing the legislation explained that the Code revision would "address legal issues raised by the Downtown Soup Kitchen litigation, which resulted in a $100,001.00 settlement paid by the Municipality." Docket 1-2 at 3.

But the legislative history does not reflect an intention to penalize or prosecute Hope Center. Docket 27-1 ¶ 8. To the contrary, during Hope Center Director Sherrie Laurie's Assembly testimony, one Assembly Member went so far as to apologize to her for the prior enforcement action, stating that the 2018 complaints should never have been brought against Hope Center, that part of the problem was the director's excessive discretion, and that the Code revision would correct that problem. May 25, 2021 Assembly Meeting at 5:22:55. Another Assembly member similarly assured Ms. Laurie that the procedural changes to the Code would help Hope Center and constitute a step up from the "tenuous" protections in the old Code; he also stated that under the language of the new Code, he believed that Hope center was neither a public accommodation nor covered under the housing discrimination section of the new code. May 25, 2021 Assembly Meeting at 5:19:19. With respect to the deletion of the homeless shelter exception, the new AERC director explained that it was removed from the new Code because it was not used and therefore was no longer needed. She explained that the new

Defendants' 12(b)(1) Motion To Dismiss For Lack Of Standing
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 9 of 29

Case 3:21-cv-00155-SLG   Document 28   Filed 08/23/21   Page 9 of 29

language exempting institutional actors from the housing code would do the work the former exception was intended to do. May 25, 2021 Assembly Meeting at 2:48:03, 3:32:18.

The AERC director stopped short of pre-judging theoretical future complaints and definitively opining that a complaint against Hope Center under the new code would or would not be legally viable; she stated that it was unclear whether Hope Center would qualify as a "public accommodation" under the new Code and that determination would likely depend on the specific facts about the shelter's operations at the time. May 25, 2021 Assembly Meeting at 2:49:04. She pointed instead to the public funds language of the new Code as a way to bring homeless shelters within the nondiscrimination umbrella. May 25, 2021 Assembly Meeting at 2:48:38.

At the time that the new Code was adopted on May 25, 2021, courts were divided on whether homeless shelters fell within the category of "public accommodation," and little published case law existed on the subject.[3] *Compare, e.g.*, *Hunter ex rel. A.H. v. D.C.*, 64 F. Supp. 3d 158, 177 (D.D.C. 2014) (homeless shelter is a public accommodation under D.C. code) and *Boykin v. Gray*, 895 F. Supp. 2d 199, 217 n.16 (D.D.C. 2012) ("place of public accommodation" would seem to include homeless shelters) with *Abdus-Sabur v. Hope Village, Inc.*, 221 F. Supp. 3d 3 (D.D.C. 2016)

---

[3]     Whether or not a specific entity qualifies as a "public accommodation" in any jurisdiction depends on the specific definition of the term "public accommodation" in that jurisdiction; although most definitions have common core elements, there is no universal definition of "public accommodation" at the local, state, or federal level.

Defendants' 12(b)(1) Motion To Dismiss For Lack Of Standing
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 10 of 29

(halfway house is not a public accommodation under D.C. code); *Vega v. United States*, No. C11–632–RSM, 2012 WL 5384735, at *1 (W.D. Wash. Nov. 1, 2012), vacated in part on reconsideration, 2013 WL 1333978, at *1 (W.D. Wash. Apr. 1, 2013) (residential treatment center not a place of public accommodation) and *Intermountain Fair Hous. Council v. Boise Rescue Mission Ministries*, 717 F. Supp. 2d 1101, 1109 (D. Idaho 2010), *aff'd on other grounds*, 657 F.3d 988 (9th Cir. 2011) (homeless shelter is not a dwelling under the FHA).[4]   Against this backdrop of conflicting case law, the Ninth Circuit declined to decide the issue.  *Community House, Inc. v. City of Boise* (490 F.3d 1041, 1048 n.2 (9th Cir. 2007) ("We have never squarely addressed the issue of whether all temporary shelters fit within the [Fair Housing] Act's definition of 'dwelling,'. . . nevertheless, we decline to do so here.")

