David A. Cortman, *Pro Hac Vice*
Ryan J. Tucker, *Pro Hac Vice*
Katherine L. Anderson, *Pro Hac Vice*
Jeremiah J. Galus, *Pro Hac Vice*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
dcortman@adflegal.org
rtucker@adflegal.org
kanderson@adflegal.org
jgalus@adflegal.org

Sonja Redmond, AK Bar No. 0605022
LAW OFFICE OF SONJA REDMOND
PO Box 3529
35202 Kenai Spur Hwy.
Soldotna, Alaska 99669
(907) 262-7846
sredmond@greatlandjustice.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

|  |  |
|---|---|
| THE DOWNTOWN SOUP KITCHEN d/b/a DOWNTOWN HOPE CENTER, | |
|     Plaintiff, | Case No. 3:21-cv-00155-SLG |
| v. | **OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING** |
| MUNICIPALITY OF ANCHORAGE, ANCHORAGE EQUAL RIGHTS COMMISSION, and MITZI BOLAÑOS ANDERSON, in her Official Capacity as the Executive Director of the Anchorage Equal Rights Commission, | **Fed. R. Civ. P. 12** |
|     Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................ii

INTRODUCTION ...............................................................................1

STATEMENT OF FACTS ....................................................................3

I.    Hope Center's religious beliefs ......................................................3

II.   The prior litigation: Anchorage's first attempt to force men into Hope Center's shelter ................................................................................4

III.  AO2021-30: Anchorage again targets Hope Center ......................6

LEGAL STANDARD ...........................................................................9

ARGUMENT .....................................................................................10

I.    Hope Center has standing to seek prospective relief because it is suffering an ongoing injury and faces a credible threat of enforcement. .................................................................................11

     A. Hope Center has shown a credible fear of enforcement to warrant prospective relief. ..................................................11

        1.  Defendants revised the laws to target Hope Center. ..............12

        2.  Hope Center cannot comply with the laws. .............................16

        3.  Hope Center faces a substantial likelihood of enforcement....17

        4.  The Executive Director's "disavowal" is equivocal, not legally binding, and does not destroy standing. ........................18

     B. Hope Center's ongoing and impending injuries are traceable to Defendants' actions and will be redressed by declaratory and injunctive relief. ......................................................21

II.   Hope Center has standing to seek damages because it has suffered a past constitutional injury. ...........................................................21

CONCLUSION ...................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Arizona Right to Life Political Action Committee v. Bayless,*
   320 F.3d 1002 (9th Cir. 2003) ................................................................. 17

*Babbitt v. United Farm Workers National Union,*
   442 U.S. 289 (1979) ................................................................................. 20

*BedRoc Ltd., LLC v. United States,*
   541 U.S. 176 (2004) ................................................................................. 13

*Bryant v. Woodall,*
   1 F.4th 280 (4th Cir. 2021) ............................................................. passim

*California Trucking Ass'n v. Bonta,*
   996 F.3d 644 (9th Cir. 2021) ................................................................... 18

*City & County of San Francisco v. Trump,*
   897 F.3d 1225 (9th Cir. 2018) ................................................ 1, 14, 15, 16

*Courthouse News Service v. Planet,*
   750 F.3d 776 (9th Cir. 2014) ................................................................... 10

*Doe v. Bolton,*
   410 U.S. 179 (1973) ........................................................................... 17, 18

*Downtown Soup Kitchen v. Municipality of Anchorage,*
   406 F. Supp. 3d 776 (D. Alaska 2019) ............................................ passim

*Duran v. City of Porterville,*
   47 F. Supp. 3d 1044 (E.D. Cal. 2014) .................................................... 22

*EQT Production Co. v. Wender,*
   870 F.3d 322 (4th Cir. 2017) ................................................................... 18

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,*
   528 U.S. 167 (2000) ................................................................................. 11

*The Downtown Soup Kitchen v. Municipality of Anchorage,* No. 3:21-cv-00155-SLG

*Fulton v. City of Philadelphia*,
141 S. Ct. 1868 (2021) ............................................................................ 14

*Italian Colors Restaurant v. Becerra*,
878 F.3d 1165 (9th Cir. 2018) ............................................ 10, 12, 16, 17

*Jacobs v. Clark County School District*,
526 F.3d 419 (9th Cir. 2008) ............................................................ 2, 11, 22

*League of Conservation Voters v. Trump*,
303 F. Supp. 3d 985 (D. Alaska 2018) ................................................ 9, 10

*Lopez v. Candaele*,
630 F.3d 775 (9th Cir. 2010) ............................................ 12, 14, 16, 18

*LSO, Ltd. v. Stroh*,
205 F.3d 1146 (9th Cir. 2000) ............................................ 11, 12, 16, 17

*Mendenhall v. United States*,
No. 3:20-cv-00156-SLG, 2020 WL 5219531
(D. Alaska Sep. 1, 2020) ............................................................ 10

*Missourians for Fiscal Accountability v. Klahr*,
830 F.3d 789 (8th Cir. 2016) ............................................................ 21, 22

*North Carolina Right to Life, Inc. v. Bartlett*,
168 F.3d 705 (4th Cir. 1999) ............................................................ 19

*Oncale v. Sundowner Offshore Services, Inc.*,
523 U.S. 75 (1998) ............................................................ 15

*Six Star Holdings, LLC v. City of Milwaukee*,
821 F.3d 795 (7th Cir. 2016) ............................................................ 2, 22, 23

