Ruth Botstein
Meagan Carmichael
Assistant Municipal Attorney
Municipal Attorney's Office
P.O. Box 196650
Anchorage, Alaska 99519-6650
Phone: (907) 343-4545
Fax: (907) 343-4550
Email: uslit@muni.org

Attorneys for Defendants Municipality of Anchorage, Anchorage Equal Rights
Commission, and Mitzi Bolaños Anderson in her Official Capacity as the
Executive Director of the Anchorage Equal Rights Commission

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| THE DOWNTOWN SOUP KITCHEN<br>d/b/a DOWNTOWN HOPE CENTER,<br><br>        Plaintiff,<br><br>vs.<br><br>MUNICIPALITY OF ANCHORAGE,<br>ANCHORAGE EQUAL RIGHTS<br>COMMISION, and MITZI BOLAÑOS<br>ANDERSON, in her Official Capacity as<br>the Executive Director of the Anchorage<br>Equal Rights Commission,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 3:21-cv-00155 SLG |

## REPLY IN SUPPORT OF DEFENDANTS' 12(b)(1) MOTION TO DISMISS FOR LACK OF STANDING

Hope Center's opposition to the motion to dismiss is rooted in a theory not

supported by the record before the Court: that the Municipality of Anchorage

revised AMC §§ 5.20.020 and 5.20.050 with the intent to target Hope Center's

1

homeless shelter, and that these ordinances apply to Hope Center's shelter operations. But neither of those things is true. Because the law does not even apply to Hope Center and it has not and is not being threatened with prosecution, Hope Center has not demonstrated the existence of a federal jurisdiction. The Court should dismiss the case.

### A. The Court properly may consider evidence and identify and resolve fact disputes in its analysis of this Rule 12(b)(1) motion.

As an initial matter, Hope Center argues that this Court must accept all of the factual allegations in its complaint as true because the Municipality's motion to dismiss is only a "facial attack, not a factual one" and because "Defendants have failed to offer any evidence in support of their motion." Docket 34 at 9-10. This is not correct. Because "a Rule 12(b)(1) motion can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency, and in so doing rely on affidavits or any other evidence properly before the court . . . [t]he district court obviously does not abuse its discretion by looking to this extra-pleading material in deciding the issue, even if it becomes necessary to resolve factual disputes." *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989).

Hope Center cites to *Courthouse News Serv. v. Planet*, 750 F.3d 776, 780 (9th Cir. 2014), in support of this argument, but it misconstrues the case. In *Courthouse News Services*, defendant Planet moved for dismissal on the basis of abstention, but did not specify which rule of civil procedure its motion sounded under. *Id.* at 779-80 & n.5. Planet did tell the court that it was "obligated to

assume the truth of the complaint's allegations," though, strongly suggesting that it was bringing a 12(b)(6) motion in which the complaint's allegations must be accepted as true. *Id.* Consistent with this posture, the abstention motion "expressly treated the complaint's allegations as true"; and for this reason, the district court was not asked to and did not make any findings of fact. *Id.* at 780. On appeal, the Ninth Circuit declined to re-classify the motion as sounding under 12(b)(1)—and therefore allowing judicial resolution of factual disputes—pointing out that the motion was presented as a 12(b)(6) motion and was treated that way by the district court. *Id.* It also distinguished between a facial jurisdictional attack, which "expressly treat[s] the complaint's allegations as true," and a factual jurisdictional challenge, which "rel[ies] on affidavits or any other evidence properly before the court to contest the truth of the complaint's allegations." *Id.* Because Planet had expressly treated the complaint's allegations as true and asked the court to do the same, its challenge fell into the "facial attack" category.