**D.     The United States Supreme Court's decision in *Fulton v. City of Philadelphia***

On June 17, 2021, three weeks after the Municipality adopted its revised nondiscrimination code, the United States Supreme Court decided *Fulton v. City of Philadelphia*, 141 U.S. 1868 (2021). Philadelphia had attempted to enforce its nondiscrimination ordinance against Catholic Social Services, a foster care agency that

---

[4]      Further adding to the confusion is the fact that Title III of the American with Disabilities Act (ADA) specifically includes homeless shelters in its definitions of public accommodations for purposes of preventing unlawful disability discrimination.   42 U.S.C. § 12181(7)(k).   Finally, the Department of Housing and Urban Development ("HUD"), the federal agency responsible for enforcing the Fair Housing Act, has promulgated a regulation which explicitly identifies "sleeping accommodations in shelters intended for occupancy as a residence for homeless persons" as an example of a "dwelling unit." 24 C.F.R. § 100.201.  *Hunter ex rel. A.H.,* 64 F. Supp. 3d at 175.

for religious reasons refused to certify same-sex couples as foster parents. *Id.* at 1874-76. The High Court resolved the matter on statutory interpretation, holding that CSS's licensing scheme was not a "public accommodation" within the meaning of the law, placing it outside of the reach of the nondiscrimination law. The Philadelphia ordinance defined "public accommodation" to mean "[a]ny place, provider or public conveyance, whether licensed or not, which solicits or accepts the patronage or trade of the public or whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or otherwise made available to the public." (This is more or less a standard definition; Anchorage's new code similarly defines "public accommodation" in part as "a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, [] whose goods, services, facilities, privileges, advantages or accommodations are made available to the general public." Docket 15-2 at 6.)

To qualify as a public accommodation under this definition, the court explained, a business "must provide a benefit to the general public allowing individual members of the general public to avail themselves of that benefit if they so desire." *Id.* at 1880 (quotation marks omitted). Classic examples include hotels, restaurants, public transportation, and swimming pools. *Id.* Foster care licensing did not qualify because it was not readily accessible to the public; instead, CSS conducted "a customized and selective assessment that bears little resemblance to staying in a hotel, eating at a restaurant, or riding a bus," including a home study, background check, and inquiries into

Defendants' 12(b)(1) Motion To Dismiss For Lack Of Standing
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 12 of 29

Case 3:21-cv-00155-SLG   Document 28   Filed 08/23/21   Page 12 of 29

the applicants' physical and mental health. *Id.* This "uniquely selective nature of the certification process . . . must inform the applicability of the ordinance." *Id.* at 1881. For these reasons, the Court held that the licensing scheme was not a public accommodation, placing CSS outside the reach of Philadelphia's nondiscrimination ordinance. *Id.* at 1880-81. Having so decided, the Court did not reach or adjudicate CSS's claim that the nondiscrimination ordinance was unconstitutional. *Id.* at 1881.

The AERC has not received any complaints against Hope Center under the new code, nor has it initiated any proceedings against Hope Center. Docket 27-1 ¶ 11. There are no pending or threatened enforcement matters. *Id.* Furthermore, the Municipality believes that *Fulton* compels the conclusion that, like Catholic Social Service's foster care licensing, the Hope Center's provision of overnight shelter services is not a "public accommodation" within the meaning of the Anchorage Municipal Code. Docket 27-1 ¶¶ 9, 10, 12. Hope Center rigorously screens applicants for admission—including reviewing medical records, government records, and conducting witness interviews—and Hope Center does not admit applicants unless they meet numerous specified criteria, including being homeless, meeting medical and psychological screening requirements, and agreeing to participate in Christian ministry, prayer, and Bible study. Docket 1-3 at 4-6. The AERC wants to comply with the law, and therefore has no intention of prosecuting Hope Center as a public accommodation. Docket 27-1 ¶ 12.