*Skyline Wesleyan Church v. California Department of Managed
Health Care*,
968 F.3d 738 (9th Cir. 2020) ............................................................ 11

*Speech First, Inc. v. Schlissel*,
939 F.3d 756 (6th Cir. 2019) ............................................................ 21

*Sun Valley Gasoline, Inc. v. Ernst Enterprises, Inc.*,
711 F.2d 138 (9th Cir. 1983) ............................................................ 10

Case 3:21-cv-00155-SLG   Document 34   Filed 09/13/21   Page 4 of 30

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ................................................................ 2, 17, 18, 20

*Uzuegbunam v. Preczewski*,
    141 S. Ct. 792 (2021) ................................................................ 2, 22, 23

*Vermont Right to Life Committee, Inc. v. Sorrell*,
    221 F.3d 376 (2d Cir. 2000) .............................................................. 1, 19

*Virginia v. American Booksellers Ass'n*,
    484 U.S. 383 (1988) ................................................................ 14, 17, 22

## **Statutes**

Alaska Stat. § 44.62.560(e) ................................................................ 8

AMC § 1.45.010 ................................................................ 9

AMC § 5.20.010 ................................................................ 8, 13

AMC § 5.20.020 ................................................................ 6, 13, 15

AMC § 5.20.050 ................................................................ 6, 12

AMC § 5.40.010 ................................................................ 8, 20

AMC § 5.50.010 ................................................................ 8, 20

AMC § 5.50.020 ................................................................ 8

AMC § 5.50.060 ................................................................ 8, 9, 19

AMC § 5.50.070 ................................................................ 9

AMC § 5.50.080 ................................................................ 9

AMC § 5.60.030 ................................................................ 19, 20

AMC § 5.70.130 ................................................................ 9

AMC § 5.80.010 ................................................................ 9

AMC § 5.80.030 ................................................................ 8

## INTRODUCTION

Defendants decided to go after Hope Center for allegedly violating its public accommodation and real property ordinance. Hope Center sued, and Defendants agreed to stop only after this Court held that an exemption applied to Hope Center. Defendants changed their mind, and their ordinance, to avoid this Court's ruling to target Hope Center again. They have been sued again. And now they claim they'll stop, again. But absent this Court denying their motion and issuing a ruling here, nothing stops them from changing their mind again.

Defendants ask the Court to ignore this history and look the other way. But their request is based on an interpretation of the laws that conflicts with their prior interpretation and a half-hearted promise to leave Hope Center alone—*for now*. The Ninth Circuit, and other courts of appeals, have rejected similar litigation tactics and attempts to evade judicial review. This Court should do the same. *E.g.*, *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1236 (9th Cir. 2018) (rejecting defendants' interpretation proffered as a litigation position); *Bryant v. Woodall*, 1 F.4th 280, 288 (4th Cir. 2021) (rejecting purported disavowal); *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000) (same).

Indeed, Defendants' newfound willingness to leave Hope Center alone should carry little weight. There has been no disavowal from the members of the Anchorage Equal Rights Commission, which enjoys unfettered discretion to initiate its own investigations, apart from the Executive Director. The Acting Director has reserved the right to investigate Hope Center *now* for

1

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

whether it receives public funds. And nothing prevents this Director, or the next, from changing his or her mind about enforcement and again turning on Hope Center. Moreover, the challenged laws allow anyone to file a complaint, subjecting Hope Center to a "universe of potential complainants," a mandatory investigation process, and potential civil and criminal sanctions— no matter the Acting Director's current interpretation of the laws. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) ("*SBA List*"). Given its ongoing injury, and the credible threat of future ones, Hope Center has standing to seek declaratory and injunctive relief.

Hope Center also has standing to seek relief for its past injury—an injury that Defendants' motion fails to even mention. In response to Defendants' repeal of the homeless-shelter exemption, and to avoid potential liabilities, Hope Center reasonably self-censored its speech and messages. Defendants cannot erase the *past* self-censorship that Hope Center suffered before the lawsuit by proffering a novel interpretation now. *See Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 802–03 (7th Cir. 2016) (affirming nominal damages award for self-censorship caused by an ordinance that was later repealed during litigation). Hope Center has standing to seek damages for this past constitutional injury. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021); *Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 425 (9th Cir. 2008).The Court should deny Defendants' motion.

**I. Hope Center's religious beliefs**

Hope Center started over thirty years ago to share God's love with Anchorage's homeless. Verified Compl. ("VC") ¶ 22 (Dkt. 1). When Hope Center first opened, it provided nearly 300 free cups of soup, free hot showers, laundry services, and clean clothing each day to homeless and low-income families. *Id.* ¶ 24. Hope Center has since expanded its ministry to serve homeless women, many of whom had been abused by men. *Id.* ¶ 26–27.

Hope Center's purpose is religious. "Inspired by the love of Jesus, [it] offer[s] those in need support, shelter, sustenance, and skills to transform their lives." *Id.* ¶ 32. Christian beliefs and values permeate everything Hope Center does. *Id.* ¶¶ 33–41. And its beliefs teach that women should be cherished, respected, and protected. *Id.* ¶ 40. Providing shelter to women in need is an exercise of that belief; it also plays a critical role in developing the women's understanding of God's design for them. *Id.* Hope Center also believes that God creates people male or female, that a person's sex is an immutable God-given gift, and that a person should not deny his or her God-given sex. *Id.*

Hope Center expresses its religious beliefs, including its beliefs about sexuality and gender, throughout its programs and activities. *Id.* ¶¶ 40, 41. Hope Center offers Bible studies and group devotions, as well as Christian counseling, teaching, and advice. *Id.* ¶¶ 35, 41. By loving, serving, and teaching homeless women in this environment, Hope Center seeks to

encourage them to put their faith in Jesus Christ and free themselves from destructive addictions, habits, or situations. *Id.* ¶ 38.