But under those standards, this case lies in the "factual attack" category. Unlike Planet's abstention motion in *Courthouse News Services*, the Municipality's motion clearly articulated from the outset that it sounded under Rule 12(b)(1), allowing this Court to look to materials outside the pleadings to resolve necessary factual disputes. Docket 28 at 15-16. Far from telling this Court that evidence and resolution of factual disputes were off-limits, the Municipality's motion identified material factual disputes—for example, whether the city's revised nondiscrimination ordinance was designed to penalize Hope

Center, and whether the Municipality intended to enforce the ordinance against it. It pointed to evidence in the record and in the public record that called into question Hope Center's asserted facts, and asked this Court to resolve those factual disputes. And in support of its motion, along with materials filed with Hope Center's complaint and municipal public records, the Municipality consistently cited to and relied upon the affidavit of AERC Executive Director Mitzi Bolanos Anderson. [Docket 27-1]. The record does not support the assertion, therefore, that the Municipality has not disputed plaintiff's factual allegations, has not placed any evidence before the Court in support of its motion,[1] and has told the court that it may not resolve factual disputes. Instead, the Municipality has brought a factual jurisdictional challenge under Rule 12(b)(1) in which consideration of evidence and resolution of factual disputes is requested and is proper.

---

[1]     If Hope Center is making a technical procedural argument that the Court cannot consider Ms. Anderson's affidavit because it was initially filed in connection with the preliminary injunction proceedings and not subsequently re-filed as an attachment to the motion to dismiss at Docket 28, this too is unavailing. The affidavit is evidence before the Court, to which the Municipality's motion to dismiss cited directly. Where the Court considers closely related motions within the same timeframe, as it has in this case, no rule requires parties to re-file identical documents with each motion, rather than simply citing to documents already before the Court. Any such rule would needlessly bloat the court's docket with numerous copies of identical evidence. In an abundance of caution, however, the Municipality hereby formally incorporates by reference into its Motion to Dismiss all of its statements, arguments, authorities, factual and legal citations, and evidence presented at Dockets 27, 27-1, and 29, as well as the statements and arguments of undersigned counsel at the September 14, 2021 oral argument.

Consideration of the fundamental characteristics of the two types of jurisdictional challenges reinforces this conclusion. The core difference between the approaches is that "[i]n a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Looking to the overall character and arguments of the Municipality's motion, it falls squarely within the factual challenge category. Anchorage's central argument is that Hope Center is wrong when it alleges that the Title 5 revisions targeted it, in its assertions about the scope and reach of the revised ordinance, and in its belief that the Municipality intends to prosecute it under this law. The city is not now, and has never argued, that what Hope Center says is true but that the Court nevertheless lacks jurisdiction. This is therefore a factual 12(b)(1) motion. This Court can and should consider all the evidence before it, and resolve factual disputes as it believes necessary.

**B.  Hope Center lacks standing to seek prospective relief because it faces no credible threat of enforcement.**

It is not surprising that Hope Center does not want the Court to resolve factual disputes here, because Hope Center's opposition to the motion to dismiss is rooted in its unsustainable view that Anchorage's recent revision of its nondiscrimination ordinance was designed and implemented in order to target or

5

persecute Hope Center, and that the agency's intention going forward is to enforce newly revised Title 5 against it. But when the evidence before the Court—including the legislative history of the ordinance revision as contained in municipal public records—is viewed as a whole, this view of the ordinance and its history is untenable. In fact, the Municipality revised its ordinance in response to this Court's prior orders finding the prior code to be confusingly drafted and structured, resulting in municipal liability; and the scope of its future enforcement must necessarily be cabined by the language and intent of the new code, and United States Supreme Court law placing Hope Center's homeless shelter outside the category of "public accommodation." For these reasons, there is no reasonable likelihood of enforcement against Hope Center, meaning that it does not present the Court with an Article III case or controversy.

1. **Hope Center's View of the intent and meaning of the ordinance is not supported by the evidence.**

Hope Center relies heavily, almost exclusively, on its narrative about the Municipality's bad-faith revision of its nondiscrimination code as evidence. For example, the only citations it provides in support of its assertions that "Defendants have renewed their effort to force Hope Center to admit men into its women's shelter" and "the legislative history further confirms that Defendants intended to target Hope Center" is to its own complaint—not to any of the actual legislative history evidence before the Court. Docket 34 at 6, 13. But Hope Center has not and cannot explain how its theory of the case is consistent with the actual

legislative materials before the Court, and makes little attempt to reconcile its theory with the record's contrary evidence.