Defendants' 12(b)(1) Motion To Dismiss For Lack Of Standing
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 13 of 29

Case 3:21-cv-00155-SLG   Document 28   Filed 08/23/21   Page 13 of 29

### E.    Hope Center's Complaint

Hope Center filed this suit in June, 2021.  Its complaint asserts that Anchorage "designed and enacted AO2021-03 to target Hope Center" and that the newly revised ordinance applies to Hope Center even though the "Hope Center women's shelter should not be considered a 'public accommodation."  Docket 1 at ¶¶ 110-12; *see also id.* at ¶¶ 104, 106-09.  Operating under the assumption that the new law applies to its overnight shelter operations, Hope Center alleges that it intends to violate newly revised AMC §§ 5.20.020 and 5.20.050 by continuing to exclude transgender women from the shelter, and that it wants to post its discriminatory admissions policies on site. Docket 1 at ¶¶ 117, 122, 126-29, 131.  Hope Center alleges that the newly revised ordinance violates its First Amendment rights to free exercise of religion, association, and speech and violates procedural due process.  It seeks preliminary and permanent injunctive relief, declaratory judgment, and compensatory and nominal damages, including attorney's fees. Docket 1 at 38-39.

## MOTION TO DISMISS STANDARDS

Pursuant to Federal Rule of Civil Procedure 12(b), a party raising certain defenses may raise them in a motion to dismiss filed in lieu of an answer.  Defendants assert such a defense here, lack of subject matter jurisdiction. This defense sounds under Rule 12(b)(1).

Federal court jurisdiction "depends on the existence of a 'case or controversy' under Article III of the Constitution." *Indep. Living Ctr. of S. California, Inc. v. Maxwell-*

*Jolly*, 590 F.3d 725, 727 (9th Cir. 2009). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The federal court lacks jurisdiction unless the plaintiffs present an actual "case or controversy." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1152 (9th Cir. 2000) (citing *Allen v. Wright*, 468 U.S. 737, 750 (1984)). Whether a live controversy exists depends on whether [a court] can grant effective relief" to plaintiff. *Kokkonen*, 511 U.S. at 377*; NASD Disp. Resol., Inc. v. Jud. Council of State of Cal.*, 488 F.3d 1065, 1068 (9th Cir. 2007).

Plaintiffs always bear the burden to demonstrate that the federal court possesses subject matter jurisdiction over their claims. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994); *see also Lujan*, 504 U.S. at 561 ("The party invoking federal jurisdiction bears the burden of establishing these elements.").

A motion to dismiss under 12(b)(6) normally must be decided based solely on the sufficiency of the complaint without reference to evidence beyond the four corners of the complaint, but this is not the case when lack of subject matter jurisdiction is asserted under Rule 12(b)(1). "Unlike a Rule 12(b)(6) motion, a Rule 12(b)(1) motion can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency, and in so doing rely on affidavits or any other evidence properly before the court." *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989). Such a showing then requires the plaintiff to produce evidence of the court's jurisdiction. *Id.* "The district court

Defendants' 12(b)(1) Motion To Dismiss For Lack Of Standing
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 15 of 29

Case 3:21-cv-00155-SLG   Document 28   Filed 08/23/21   Page 15 of 29

obviously does not abuse its discretion by looking to this extra-pleading material in deciding the issue, even if it becomes necessary to resolve factual disputes." *Id.*

**ARGUMENTS**

**A.    Hope Center lacks Article III standing because there is no credible threat of enforcement against it.**

Because the Municipality has not enforced the new code against Hope Center and has no intention of doing so, Hope Center lacks standing to bring this action.  The Court therefore should dismiss plaintiffs' complaint.

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560.  A plaintiff must show an injury in fact, meaning "an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; a causal connection between the injury and the defendant's conduct; and the likelihood that "the injury will likely be redressed by a favorable decision."  *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013) (citing *Lujan*, 504 U.S. at 560–61).

The AERC has not received any complaints against Hope Center under the newly revised municipal code, nor has it initiated any proceedings against Hope Center. There are no pending or threatened enforcement matters against Hope Center. Docket 27-1 ¶ 11. Thus, this is a pre-enforcement challenge to the law.  "[W]hen plaintiffs seek to establish standing to challenge a law or regulation that is not presently being enforced against them, they must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1152 (9th Cir.