Because Hope Center shelters many homeless women who have been raped, beaten, trafficked, and threatened by men, it believes that biological men should not sleep with and disrobe next to women. *Id.* ¶¶ 54–55. This makes sense, especially since space is sparse: just 50 women can stay at Hope Center each night, and the women must set up their sleeping areas in a single room, side-by-side, three to five feet away from each other. *Id.* ¶ 52. Hope Center nevertheless provides its free day services to men too, including meals, laundry services, showers, and job skills training. *Id.* ¶ 24. It merely refers men looking for a place to sleep to other nearby shelters. *Id.* ¶ 57.

Hope Center desires to post and publish its admissions policy so that women seeking refuge will know of the unique protection and care Hope Center provides. *Id.* ¶¶ 40, 58. It also wants to follow its religious belief about being upfront and honest with others. *Id.* ¶ 40. Hope Center used to do this, but recent amendments to the law threaten fines and penalties for publishing such statements. *Id.* ¶ 59. So Hope Center has stopped posting its policy to avoid exposing itself to additional liability. *Id.* ¶¶ 59, 128.

## II. The Prior Litigation: Anchorage's first attempt to force men into Hope Center's shelter

In 2018, Anchorage police officers dropped "Jessie Doe" off at Hope Center. *Id.* ¶ 79. Doe smelled strongly of alcohol, acted agitated and aggressive, and had an open wound above the eye. *Id.* ¶ 81. Because Hope Center is a sober shelter, Sherrie Laurie—Hope Center's Executive

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

Director—explained that Doe could not stay. *Id.* ¶ 82. Laurie instead recommended that Doe go to the hospital to receive medical care. *Id.* ¶ 83. Laurie prayed with Doe; Doe hugged Laurie; and Laurie paid for the cab to take Doe to the emergency room. *Id.* ¶¶ 83–84.

The next day (a Saturday), Doe again tried to access the women's shelter. *Id.* ¶ 87. But Doe had not stayed the previous evening, a condition to Saturday admission, and Doe sought entry at a time when Hope Center was not even accepting new guests. *Id.* ¶ 88. Doe left Hope Center that day, but later filed a complaint with Defendant Anchorage Equal Rights Commission claiming sex and gender-identity discrimination under Anchorage's public accommodation law. *Id.* ¶ 89.

In response, Hope Center's then-legal counsel sent a letter to the Commission informing it that Hope Center was not a place of public accommodation, that Doe had not been turned away based on sex or gender-identity, and that Hope Center had a constitutional right to operate its shelter consistently with its religious beliefs. *Id.* ¶ 90. But the Commission refused to dismiss the complaint and continued its "investigation" by sending Hope Center intrusive discovery requests. *Id.* ¶ 91. In fact, rather than dismissing, the Commission filed *its own* separate complaint against Hope Center for statements made by Hope Center's legal counsel about the incident. *Id.* ¶¶ 92–94. This second complaint alleged sex and gender-identity

discrimination under both the public accommodation law and the real property law. *Id.* ¶ 93.[1]

Facing these complaints and intrusive "investigations," Hope Center filed a civil-rights complaint in this Court in August 2018. *Id.* ¶ 98. Hope Center asked this Court to stop Anchorage from enforcing AMC §§ 5.20.050 and 5.20.020 against it and to declare those ordinances unconstitutional as applied to Hope Center. *Id.* ¶ 99.

The Court granted a preliminary injunction in August 2019. Based on the homeless-shelter exemption, the Court held (1) that Hope Center was not a "public accommodation" under the public accommodation law and (2) that the real property law did not apply to homeless shelters. *Downtown Soup Kitchen v. Mun. of Anchorage*, 406 F. Supp. 3d 776, 794–97 (D. Alaska 2019).

## III. AO2021-30: Anchorage again targets Hope Center

***Hostility in the drafting process.*** Since the prior litigation, Defendants have renewed their effort to force Hope Center to admit men into its women's shelter. VC ¶ 104. On May 25, 2021, the Anchorage Assembly enacted AO2021-30, an ordinance developed and advocated for by the Commission and its Executive Director. VC ¶ 105; AO2021-30 (Dkt. 1-1); Assemb. Mem. 3 (Dkt. 1-2). The accompanying Assembly Memorandum made clear that "[t]he [proposed] changes . . . address legal issues raised by the *Downtown Soup Kitchen* litigation." VC ¶ 114; Assemb. Mem. 2.

---

[1] Title 5 of the Anchorage Municipal Code (AMC) prohibits sex and gender identity discrimination "in places of public accommodation," AMC § 5.20.050, and "in the sale, rental or use of real property," AMC § 5.20.020.

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

Anchorage Assembly Members and the Commission's Executive Director repeatedly referenced Hope Center and the prior litigation during their "Worksessions" that took place on May 14 and 21 and the regular Assembly Meeting on May 25. VC ¶ 115. During the May 25 Assembly Meeting, regarding Hope Center, the Assembly Chair remarked that it was "really disappointing" to hear what he viewed as "misinformed" views and "mischaracterizations of . . . transgender individuals." *Id.* ¶ 116.