For example, the theory that the Anchorage Assembly designed and intended this code revision to target Hope Center is not consistent with the undisputed evidence that one legislator apologized to Hope Center's director for the prior prosecution and explained that the revision was intended to prevent that from re-occurring in the future.  May 25, 2021 Assembly Meeting at 5:22:55.  Nor is it consistent with a second legislator's explanation that the code revision was intended to beef up the prior code's "tenuous" protections for Hope Center, and that Hope Center's shelter would not be covered.  May 25, 2021 Assembly Meeting at 5:19:19.  And Hope Center cannot explain why the Assembly placed so much emphasis on enacting stronger controls on the AERC's executive director and strengthening procedural protections for respondents unless the reason was, as the legislators stated, to prevent the aggressive 2018 Hope Center enforcement effort from re-occurring—another aspect of the legislation and its history that is not consistent with Hope Center's central theory.  Docket 15-2; Docket 27-1 ¶¶ 3-4.  This evidence significantly undermines Hope Center's factual theory about the purpose and effect of the ordinance before the Court.  The Court should not similarly turn a blind eye to the record.  Instead, it should consider the record as a whole and conclude that Hope Center is wrong about what happened here.

Nor is Hope Center correct that the changes to the law's text support its view.  Hope Center relies heavily on the new code's elimination of what it calls

the "homeless center exception" as evidence of intent to target it. This prior

provision was not limited to homeless centers; it was located within the "statutory

relic" Fair Housing Act section of the former code, and exempted any

"establishment of a hospital, convent, monastery, shelter, asylum, or residential

facility for the care and lodging of persons in need of special medical,

rehabilitative, social, or psychological support, including, but not limited to half-

way houses, drug treatment centers, detoxification facilities, and shelters for the

homeless" from the housing nondiscrimination code. Former AMC 5.25.030A.9.

Hope Center correctly notes that this language was deleted in the 2021 Code.

But contrary to Hope Shelter's contentions, the legislative history does not

"confirm[] that Defendants intended to target Hope Center by repealing the

homeless-shelter exemption." Docket 34 at 13. Instead, the legislative history

shows that this language was eliminated because the entire chapter where it was

contained was repealed as unnecessary. The language originally had been adopted

pursuant to a workshare agreement between the AERC and the U.S. Department of

Housing and Urban Development, but the agreement did not materialize. Docket

27-1 ¶ 6. The chapter contained provisions that the federal government wanted to

include in local law had the workshare proceeded, but the resulting chapter was

not utilized by the AERC and was duplicative and related confusingly to other

parts of the code—a structural problem that this Court previously identified.

Docket 27-1 ¶ 6. Fairly read, the Assembly's decision to repeal an unnecessary,

confusing statutory provision reflects legislative intent to clean up the code in

accordance with this Court's observations about its deficiencies—not an intent to target Hope Center.

This conclusion is bolstered by the fact that the former exception was replaced with language intended to do the same work in the new code. May 25, 2021 Assembly Meeting at 2:48:03, 3:32:18. To compensate for the deletion, new exemption language was added to the remaining housing chapter: "This section also does not apply to places which are institutional in nature and for which housing is merely incidental to a broader purpose, such as rehabilitation or medical care. Such institutional places may still be covered under section 36 5.20.050." Docket 15-2 at 8; *see also* May 25, 2021 Assembly Meeting at 2:48:03, 3:32:18.

Finally, Hope Center relies on a post-enactment comment regarding civility and tolerance by the Anchorage Assembly chair in its attempt to establish intent. Docket 34 at 12. But review of the comment makes clear that it was nothing more than an aspirational call for civility and tolerance, not an opinion on the legal intent or effect of the newly enacted code revision: "Putting aside a lot of the issues we've talked about with regard to Title 5, just generally, whenever these types of issues come up, whether it's a resolution supporting trans day visibility or anything else, it's just really disappointing when I hear such misinformed comments, either from members of the body or members of the public . . . ." 5/25/21 Assembly Meeting 5:27:00. This comment does not establish or even support the idea that the Municipality revised Title V to target Hope Center.

This Court should independently review the evidence regarding the Municipality's revisions to its nondiscrimination code and should conclude that the law was not revised with the intent to target Hope Center.