2000); *Bland v. Fessler*, 88 F.3d 729, 736–37 (9th Cir.1996) (both quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). The challenger seeking relief must show that it "intends to engage in a course of conduct arguably affected with a constitutional interest and that there is a credible threat that the challenged provision will be invoked against the plaintiff." *LSO*, 205 F.3d at 1154-55 (internal citations and quotations omitted). "[P]ersons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs.'" *LSO* at 1155 (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)).

First Amendment challenges like this one "present unique standing considerations because of the 'chilling effect of sweeping restrictions' on speech," significantly tilting the inquiry in favor of standing. *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1171 (9th Cir. 2018) (quoting *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003)). But even in a First Amendment challenge, plaintiff must show a credible threat of enforcement. *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010); *LSO*, 205 F.3d at 1155. To determine the existence of a credible enforcement threat, the court analyzes three factors: "1) the likelihood that the law will be enforced against the plaintiff; 2) whether plaintiff has shown, with some degree of concrete detail, that she intends to violate the challenged law; and 3) whether the law even applies to the plaintiff." *Italian Colors*, 272 F.3d at 1171-72 *(*citing *Lopez*, 630 F.3d at 786) (internal quotes omitted). Hope Center cannot make the required showing here. Accordingly, it lacks standing, and the Court should dismiss the case.

Defendants' 12(b)(1) Motion To Dismiss For Lack Of Standing
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 17 of 29

Case 3:21-cv-00155-SLG   Document 28   Filed 08/23/21   Page 17 of 29

**1. AMC § 5.20.050 does not apply to Hope Center's shelter because it is not a public accommodation.**

Looking first to the third factor, *cf Italian Colors*, 272 F.3d at 1172, Hope Center lacks standing because the laws it wishes the Court to enjoin—newly revised AMC §§ 5.20.020 and 5.20.050—do not even apply to its conduct. "[P]laintiffs' claims of future harm lack credibility when the challenged speech restriction by its terms is not applicable to the plaintiffs." *Lopez*, 630 P.3d at 778. This is so because, "[i]n the free speech context, such a fear of prosecution will only inure if the plaintiff's intended speech arguably falls within the statute's reach." *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003). A plaintiff also does not "demonstrate the necessary injury in fact where the enforcing authority expressly interpreted the challenged law as not applying to the plaintiffs' activities." *Id.* The court may consider whether the law is inapplicable "either by its terms or as interpreted by the government." *Id.* at 786. Both are the case here.

Anchorage Municipal Code § 5.20.050 makes it unlawful, among other things, for a "public accommodation" to discriminate on the basis of sex or gender identity; to publish or circulate a written communication indicating an intent to discriminate on these bases; or to inquire as to protected categories in connection with access or use of facilities and services.[5] But the law only applies to "public accommodations," now defined as ""a

---

[5]     AMC § 5.20.050 was not revised in the 2021 Title 5 revision. It reads:
It is unlawful for a person, whether the owner, operator, agent or employee of an owner or operator of a public accommodation, to:

business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, (1) whose goods, services, facilities, privileges, advantages or accommodations are [extended, offered, sold, or made available to the general public, or (2) that accepts public funds with non-discrimination contractual requirements." Docket 15-2 at 6. The United Supreme Court's recent decision in *Fulton v. City of Philadelphia*, 141 U.S. 1868 (2021), makes clear that Hope Center is not a public accommodation, and this is the AERC's express interpretation of the law—depriving Hope Center of standing in this pre-enforcement challenge.

Even before *Fulton* was issued, it was doubtful that Hope Center's shelter operations fell within the category of public accommodation—indeed, this Court found

---

1. Refuse, withhold from or deny to a person any of its accommodations, advantages, facilities, benefits, privileges, services or goods of that place on account of race, color, sex, sexual orientation, gender identity, religion, national origin, marital status, age or physical or mental disability.