***Substantive changes.*** AO2021-30 changed existing law substantively in two critical ways. *First*, it repealed the exemption for homeless shelters incorporated into the real property law—and relied on by this Court in its prior preliminary-injunction ruling. AO2021-30, at 6, 8. *Second*, it expanded the definition of "public accommodation" so that the public accommodation law would apply to homeless shelters like Hope Center. *Id.* at 5.

Because of these changes, Hope Center is no longer statutorily exempted from Anchorage's public accommodation or real property laws. And that was the whole point. As noted, Defendants admitted to getting rid of the homeless-shelter exemption because of Hope Center and the prior litigation. VC ¶¶ 113–16; *see also* Assemb. Mem. 2.

***Extensive enforcement mechanism.*** The AMC sets forth an extensive enforcement mechanism. Indeed, the real property and public accommodation laws can be enforced in a variety of ways by a variety of persons.

For one thing, any person in the public may file a complaint. AMC § 5.40.010(A) (Dkt. 1-1, at 10).[2] And the law *requires* a mandatory investigation whenever a complaint is filed. *Id.* § 5.50.010 (Dkt. 1-1, at 12) (using mandatory word "shall"). Approximately 30 days after a complaint is filed, the Commission must "convene a fact finding conference with the parties to define issues, receive and exchange information relevant to the complaint and response, . . . and negotiate a voluntary resolution of the complaint." *Id.* § 5.50.020 (Dkt. 1-1, at 13); *see also id.* § 5.20.010 (defining fact finding conference). The law also gives the complainant the right to "obtain judicial review of" the dismissal of the complaint to the state superior court, *id.* § 5.80.030(A), which could then "compel [the Commission] to initiate action," Alaska Stat. § 44.62.560(e).

The Executive Director, with the approval of a panel of three commissioners, may also initiate a complaint. AMC § 5.40.010(B) (Dkt. 1-1, 10). And again, once the complaint is filed, the Commission *must* investigate the allegations. *Id.* § 5.50.010 (Dkt. 1-1, at 12).

The AMC also gives the Commission an unfettered, discretionary investigatory power to initiate a general investigation. AMC § 5.50.060(A) (Dkt. 1-1, at 15). The Commission may—"on its own motion"—"initiate a general investigation to determine the extent to which an individual, group, corporation, business, industry, agency, or organization is complying with the [public accommodation law]." *Id.* This provision does not require any

---

[2] Because AO2021-30 has not yet been codified, Hope Center has provided parallel cites to the relevant ECF document whenever citing an amended portion of the code.

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

suspicion or any complaint. *See id.* And the "investigation may be as broad in scope as may be necessary to effectuate the purposes of title 5." *Id.* § 5.50.060(C) (Dkt. 1-1, at 15).

In conducting investigations, the Executive Director and the Commission staff enjoy broad discovery and subpoena powers. AMC §§ 5.50.070(A) (allowing the use of requests for interrogatories, production, and admissions), (C) (using a broad "relevance" standard), (G) (allowing the use of motions to compel), 5.50.080 (allowing the use of subpoenas). Furthermore, the Commission has the authority to issue an order requiring compliance with the public accommodation and real property laws. *Id.* §§ 5.70.130(C), (D), 5.80.010. Those who violate the challenged laws also face criminal liability, punishable up to $2,000 in fine and 30 days of imprisonment. *Id.* § 1.45.010(A) (imposing criminal penalties on "every person convicted of a violation of any provision of the Charter or this Code").

## LEGAL STANDARD

Defendants raised a *facial* challenge to jurisdiction, not a factual one. *See* Defs.' 12(b)(1) Mot. to Dismiss for Lack of Standing ("Defs.' Mot.") 15–16 (Dkt. 28). In a facial challenge, "the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *League of Conservation Voters v. Trump*, 303 F. Supp. 3d 985, 992 (D. Alaska 2018). Defendants raise a facial challenge when they "treat[ ] the complaint's allegations as true" and "submit[ ] evidence . . . only in response to [a] motion for a preliminary injunction" but failed to submit any evidence in support of

the motion to dismiss. *Courthouse News Serv. v. Planet*, 750 F.3d 776, 780 (9th Cir. 2014).

Here, defendants assert that the challenged laws—"as a legal matter"—do not apply to Hope Center and treat Hope Center's relevant factual allegations as true. *League of Conservation Voters*, 303 F. Supp. 3d at 992; *see also Courthouse News Serv.*¸ 750 F.3d at 780. And, although Defendants rely on the Anderson Affidavit, it was submitted "only in response to [Hope Center's] motion for a preliminary injunction," *Courthouse News Serv.*¸ 750 F.3d at 780, and Defendants have failed to offer any evidence in support of their motion, *see* Defs.' Mot. Because Defendants raised a facial attack, not a factual one, the Court should "[a]ccept[ ] [Hope Center's] allegations as true and draw[ ] all reasonable inferences in [its] favor."[3] *League of Conservation Voters*, 303 F. Supp. 3d at 992.