**2.    Hope Center's homeless shelter is not a public accommodation.**

Not only was the law not designed to target Hope Center, but its terms exempt Hope Center's shelter operation from the scope of the public accommodations law.  At the time the code was revised, it was already doubtful that Hope Center's shelter operations fell within the category of public accommodation—indeed, this Court found under the old code that they did not so qualify.  *Downtown Soup Kitchen*, 406 F. Supp 3d at 796-97.  And at least some members of the Assembly expressly believed that Hope Center could not properly be classified as a public accommodation under the new AMC § 5.20.050.  May 25, 2021 Assembly Meeting at 5:19:19, 2:49:04. And any doubt was eliminated by the Supreme Court's decision in *Fulton v. City of Philadelphia*, 141 U.S. 1868 (2021), which held that public accommodations "must provide a benefit to the general public allowing individual members of the general public to avail themselves of that benefit if they so desire" and that a "uniquely selective nature of the certification process" placed a business outside of this category. *Id.* at 1881.

Hope Center says little about *Fulton*.  Docket 34 at 14.  What it does *not* say is most critical. Hope Center does not dispute the applicability of this controlling precedent.  It also does not dispute the correctness of the Municipality's legal analysis placing Hope Center's shelter outside of the public

accommodation code under *Fulton* because of its intensive, selective application and approval process for shelter guests. Docket 34 at 14. This tacit concession that *Fulton* applies here and is controlling is fatal to Hope Center's attempt to establish standing. This Court cannot ignore Supreme Court precedent; its analysis must recognize that, according to controlling law, Hope Center is not a public accommodation under the current Anchorage Municipal code. But as discussed below, Hope Center cannot have a reasonable fear of enforcement of a law that does not apply to it, depriving it of standing.

### 3. There is no credible enforcement threat.

To determine the existence of a credible enforcement threat, the court analyzes three factors: "1) the likelihood that the law will be enforced against the plaintiff; 2) whether plaintiff has shown, with some degree of concrete detail, that she intends to violate the challenged law; and 3) whether the law even applies to the plaintiff." *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1171-72 (9th Cir. 2018) *(*citing *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010)) (internal quotes omitted). The parties appear to agree that the existence of a realistic enforcement danger, and the closely related inquiry as to whether the law covers Hope Center at all, are central factual questions before the Court. Hope Center has not made a sufficient showing.

"[W]hen plaintiffs seek to establish standing to challenge a law or regulation that is not presently being enforced against them, they must demonstrate a realistic danger of sustaining a direct injury as a result of the

statute's operation or enforcement." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1152 (9th Cir. 2000); *Bland v. Fessler*, 88 F.3d 729, 736–37 (9th Cir.1996) (both quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  As discussed above, the record does not support Hope Center's assertion that the law was revised to target it, significantly undercutting its claim of a reasonable fear of enforcement against it.  And Hope Center's tacit concession that *Fulton* applies here undermines any attempt to establish that AMC § 5.20.050 applies to it at all, since under *Fulton* the shelter is not a public accommodation.  With respect to AMC § 5.20.020, it does not apply to Hope Center for the reasons that this Court has already articulated: "the Alaska Supreme Court has concluded that '[t]he purpose of AMC 5.20.020 . . . is to prohibit discrimination in the rental housing market.' Applying the provision's prohibitions to Hope Center's homeless shelter would not further this purpose." 406 F. Supp. 3d. at 795.  Accordingly, these provisions do not apply to Hope Center's shelter, and it faces no realistic fear of enforcement.

> **4.      The Municipality has disavowed its intent to enforce the law against Hope Center; in the alternative, instead of relying on the Municipality's disavowal of prosecution, the Court can and should find as a matter of law that Hope Center does not fall within the challenged ordinances.**

Hope Center focuses on what it perceives as the insufficiency of the Municipality's disavowal of prosecution as support for its credible fear of enforcement.  Docket 34 at 18-21.  Under the circumstances, the Court can and should accept the disavowal as adequate.