2. Publish, circulate, issue, display, post or mail a written or printed communication, notice or advertisement which states or implies that:

    a. Any of the services, goods, facilities, benefits, accommodations, advantages or privileges of the public accommodation will be refused, withheld from or denied to a person of a certain race, color, sex, sexual orientation, gender identity, religion, national origin, marital status, age, or physical or mental disability; or

    b. The patronage or presence of a person belonging to a particular race, color, sex, sexual orientation, gender identity, religion, national origin, marital status, age, or physical or mental disability is unwelcome, not desired, not solicited, objectionable or unacceptable.

3. Make a written or oral inquiry concerning the race, color, sex, sexual orientation, gender identity, religion, national origin, marital status, age, or physical or mental disability of an individual in connection with the solicitation, reservation, booking, sale or dispensing of its accommodations, advantages, facilities, benefits, privileges, services or goods.

under the old code that they did not so qualify. *Downtown Soup Kitchen*, 406 F. Supp 3d at 796-97. Further, the legislative history of the 2021 Title 5 revision also supports the view that the Assembly did not intend for homeless shelters to be considered public accommodations under the revised definition. May 25, 2021 Assembly Meeting at 2:42:19, 2:48:03, 2:52:00, 3:32:18, 5:19:19. But *Fulton* eliminates any doubt, making clear that Hope Center is not a public accommodation and therefore not subject to AMC § 5.20.050.

In *Fulton*, the Supreme Court considered whether a foster care licensing scheme was a "public accommodation" under very similar definition of the term to Anchorage's. To qualify, the court explained, a business "must provide a benefit to the general public allowing individual members of the general public to avail themselves of that benefit if they so desire." *Id.* at 1880 (quotation marks omitted). Classic examples include hotels, restaurants, public transportation, and swimming pools. *Id.* The foster care licensing scheme there at issue did not qualify because it was not readily accessible to the public; instead of opening its doors to the general public, CSS conducted "a customized and selective assessment that bears little resemblance to staying in a hotel, eating at a restaurant, or riding a bus," including a home study, background check, and inquiries into the applicants' physical and mental health. *Id.* For these reasons, the Court held that the licensing scheme was not a public accommodation, placing CSS outside the reach of Philadelphia's nondiscrimination ordinance. *Id.* at 1880-81.

Defendants' 12(b)(1) Motion To Dismiss For Lack Of Standing
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 20 of 29

Hope Center too conducts "a customized and selective assessment" of all potential shelter guests before they are allowed to stay at its overnight shelter. Its three-page admissions policies require shelter guests to meet numerous requirements as a prerequisite to admission. Docket 1-3 at 4-6. Hope Center screens guests to ensure they are homeless, at imminent risk of homelessness, or fleeing domestic violence; over the age of 18; and present as female and have been assigned a female gender identity at birth (i.e., not be transgender). Docket 1-3 at 4-5. Hope Center evaluates potential guests to ensure that they can "function in the shelter environment without serious disruption" or posing danger to others; are medically and psychiatrically stable and have adequate functional capacity to be self-sufficient in the shelter environment; and are sober. Docket 1-3 at 4-5. As a condition of admission, guests must also agree to perform chores at the shelter; abide by shelter policies, including a curfew; and be open to receiving Christian ministry and Christian teachings that are provided to residents by Hope Center, including group prayer, Bible study, and group devotions. Docket 1-3 at 4-6; Docket 15-4 at 1 ¶¶ 15-17, 20. Women who want to stay at the Hope Center shelter must apply for admission, agree in writing to follow Hope Center policies, and receive advance approval from staff before they can be admitted. Docket 1-3 at 6.

Although this process is likely less onerous than a foster care home study, it has much more in common with the foster care certification process described in *Fulton* than it does with first-come, first-serve, open access to a public bus or swimming pool. Hope Center shelter admission is *not* "readily accessible to the public" and does not "provide a

Defendants' 12(b)(1) Motion To Dismiss For Lack Of Standing
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 21 of 29