## ARGUMENT

Hope Center has standing to bring this lawsuit. To establish standing, a plaintiff must show: (1) an injury in fact, (2) traceability, and (3) redressability. *It. Colors Rest. v. Becerra*, 878 F.3d 1165, 1171 (9th Cir. 2018). And "a plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528

---

[3] Alternatively, even in a factual challenge, the Court cannot resolve "genuinely disputed facts" that are "intertwined" with the merits of Hope Center's arguments. *Sun Valley Gasoline, Inc. v. Ernst Enters., Inc.*, 711 F.2d 138, 139 (9th Cir. 1983). And it would be improper to dismiss the complaint without at least giving Hope Center the chance to conduct limited jurisdictional discovery. *See Mendenhall v. United States*, No. 3:20-cv-00156-SLG, 2020 WL 5219531, at *3 (D. Alaska Sep. 1, 2020).

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

U.S. 167, 185 (2000). Hope Center easily meets these requirements for its pre-enforcement challenge and for its damages claims.

## I. Hope Center has standing to seek prospective relief because it is suffering an ongoing injury and faces a credible threat of enforcement.

Hope Center has sufficiently shown injuries in fact—past, ongoing, and future. To satisfy the injury-in fact prong, an injury must be "actual or imminent." *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 747 (9th Cir. 2020) (citation omitted). A plaintiff can show an injury in fact by alleging (1) "a credible threat that the challenged provision will be invoked against the plaintiff," *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000), or (2) a past injury that it already suffered, *see Jacobs*, 526 F.3d at 425.

Here, Hope Center has shown both types of injuries. *First*, because Hope Center faces a substantial and credible fear of enforcement, it has standing to seek appropriate injunctive and declaratory relief to prevent ongoing and impending harms. *Second*, Hope Center also has standing to seek damages for its past injuries caused because it reasonably responded to Defendants' repeal of the homeless-shelter exemption by self-censoring.

### A. Hope Center has shown a credible fear of enforcement to warrant prospective relief.

Hope Center faces a substantial and credible threat of enforcement. One "does not have to await the consummation of the threatened injury to obtain preventive relief." *LSO*, 205 F.3d at 1154 (citation omitted). It is

sufficient if there is "a credible threat that the challenged provision will be invoked against the plaintiff." *Id.* at 1155.

In assessing the credible threat in the pre-enforcement context, courts examine: (1) "whether the law even applies to the plaintiff"; (2) "whether the plaintiff has shown, 'with some degree of concrete detail,' that she intends to violate the challenged law"; and (3) "the likelihood that the law will be enforced against the plaintiff." *It. Colors Rest.*, 878 F.3d at 1172 (quoting *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010)). Especially in cases that implicate speech—such as this one—"the inquiry tilts dramatically toward a finding of standing." *LSO*, 205 F.3d at 1155. All of these factors support standing to seek injunctive and declaratory relief.

### 1. Defendants revised the laws to target Hope Center.

The first factor heavily supports standing because, without the homeless-shelter exemption, the challenged laws apply to Hope Center. And Defendants repealed the exemption to target Hope Center.

In the previous litigation, this Court held that the prior version of the challenged laws did not apply to Hope Center because of the homeless-shelter exemption. *Downtown Soup Kitchen*, 406 F. Supp. 3d at 796–97. In response, Defendants repealed the homeless-shelter exemption. VC ¶¶ 113–16. The challenged laws therefore now apply in full force to Hope Center.

The text is clear. The public accommodation law prohibits "an owner or operator of a public accommodation" from refusing "accommodations, advantages, facilities, benefits, privileges, services or goods" on the basis of "sex" or "gender identity." AMC § 5.20.050. It also prohibits any

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

"communication . . . which states or implies" that services will be denied because of sex or gender identity. *Id.* "[P]ublic accommodation" includes a "facility of any kind" "(1) whose goods, services, facilities, privileges, advantages or accommodations are made available to the general public, or (2) that accepts public funds with non-discrimination contractual requirements." *Id.* § 5.20.010 (Dkt 1-1, at 6).

In the previous case, although the Court ultimately concluded that the prior version of the public accommodation law did not apply to Hope Center, it found that Hope Center had standing because its "intended conduct 'arguably falls within the [provision's] reach.'" *Downtown Soup Kitchen*, 406 F. Supp. 3d at 792–93 (citation omitted). The same is true with the current version of the public accommodation law. *See id.*

The real property law similarly prohibits sex- and gender-identity-discrimination "in a term, condition or privilege relating to the use . . . of real property." AMC § 5.20.020 (Dkt 1-1, at 7). And it similarly prohibits any communication "that indicates any preference, limitation, specification or discrimination based on . . . sex [or] gender identity." *Id.* With the homeless-shelter exemption intentionally removed, this provision fully applies to Hope Center. *Cf. Downtown Soup Kitchen*, 406 F. Supp. 3d at 793.

Because the text is clear, that should be the end of the analysis. *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). But the legislative history further confirms that Defendants intended to target Hope Center by repealing the homeless-shelter exemption. *See* VC ¶¶ 112–16. The Assembly Memorandum states that the proposed changes were to "address legal issues

raised by the *Downtown Soup Kitchen* litigation." *Id.* ¶ 114; *see also* Assembly Mem. 2. And the Assembly Chair even expressed hostility to Hope Center, describing its beliefs as "misinformed." VC ¶ 116.

Despite the unambiguous text and evidence of targeting Hope Center, Defendants try to avoid any accountability for their actions by now saying they will not enforce the laws against Hope Center. Defs.' Mot. 18–23, 26–28. This Court should reject Defendants' litigation tactic.