First, as discussed above, Hope Center's view that the ordinance was designed to, and does, target it is not supported by the record as a whole. This Court should reject that claim, and along with it Hope Center's arguments that the Municipality's expressed intent not to prosecute under the newly revised code is "manifestly unreasonable" because of that intent. Docket 34 at 18. And contrary to the emphasis that Hope Center gives them, the 2018 AERC proceedings should carry little weight here because "the challenged law is relatively new and the record contains little information as to enforcement or interpretation." *California Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021) (internal quotes omitted).

Second, Hope Center misunderstands the executive director's role in the statutory scheme. The Municipality's disavowal affidavit was submitted from the AERC Executive Director. Docket 27-1. Hope Center argues that the Commission itself, and not the director, should be the proper parties to establish a meaningful disavowal of prosecution because "even without the Director's involvement, Hope Center still faces a threat of enforcement from the Commission," which it believes is "required to commence an investigation" upon receiving a complaint. Docket 34 at 19-20. But this is not correct. In fact, the executive director—not the Commission—has the power to dismiss complaints at any time, without convening an investigation or any other proceedings, if she determines that "the commission lacks jurisdiction over the subject matter" of the complaint. AMC § 5.60.020.A.4 (Administrative Closure). Non-jurisdictional

allegations—such as a complaint of discrimination against an entity, like Hope Center's shelter, that is not covered by Title V—can and routinely are screened out and not accepted by the AERC pursuant to this provision. Because it is the executive director who bears responsibility for screening out non-cognizable complaints, she is the correct person to weigh in on whether the AERC would or would not accept and prosecute such a matter. She stated that it would not. This is a disavowal of prosecution, making clear that there is no "specific and credible" threat of enforcement. *Lopez*, 630 F.3d at 786-87.

Hope Center views this affidavit as too equivocal because Ms. Anderson stated that she was relying on the Supreme Court's *Fulton* decision to conclude that Hope Center was not a public accommodation, and suggested that her analysis could change if the Supreme Court reversed course: "Because Hope Center's services fall outside of the scope of the public accommodations category as described by *Fulton*, the AERC has no basis to and does not intend to enforce Title 5's gender identity or sex discrimination provisions against Hope Center's overnight shelter operations unless Hope Center affirmatively decides to enter into contracts that contain nondiscrimination requirements or the federal law changes in such a way as to allow a more expansive definition of the public accommodations category." Docket 27-1 at ¶ 11. But the concession that the AERC will follow federal law is not, as Hope Center views it, a license for the Executive Director to change her mind at will. A lawyer's statement that if the United States Supreme Court changes the governing law she will need to re-

evaluate her legal analysis[2] is nothing more than a recognition that the AERC must continue to follow controlling federal law, an uncontroversial proposition. Nor is there any specific and credible reason to believe that the United States Supreme Court will soon overrule a three-and-a-half-month-old decision.

Finally, even if the Court believes that the disavowal of prosecution is not specific, permanent, or global enough as Hope Center has argued, that deficiency still would not confer standing. This is because the Court need not rely on the Municipality's disavowal to conclude that the challenged law is inapplicable to Hope Center and therefore will not be enforced against it. The Ninth Circuit has explained that lack of applicability may be established either through disavowal or through the Court's independent analysis: courts should consider "whether the challenged law is inapplicable to the plaintiffs, either by its terms or as interpreted by the government. Such inapplicability weighs against both the plaintiffs' claims that they intend to violate the law, and also their claims that the government intends to enforce the law against them." *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010). Thus, even without Ms. Anderson's affidavit, the Court can and should look to the legislative history, ordinance text, and governing decisional law to conclude that revised AMC §§ 5.20.020 and 5.20.050 do not apply to Hope

---

[2] The public funds aspect of the public accommodations definition is not at issue in this case. But it also does not undercut the Municipality's disavowal to observe that the AERC could have jurisdiction if, and only if, Hope Center affirmatively decides to enter into contracts that bring it within the scope of the public accommodation. It is not inconsistent or wishy-washy to note that Hope Center could affirmatively opt in as a public accommodation, but will not be prosecuted unless it does so.

Center and therefore that it does not face a realistic fear of enforcement, depriving it of standing.