Case 3:21-cv-00155-SLG   Document 28   Filed 08/23/21   Page 21 of 29

benefit to the general public allowing individual members of the general public to avail themselves of that benefit if they so desire." *Fulton*, 141 U.S. 1880. Instead, shelter admission is available only to a small subset of the public who meet specified housing status, medical, psychological, gender, religious, and other criteria. Further, unlike a bus, park, or swimming pool that is open to all who arrive, Hope Center actively investigates a person's eligibility under its published criteria and restricts access based on factors including the personal observations of staff, statements of other shelter guests, medical records, and government records and reports. Docket 1-3 at 6. A group that requires access to medical and government records and housing status information, and conducts medical, psychological, sobriety, and fitness evaluations before allowing entry into its facility and access to its services is conducting "a customized and selective assessment that bears little resemblance to staying in a hotel, eating at a restaurant, or riding a bus" and therefore is not a public accommodation. *Fulton*, 141 U.S. 1880.

Because AMC § 5.20.050 applies only to public accommodations, and Hope Center's homeless shelter is not a public accommodation, the law does not apply to Hope Center and therefore does not burden or limit Hope Center's conduct or its First Amendment rights. "[P]laintiffs' claims of future harm" therefore "lack credibility [because] the challenged speech restriction by its terms is not applicable to the plaintiffs." *Lopez*, 630 P.3d at 778.

Similarly, Hope Center lacks standing because "the enforcing authority [has] expressly interpreted the challenged law as not applying to the plaintiffs' activities." *Id.*

Defendants' 12(b)(1) Motion To Dismiss For Lack Of Standing
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 22 of 29

Case 3:21-cv-00155-SLG   Document 28   Filed 08/23/21   Page 22 of 29

The AERC's new director explains that she reads *Fulton* "to narrow the category of 'public accommodation' to exclude services that are not readily accessible to the public and instead utilize a customized and selective application or certification process." Docket 27-1 ¶ 9. She concludes that Hope Center is not a public accommodation under Anchorage's code:

> Based on the numerous criteria for admission, the selective nature of the shelter's admission policies, and the required pre-approval process for all potential shelter residents, my view is that, unless it opts to receive public funds with a nondiscrimination requirement, or new federal guidance on the scope of public accommodations is issued, Downtown Hope Center's homeless shelter is not a "public accommodation" under the revised Anchorage Municipal Code.

Docket 27-1 § 10.[6] Ultimately, under current law, "[b]ecause Hope Center's services fall outside of the scope of the public accommodations category as described by *Fulton*, the AERC has no basis to and does not intend to enforce Title 5's gender identity or sex discrimination provisions against Hope Center's overnight shelter operations." Docket 27-1 § 12. These sworn statements illustrate that the AERC has "expressly interpreted the challenged law as not applying to [Hope Center's] activities," depriving it of standing.

---

[6] Because this is a pre-enforcement challenge, there is no factual record regarding whether Hope Center has sought or received public funds that would operate to classify it as a public accommodation under the public funds prong of the new public accommodations, but the Municipality does not believe that Hope Center has done so. Hope Center retains control over whether it enters into contracts that obligate it to comply with municipal nondiscrimination requirements.

## 2. Because the statute does not apply to Hope Center, it has not and cannot shown that its actions will be in violation of the law.

The second standing factor is whether Hope Center has "shown, with some degree of concrete detail, that [it] intends to violate the challenged law." *Italian Colors*, 272 F.3d at 1171-72 *(*citing *Lopez*, 630 F.3d at 786). Hope Center's complaint does describe with concrete detail the conduct it intends to continue at its shelter—including discriminating against transgender women in admissions and its desire posting its discriminatory policies. These actions would violate AMC § 5.20.050 if Hope Center's shelter were a public accommodation. But while it has provided detailed descriptions of its conduct, Hope Center has not made any showing that it "intends to violate the challenged law"—because, as described above, AMC § 5.20.050 does not even apply to Hope Center, since it is not a public accommodation.

## 3. Hope Center cannot demonstrate a likelihood that that § 5.20.050 will be enforced against Hope Center.

Nor can Hope Center show a "likelihood that the law will be enforced against the plaintiff." *Italian Colors*, 272 F.3d at 1171-72 *(*citing *Lopez*, 630 F.3d at 786). "In evaluating the genuineness of a claimed threat" of government enforcement, the court considers "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000). These factors do not favor Hope Center.