To begin, Defendants contend that Hope Center is not a place of public accommodation because of an interpretative gloss under *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021). *See* Defs.' Mot. 18–23. But this interpretation is subject to change depending on the Director's "view" of "federal guidance." *Id.* 23. And the Ninth Circuit has rejected "argu[ments] for a narrower reading" proffered by government officials in litigation to contest standing. *San Francisco*, 897 F.3d at 1236. Even when "the parties dispute[ ] the scope of the challenged measure," it is enough that "if the plaintiffs' 'interpretation of the statute [is] correct,' the plaintiffs would face serious repercussions." *Id.* (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988)). As this Court aptly observed, "at the standing stage, the applicability factor weighs in favor of standing if conduct '*arguably* falls within the [provision's] reach.'" *Downtown Soup Kitchen*, 406 F. Supp. 3d at 797 n.145 (quoting *Lopez*, 630 F.3d at 788). There is no question that Hope Center's intended conduct and speech *arguably* falls within the public accommodation law's reach—especially when Defendants have previously enforced that law against Hope Center.

As to the real property law, the main basis for exempting Hope Center from the law in the previous litigation (*i.e.*, homeless-shelter exemption) is no longer available. Yet Defendants assert that because the true purpose of the real property law is to prohibit discrimination in the *rental housing market*, it should not apply to homeless shelters. Defs.' Mot. 27. But that argument ignores the fact that Defendants also enforced the real property law against Hope Center and deliberately deleted the law's homeless-shelter exemption after this Court relied on the exemption to halt their enforcement efforts. *See* VC ¶¶ 112–16. In any event, the law's application can reach "beyond the principal evil" that the legislators intended to address. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). And the real property law's text covers not just rentals but also a "condition or privilege relating to the use" of a real property. AMC § 5.20.020(A)(2) (Dkt. 1-1, at 7).

Finally, Defendants assert that the real property law does not apply to Hope Center because it "does not apply to places . . . for which housing is merely incidental to a broader purpose." Defs.' Mot. 27–28. But housing is not "merely incidental" to a *homeless* shelter's operations. Rather, it's the whole point. *See* VC ¶ 44 (alleging that providing housing is central to Hope Center's mission). And Defendants reserved the right to change their minds about this interpretation depending on "facts regarding to what extent Hope Center's homeless sheltering is 'incidental'" to Hope Center's ministry. Defs.' Mot. 28. Again, at the standing stage, the relevant inquiry is whether the real property law *arguably* covers Hope Center. *See San Francisco*, 897 F.3d at 1236; *Downtown Soup Kitchen*, 406 F. Supp. 3d at 797 n.145. It does.

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

## 2. Hope Center cannot comply with the laws.

The second factor also supports standing. This factor examines whether there is "an articulated, concrete plan" to fail to comply with the law. *It.* *Colors Rest.*, 878 F.3d at 1174 (citation omitted). This factor is satisfied if a plaintiff's policy is "presently in conflict" with the government's challenged policies, as interpreted by the plaintiff. *San Francisco*, 897 F.3d at 1236–37. And in speech cases, "plaintiffs may carry their burden of establishing injury in fact when they provide adequate details about their intended speech." *It.* *Colors Rest.*, 878 F.3d at 1174 (quoting *Lopez*, 630 F.3d at 787).

Here, Hope Center sufficiently showed that it cannot—and will not—allow biological men to sleep next to women who have suffered trauma and abuse, because of its "religious beliefs and desire to create a safe and secure environment" for these women, VC ¶¶ 54, 117, who feel uncomfortable sleeping in the same room with biological men due to past trauma, *id.* ¶120. *See also id.* ¶¶ 124, 126 (continuing to direct biological men to other shelters). In sum, Hope Center's admissions policy is "presently in conflict with" Defendants' challenged laws. *San Francisco*, 897 F.3d at 1237.

Hope Center also showed that it would once again "make its admissions policy clear by posting it on its grounds and on its website" if not for the challenged laws' publication ban. VC ¶¶ 127–31. "This is enough to show a concrete plan." *It. Colors Rest.*, 878 F.3d at 1174; *LSO*, 205 F.3d at 1156 (finding standing when the challenged law was likely to impede the plaintiff's speech).

### 3. Hope Center faces a substantial likelihood of enforcement.

The third factor also heavily favors finding standing. "[L]aws that are 'recent and not moribund' typically do present a credible threat." *Bryant*, 1 F.4th at 286 (quoting *Doe v. Bolton*, 410 U.S. 179, 188 (1973)). And "the threat of future enforcement . . . is substantial" when there is "a history of past enforcement." *SBA List*, 573 U.S. at 164; *LSO*, 205 F.3d at 1155 (past enforcement "is important in a standing inquiry").

"The credibility" of the threat of enforcement is "bolstered" when "the universe of potential complainants is not restricted to state officials." *SBA List,* 573 U.S. at 164. Critically, in cases implicating speech, when the plaintiff is "'forced to modify [its] speech and behavior to comply with the [law],' . . . [s]uch 'self-censorship' may be a sufficient injury" even without a pending enforcement action. *It. Colors Rest.*, 878 F.3d at 1173 (quoting *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003)  and *Am. Booksellers*, 484 U.S. at 393).

Here, Hope Center is already suffering a significant injury because the challenged laws—and the risk of civil and criminal sanctions—are forcing it to self-censor. *See It. Colors Rest.*, 878 F.3d at 1173. "To avoid additional risk of liability, . . . Hope Center has stopped posting its admissions policy on its grounds and on its website." VC ¶ 128. That alone is enough to find standing.