> **5.** **Because Hope Center's shelter operation falls outside of the reach of the nondiscrimination law, the Court can grant no effective relief here.**

The Municipality's opening motion took the position that "Hope Center has failed to show a likelihood that its claimed 'injury will likely be redressed by a favorable decision'" because the challenged ordinances do not apply to it at all. Docket 28 at 28 (quoting *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013) and *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). It explained that "any decision from the Court on the merits of Hope Center's claims would be advisory and would not redress any harms suffered by Hope Center; indeed, such an order would not have any practical impact on Hope Center at all. There is no effective relief that this Court can grant to Hope Center." Docket 28 at 28. In light of these arguments, Hope Center's statement that "Defendants do not dispute traceability and redressability," Docket 34 at 21, is not correct. The Municipality has consistently maintained that since the challenged ordinance does not apply to Hope Center's shelter and there is no threat of enforcement, there is no effective relief this Court could grant. This Court should find the same.

**C.    Hope Center lacks standing to seek damages for past harms because its self-censorship was not rooted in a well-founded fear of prosecution.**

Nor is Hope Center's asserted self-censorship injury sufficient to save the case from dismissal. Hope Center states that it decided not to post its shelter

admissions policies, which include its rule against accepting transgender women, for fear that doing so would run afoul of the revised Title V. This is the only past injury it asserts. Hope Center then points to cases holding that self-censorship is a recognizable First Amendment harm sufficient to confer standing. [Docket 34 at 21-23]

But the self-censorship doctrine is more narrow than Hope Center would like it to be. "The self-censorship door to standing does not open for every plaintiff." *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003). Hope Center neglects to mention that, as with standing on the basis of feared future enforcement, standing for past self-censorship harm only exists where the self-censorship "is based on an actual and well-founded fear that the challenged statute will be enforced" against it. *Libertarian Party of Los Angeles Cty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) (quoting *Ariz. Right to Life Political Action Comm. v. Bayless,* 320 F.3d 1002, 1006 (9th Cir. 2003)); *see also Getman*, 328 F.3d at 1095. And "[i]n the free speech context, such a fear of prosecution will only inure if the plaintiff's intended speech arguably falls within the statute's reach." *Getman*, 328 F.3d at 1095.

Thus, Hope Center's standing to seek damages for past self-censorship is not a separate, automatically-available category of damages. Instead, standing to seek this relief turns on the same core questions as does the claim for prospective relief: whether Title V applies to Hope Center at all, and whether Hope Center's fear of prosecution is well-founded. As discussed above, the revised law does *not*

actually apply to Hope Center; and although "the chilling effect of a statute that *violates* the First Amendment is enough to support a claim," *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 804 (7th Cir. 2016) (emphasis added), the same cannot be said of an inapplicable, constitutional statute. And as discussed above and in the related preliminary injunction briefing and argument, Hope Center's fear of prosecution was not well-founded in light of the fact that its homeless shelter operation lies outside the scope of the law, as confirmed by legislative history of the ordinance; the United States Supreme Court's decision in *Fulton*; the Municipality's stated intent not to enforce; and this Court's prior holding that the housing code's speech restriction is aimed at residential real estate discrimination and does not cover Hope Center's homeless shelter operation at all.

\* \* \*

For all these reasons, Hope Center lacks standing in this case. Because there is no federal jurisdiction, this Court should dismiss the case in its entirely.

Respectfully submitted this 6th day of October, 2021.

PATRICK N. BERGT
Municipal Attorney

By: s/Ruth Botstein, s/ Meagan Carmichael
    Ruth Botstein (AK Bar No. 9906016)
    Meagan Carmichael (AK Bar No. 1011071)
    Assistant Municipal Attorneys
    Municipal Attorney's Office
    P.O. Box 196650
    Anchorage, Alaska 99519-6650
    Phone: (907) 343-4545
    Fax: (907) 343-4550
    Email: uslit@muni.org

Certificate of Service
The undersigned hereby certifies that on October 6, 2021, a true and correct copy of the foregoing was served by electronic means through the ECF system.


s/ Amber J. Cummings
Amber J. Cummings, Legal Secretary
Municipal Attorney's Office