Defendants' 12(b)(1) Motion To Dismiss For Lack Of Standing
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 24 of 29

Case 3:21-cv-00155-SLG   Document 28   Filed 08/23/21   Page 24 of 29

As discussed above, the public accommodations law does not apply to Hope Center and for that reason, Hope Center has not articulated any concrete plan to violate it. Far from communicating a specific threat to enforce against Hope Center, the AERC's new director has clearly indicated the opposite: an intent *not* to prosecute. Docket 27-1 ¶¶ 9-10, 12. This disavowal of prosecutorial intent deprives Hope Center of a "specific and credible" threat of enforcement. *Lopez*, 630 F.3d at 786-87.

Despite its assertions to the contrary, Hope Center is not being prosecuted or targeted under the new code. The AERC has not received any complaints against Hope Center under the new code, nor has it initiated any proceedings against Hope Center. There are no pending or threatened enforcement matters. Docket 27-1 ¶ 11. Hope Center will surely point to the enforcement actions leading to the 2018 litigation as evidence of prosecutorial intent; there admittedly is a past enforcement history with the AERC. But the Ninth Circuit has cautioned that the historical enforcement factor should be given "little weight" where, as here, "the challenged law is relatively new and the record contains little information as to enforcement or interpretation." *California Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021) (internal quotes omitted). This caution applies here. Anchorage's Title 5 revision is less than three months old, and there have been no enforcement attempts against Hope Center under it. Docket 27-1 ¶ 11. Furthermore, the leadership of the AERC has changed and the new director has disavowed the intent to prosecute Hope Center under the new code. The governing law on public accommodations too has shifted. All these factors combine to significantly

Defendants' 12(b)(1) Motion To Dismiss For Lack Of Standing
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 25 of 29

Case 3:21-cv-00155-SLG   Document 28   Filed 08/23/21   Page 25 of 29

diminish the relevance and weight that the Court should afford pre-2018 enforcement efforts. Hope Center therefore has no standing to seek a preliminary injunction in this pre-enforcement challenge to AMC § 5.20.050.

### 4. Similarly, Hope Center also lacks standing to challenge AMC § 5.20.020 because the ordinance does not apply to Hope Center's overnight shelter.

Hope Center similarly lacks standing to challenge the constitutionality of AMC § 5.20.020 or obtain an injunction enjoining this law. This ordinance, titled "Unlawful practices in the sale, rental or use of real property," in relevant part makes it unlawful for property owners to, on the basis of a protected class (including sex and gender identity), "1. Refuse to sell, lease or rent, or to otherwise make unavailable, the real property to a person"; "2. Discriminate against a person . . . in a term, condition or privilege relating to the use . . . of real property"; or "7. Circulate, issue or display, make, print or publish, or cause to be made or displayed, printed or published, any communication, sign, notice, statement or advertisement with respect to the use . . . of real property that indicates any preference, limitation, specification or discrimination." Docket 15-2 at 7-8. The substantive provisions of this ordinance were not altered in the 2021 code revision other than to add "familial status" to the list of protected classes. Docket 15-2 at 7-8. But an additional exception was added to the applicability of this section: AMC § 5.20.020B now provides that "This section also does not apply to places which are institutional in nature and for which housing is merely incidental to a broader purpose, such as rehabilitation or medical care. Such institutional places may still be covered under

Defendants' 12(b)(1) Motion To Dismiss For Lack Of Standing
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 26 of 29

Case 3:21-cv-00155-SLG   Document 28   Filed 08/23/21   Page 26 of 29

section 5.20.050 [public accommodations]." Docket 15-2 at 8.