What's more, there is a history of aggressive enforcement. Defendants instituted various proceedings against Hope Center when the laws did not even apply to Hope Center because of the homeless-shelter exemption. *Downtown Soup Kitchen*, 406 F. Supp. 3d at 784–85, 796–97 (detailing the

history of enforcement). Defendants' "past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" *SBA List*, 573 U.S. at 164 (citation omitted). And Defendants have repealed the exemption—and invoked Hope Center as justification for doing so. These "recent" actions "present a credible threat." *Bryant*, 1 F.4th at 286 (quoting *Doe*, 410 U.S. at 188); *see also Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653–54 (9th Cir. 2021) (finding standing when the revised law adopted a previous rule that led to enforcement), *cert. docketed* No. 21-194 (U.S. Aug. 11, 2021).

### 4. The Executive Director's "disavowal" is equivocal, not legally binding, and does not destroy standing.

Although the threat of enforcement is substantial, Defendants ask the Court to look the other way, because the current Acting Director currently says she has no plans to enforce the laws against Hope Center. Defs.' Mot. 19, 23. This purported disavowal is a textbook "litigation position" that should be discounted for three reasons. *Lopez*, 630 F.3d at 788.

*First*, it is manifestly unreasonable given the expansive reach of the laws' text, the legislative history, and Defendants' previous interpretative positions. *See supra* pp. 13–14. Defendants' "[u]nofficial and non-binding statements . . . 'cannot override the plain text of the [laws] when it comes to establishing a credible threat of enforcement.'" *Bryant*, 1 F.4th at 289 (quoting *EQT Prod. Co. v. Wender*, 870 F.3d 322, 331 (4th Cir. 2017)) (rejecting the state's purported disavowal). This is sufficient to disregard Defendants' current litigating position. But, in addition, Defendants' previous interpretation make their current interpretation even less credible. When the

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

laws actually included the homeless-shelter exemption, Defendants *applied* the laws to Hope Center. *See Downtown Soup Kitchen*, 406 F. Supp. 3d at 784. Now, when the laws no longer carry the exemption, Defendants argue that the laws do *not* apply to Hope Center. The Court should see this inconsistency for what it is: a litigation position.

*Second*, it is not legally binding. "[T]here is nothing that prevents the [Defendants] from changing [their] mind." *Vt. Right to Life Comm.*, 221 F.3d at 383. Defendants say that "the leadership of the [Commission] has changed and the new director" will leave Hope Center alone for now. Defs.' Mot. 23, 25. But there is "no guarantee that [Defendants] might not tomorrow bring [their] interpretation more in line with the [statutes'] plain language." *Bryant*, 1 F.4th at 289 (quoting *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 711 (4th Cir. 1999)). In fact, the Acting Director also reserved the right to change her mind based on "federal guidance" and to investigate whether Hope Center accepts public funds. Defs.' Mot. 23. Hope Center will be right back in this Court when the Director changes her mind.

*Third*, Defendants purported disavowal promises little in view of the overall enforcement scheme. Critically, Defendants' purported disavowal is based on the Acting Director's statements, but there has been no disavowal from the members of the *Commission*. Yet the Commission—"on its own motion"—can initiate a general investigation apart from any complaint from the public or the Director. VC ¶ 77; AMC § 5.50.060(A) (Dkt. 1-1, at 15). It also can reconsider the Director's decision to close a complaint, AMC § 5.60.030(A) (Dkt. 1-1, at 18), and may reverse the decision if it believes

there has been "a mistake . . . in the application of the law," *id.* § 5.60.030(E) (Dkt. 1-1, at 19). The Commission's silence here speaks volumes, especially considering that it knows how to disavow enforcement when it wants to. *See* Wanda Greene Aff., *Downtown Soup Kitchen v. Mun. of Anchorage*, No. 3:18-cv-00190-SLG (D. Alaska Dec. 10, 2018) (Dkt. 59-1) (affidavit from Commission Chair disavowing enforcement while the prior litigation was pending). Thus, even without the Director's involvement, Hope Center still faces a threat of enforcement from the Commission. *See Bryant*, 1 F.4th at 288 (rejecting disavowal when two other defendants made no disavowal).

What's more, the challenged laws allow *anybody* to file a complaint, with a right to seek judicial order compelling the Commission to act. *See* AMC § 5.40.010 (Dkt. 1-1, at 10). And the Commission is *required* to commence an investigation. AMC § 5.50.010 (Dkt. 1-1, at 12); *Downtown Soup Kitchen*, 406 F. Supp. 3d at 783. The enforcement mechanism here "bolster[s]" the credibility of enforcement by enabling a "universe of potential complainants" to initiate proceedings against Hope Center. *SBA List*, 573 U.S. at 164. And because of the publicity of this dispute and because of the ongoing requests from biological men to stay overnight, VC ¶¶ 94, 124, Hope Center is an "easy target[]." *SBA List*, 573 U.S. at 164.

Finally, Hope Center faces both civil and criminal sanctions if it violates the laws. So this too weighs in favor of standing. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979) (existence of criminal sanctions creates a credible fear of enforcement). And because this case implicates speech, the mere specter of investigation alone—that "could

lead to" civil or criminal penalties—is "a real consequence that objectively chills" Hope Center's speech. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019); *see also Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 795 (8th Cir. 2016) ("[N]on-criminal consequences . . . can also contribute to the objective reasonableness of alleged chill").

### B. Hope Center's ongoing and impending injuries are traceable to Defendants' actions and will be redressed by declaratory and injunctive relief.