Like AMC § 2.20.050, this ordinance does not apply to Hope Center, and for this reason it faces no credible enforcement threat and lacks standing. This Court has already found that, as a matter of statutory construction, this section does not apply to Hope Center's shelter activities. In the 2018 Hope Center litigation, this Court found that "Hope Center is [] likely to succeed as to its contention that AMC § 5.20.020 does not apply to Hope Center's homeless shelter." *Downtown Soup Kitchen*, 406 F. Supp. 3d. at 795. One basis for that holding was the homeless shelter exception previously codified at AMC § 5.25.030. The homeless shelter exception has been repealed along with the rest of Chapter 5.25, so obviously that aspect of the court's prior no longer is relevant. But this Court also set forth an alternative basis for its statutory holding, one that is unaffected by the code's revision: Citing and quoting *Swanner v. Anchorage Equal Rights Comm'n*, 874 P.2d 274, 280 (Alaska 1994), this Court held that "the Alaska Supreme Court has concluded that '[t]he purpose of AMC 5.20.020 . . . is to prohibit discrimination in the rental housing market.' Applying the provision's prohibitions to Hope Center's homeless shelter would not further this purpose." 406 F. Supp. 3d. at 795. This alternative holding continues to apply with full force to the revised code, compelling the same conclusion: AMC § 5.20.020 does not apply to Hope Center's overnight shelter.

The Assembly's addition of an additional exception to the ordinance –it now does "not apply to places which are institutional in nature and for which housing is merely incidental to a broader purpose, such as rehabilitation or medical care"—illustrates the

legislative body's continuing intent to restrict the reach of this law to "discrimination in the retail housing market." And although the record in this pre-enforcement challenge does not include many facts regarding to what extent Hope Center's homeless sheltering is "incidental" to the other aspects of its religious ministry, the exception also may well apply directly to Hope Center. Thus, as with the public accommodation non-discrimination ordinance, Hope Center's "claims of future harm lack credibility [because] the challenged speech restriction by its terms is not applicable to the plaintiffs." *Lopez*, 630 P.3d at 778. Because Hope Center's shelter is not covered by the residential real property nondiscrimination ordinance, the above analysis regarding lack of showing of intent to violate the law and lack of credible enforcement threat applies with equal force to this statute as well.

For these reasons too, Hope Center has failed to show a likelihood that its claimed "injury will likely be redressed by a favorable decision." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013) (citing *Lujan*, 504 U.S. at 560–61). Since there are no current enforcement efforts and the AERC believes that the ordinance that Hope Center wants to challenge does not even apply to it and does not intend to prosecute, any decision from the Court on the merits of Hope Center's claims would be advisory and would not redress any harms suffered by Hope Center; indeed, such an order would not have any practical impact on Hope Center at all. There is no effective relief that this Court can grant to Hope Center.

Defendants' 12(b)(1) Motion To Dismiss For Lack Of Standing
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 28 of 29

Case 3:21-cv-00155-SLG   Document 28   Filed 08/23/21   Page 28 of 29

## CONCLUSION

For all these reasons, this Court should find that Hope Center lacks Article III standing in this facial, pre-enforcement challenge to AMC §§ 5.20.020 and 5.20.050. Hope Center lacks standing to sue. The Municipality has made no efforts to apply its revised nondiscrimination code to the Hope Center and has no plans to do so, because it believes that the law does not even apply to Hope Center's shelter operations as a matter of statutory construction. Because this is a pre-enforcement challenge in which Hope Center has not demonstrated a credible threat of enforcement, the Court lacks Article III jurisdiction over the case, and therefore should dismiss it in its entirety.

Respectfully submitted this 23d day of August, 2021.

PATRICK N. BERGT
Municipal Attorney

By: s/Ruth Botstein, s/ Meagan Carmichael
       Ruth Botstein (AK Bar No. 9906016)
       Meagan Carmichael (AK Bar No. 1011071)
       Assistant Municipal Attorneys
       Municipal Attorney's Office
       P.O. Box 196650
       Anchorage, Alaska 99519-6650
       Phone: (907) 343-4545
       Fax: (907) 343-4550
       Email: uslit@muni.org

Certificate of Service
The undersigned hereby certifies that on August 23, 2021, a true and correct copy of the foregoing was served by electronic means through the ECF system.

s/ Marie Stafford
Marie Stafford, Legal Secretary
Municipal Attorney's Office

Defendants' 12(b)(1) Motion To Dismiss For Lack Of Standing
*Downtown Hope Center v. MOA, AERC*; Case No. 3:21-cv-00155 SLG
Page 29 of 29