Defendants do not dispute traceability and redressability. Nor could they. *See Downtown Soup Kitchen*, 406 F. Supp. 3d at 793–94 (finding redressability and traceability and granting injunctive relief). The challenged laws target Hope Center's admission policies and practices. VC ¶¶ 117–22, 127–29. Thus, the injury to Hope Center's free-exercise and free-speech rights, and the intimate-association rights of the women it serves, is traceable to them and will be redressed by a favorable ruling.

* * *

For these reasons, Hope Center has standing to raise a pre-enforcement challenge to Defendants' actions.

### II. Hope Center has standing to seek damages because it has suffered a past constitutional injury.

Hope Center has also sufficiently shown standing to seek damages for being forced to self-censor on account of Defendants' actions. This injury—which occurred before the lawsuit was filed and is ongoing—should be redressed regardless of Defendants' current litigating position.

*Injury-in-fact.* Hope Center has suffered self-censorship, which is a constitutionally recognized injury. *Am. Booksellers*, 484 U.S. at 393. "[E]ven minor constitutional injuries that justify only nominal damages may be sufficient to establish an injury-in-fact." *Duran v. City of Porterville*, 47 F. Supp. 3d 1044, 1053 (E.D. Cal. 2014); *see also Uzuegbunam*, 141 S. Ct. at 796 ("[A]n award of nominal damages . . . can redress a past injury.").

In *Jacobs*, the Ninth Circuit held that a group of students showed an injury in fact because the school district's uniform policy allegedly "depriv[ed] [their] First Amendment right to communicate a particular written message" and "to engage in expressive conduct." 526 F.3d at 426. Other courts have affirmed this principle. For example, the Seventh Circuit observed that, if a party "refrained from protected speech in response to [a city's] unconstitutional ordinances," then it "ha[s] already suffered an injury" "sufficient to support standing." *Six Star Holdings*, 821 F.3d at 803. This is so even if the government later repeals the problematic law. *Id.* at 779.

Here, Hope Center suffered such an injury, and Defendants fail to address this point. VC ¶¶ 59, 128–29. Hope Center was not "self-censoring in a vacuum." *Six Star Holdings*, 821 F.3d at 804. Rather, it "respond[ed] rationally," *id.*, to the history of enforcement and the subsequent repeal of the homeless-shelter exemption. *See also id.* (self-censorship reasonable when the law prohibited unlicensed speech); *Klahr*, 830 F.3d at 795 (self-censorship reasonable if there are civil and criminal penalties). Furthermore, Defendants singled out Hope Center and the prior litigation during the

*The Downtown Soup Kitchen v. Municipality of Anchorage*, No. 3:21-cv-00155-SLG

legislative process and characterized Hope Center's beliefs as "disappointing," "misinformed," and based on "mischaracterizations." VC ¶¶ 114, 116. Hope Center reasonably chilled it speech in response. And Defendants' purported interpretative shift after-the-fact does not, and cannot, undo this past constitutional injury. *See Six Star Holdings*, 821 F.3d at 799, 802–03.

    ***Traceability & Redressability***. Again, Defendants cannot dispute that their actions have caused Hope Center to self-censor its speech. *Cf. Downtown Soup Kitchen*, 406 F. Supp. 3d at 793–94. And their current litigation shift cannot change the injury that Hope Center already suffered. This kind of constitutional harm can be redressed through damages, nominal or otherwise. *See Uzuegbunam*, 141 S. Ct. at 796. Accordingly, Hope Center has standing to pursue its claims for damages.

## CONCLUSION

    Hope Center has standing to seek appropriate redress for its injuries. After this Court issued a ruling to protect Hope Center from Defendants' reach, Defendants changed the laws to target Hope Center. Now that Hope Center has sought relief from this Court again, Defendants seek to avoid accountability by offering a litigation position premised on a novel interpretation of the laws and a promise to leave Hope Center alone that is written in sand. If the Court looks the other way now, Hope Center's "constitutional rights" will be left "in limbo," unsure when the sword of enforcement will fall. *Downtown Soup Kitchen*, 406 F. Supp. 3d at 788 (denying Defendants' request for abstention). The Court should deny Defendants' motion to dismiss.

Respectfully submitted this 13th day of September 2021.

s/ *Ryan J. Tucker*
David A. Cortman, *Pro Hac Vice*
Ryan J. Tucker, *Pro Hac Vice*
Katherine L. Anderson, *Pro Hac Vice*
Jeremiah J. Galus, *Pro Hac Vice*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
dcortman@adflegal.org
rtucker@adflegal.org
kanderson@adflegal.org
jgalus@adflegal.org

Sonja Redmond, AK Bar No. 0605022
LAW OFFICE OF SONJA REDMOND
PO Box 3529
35202 Kenai Spur Hwy.
Soldotna, Alaska 99669
(907) 262-7846
sredmond@greatlandjustice.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2021, the foregoing was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

Municipality of Anchorage
623 W. 6th Avenue, Suite 730
Anchorage, AK 99501

Anchorage Equal Rights Commission
632 W. 6th Avenue, Suite 110
Anchorage, AK 99501

Mitzi Bolaños Anderson
Executive Director
Anchorage Equal Rights Commission
632 W. 6th Avenue, Suite 110
Anchorage, AK 99501

Respectfully submitted this 13th day of September 2021.

*s/ Ryan J. Tucker*
Ryan J. Tucker

*Attorney for Plaintiff*