# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

THE DOWNTOWN SOUP KITCHEN
d/b/a DOWNTOWN HOPE
CENTER,

          Plaintiff,

       v.

MUNICIPALITY OF ANCHORAGE,
ANCHORAGE EQUAL RIGHTS
COMMISSION, and MITZI
BOLAÑOS ANDERSON, in her
Official Capacity as the Executive
Director of the Anchorage Equal
Rights Commission,

          Defendants.

Case No. 3:21-cv-00155-SLG

## ORDER RE DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING

Before the Court at Docket 28 is *Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing* filed by the Municipality of Anchorage, the Anchorage Equal Rights Commission, and Mitzi Bolaños Anderson (collectively, "the Municipality"). Plaintiff the Downtown Soup Kitchen d/b/a Downtown Hope Center ("Hope Center") responded in opposition at Docket 34, and the Municipality replied at Docket 40. Oral argument on a separate motion—Plaintiff's Motion for Preliminary Injunction at Docket 15—was held on September 14, 2021.[1]

---

[1] *See* Docket 35.

# BACKGROUND

## I.  Hope Center

Hope Center is a non-profit religious organization located in Anchorage, Alaska that provides meals, showers, laundry services, clothing, job training, and religious ministry to homeless individuals, as well as an overnight shelter for homeless women.[2]  The shelter can accommodate up to fifty women per night.[3] Due to limited space, the women must all sleep three to five feet apart on the floor of one large room, where they may change clothes or be in various states of undress.[4]  Many of the women who stay at Hope Center's shelter have experienced rape, sex trafficking, physical abuse, and domestic violence, "primarily at the hands of men."[5]

Hope Center maintains that its religious beliefs compel it to care for Anchorage's homeless and to "cherish, respect, and protect women."[6]  It also believes that "God creates people male or female," that "[a] person's sex (male or female) is an immutable God-given gift," and that "[i]t is wrong for a person to deny his or her God-given sex."[7]  In keeping with these beliefs, Hope Center allows "only

---

[2] Docket 1 at 2, ¶¶ 2, 4.

[3] Docket 1 at 2, ¶ 4.

[4] Docket 1 at 12, ¶¶ 52–53.

[5] Docket 1 at 2, ¶ 4.

[6] *See* Docket 1 at 3, 10, ¶¶ 5, 40.

[7] Docket 1 at 10, ¶ 40.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 2 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 2 of 48

biological women to stay overnight at the shelter."[8]  Hope Center previously posted an admissions policy on its website and at its premises stating that "guests of the shelter must be biological females" and that "[it] is against [shelter] policy for biological males to spend the night."[9]  It states that it has since removed these postings due to fear of prosecution under the Municipality's nondiscrimination laws.[10]

Hope Center's operational policies explain that "[b]ecause of limited resources and limited space and because of its mission to serve and empower those most in need, the Center cannot accept everyone, a large portion of the public, or even a large portion of those in need of transient overnight housing."[11]  Accordingly, shelter guests must meet detailed admissions criteria, and certain categories of potential shelter guests receive priority when space is limited.[12]  To qualify for admission, shelter guests must be homeless, at imminent risk of homelessness, or fleeing domestic violence; be 18 years of age or older; avoid "demonstrat[ing] behavior dangerous to staff, guests, or themselves"; be able to "function in the shelter environment without serious disruption"; be "clean and sober"; be "biological females, meaning they were born with, and currently have,

---

[8] Docket 1 at 12, ¶ 54.

[9] Docket 1 at 13, ¶ 57.

[10] *See* Docket 1 at 28, ¶¶ 127–29.

[11] Docket 1-3 at 4.

[12] Docket 1-3 at 4–6; Docket 1 at 11, ¶¶ 46–50.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 3 of 48

only anatomical and genetic characteristics of a woman"; adhere to shelter policies; be willing to "be exposed to Christian teachings and not disrupt meetings inculcating Christian values"; follow the shelter schedule; perform chores; and meet medical, functional limitation, and hygiene requirements.[13]  Potential guests must agree in writing to follow these policies and must receive advance approval from Hope Center staff before they can access the shelter.[14]  Hope Center staff have "sole discretion" to determine whether an applicant meets the admissions criteria and may look to factors including their personal observations, interviews with the applicant, reports from other shelter guests, medical tests, and government records.[15]

## II.  Prior Litigation

Title 5 of the Anchorage Municipal Code ("AMC"), entitled "Equal Rights," is intended to "guarantee fair and equal treatment under law to all people of the municipality, consistent with federal and state constitutional freedoms and laws, including freedom of expression, freedom of association and the free exercise of religion."[16]  Chapter 5.20 of the title includes prohibitions on discriminatory practices "in the sale, rental, or use of real property" (section 5.20.020) and "in

---

[13] Docket 1-3 at 4–5.

[14] Docket 1-3 at 6.

[15] Docket 1-3 at 6.

[16] AMC § 5.10.010.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 4 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 4 of 48

places of public accommodation" (section 5.20.050). The Municipality has charged the Anchorage Equal Rights Commission ("AERC") with administering and enforcing Title 5.[17] Any person who believes they have been discriminated against in violation of Title 5 may file a complaint with the AERC, and the Commission's Executive Director also has the power to file a complaint on behalf of others, subject to the approval of a panel of three Commissioners.[18]

In 2018, "Jessie Doe," a transgender woman, filed a complaint with the AERC alleging that Hope Center had denied her admission to its homeless shelter based on her sex and gender identity in violation of Title 5's public accommodations provision, section 5.20.050.[19] Doe had been dropped off at Hope Center by the Anchorage police on a Friday evening and "smelled of alcohol, had an open eye wound, and seemed agitated and aggressive."[20] Sherrie Laurie, Hope Center's Executive Director, denied Doe admission to the shelter because Doe was inebriated, which violated Hope Center's admissions criteria.[21] Doe tried to access the shelter the following day but was again denied entry because Hope Center was not accepting new shelter guests at the time and does not allow Saturday admission unless the guest has stayed at the shelter the previous

---

[17] *Id.* §§ 5.10.020, 5.10.040.

[18] *Id.* §§ 5.40.010(A)–(B).

[19] Docket 1 at 19, ¶ 89; Docket 34 at 9–10.

[20] Docket 1 at 18, ¶¶ 79, 81.

[21] Docket 1 at 18–19, ¶¶ 80, 82; *see also* Docket 1-3 at 5.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 5 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 5 of 48

evening.[22]   The AERC and its then–Executive Director "aggressively litigated" Doe's claim, refusing to dismiss the claim and even filing a second action against Hope Center and its then–legal counsel based on that attorney's statements in the media regarding the shelter's admissions policy.[23]

In response, Hope Center filed a complaint against the Municipality in this Court, seeking declaratory and injunctive relief from enforcement of sections 5.20.020 and 5.20.050.[24]   The Court granted a preliminary injunction in August 2019, holding that Hope Center was likely to succeed on the merits of its claims because neither of the Municipal Code provisions applied to homeless shelters.[25] The Court held that section 5.20.020, the real property provision, did not apply to Hope Center because that section, as it was then drafted, expressly incorporated by reference a homeless-shelter exemption contained in AMC chapter 5.25.[26]   The Court further reasoned that section 5.20.050 should not be interpreted to include homeless shelters as "public accommodations" because doing so would render meaningless the homeless-shelter exemption incorporated into section 5.20.020.[27]

---

[22] Docket 1 at 19, ¶¶ 87–88; Docket 1-4 at 3; Docket 34 at 10.

[23] Docket 28 at 4; *see also* Docket 1 at 20–21, ¶¶ 90–94.

[24] *See* Docket 1 at 22, ¶ 99; *Downtown Soup Kitchen v. Municipality of Anchorage*, 406 F. Supp. 3d 776 (D. Alaska 2019).

[25] *Downtown Soup Kitchen*, 406 F. Supp. 3d at 794–97, 799.

[26] *Downtown Soup Kitchen*, 406 F. Supp. 3d at 795.

[27] *Downtown Soup Kitchen*, 406 F. Supp. 3d at 794–97.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 6 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 6 of 48

Because the Court found that both of the AMC sections did not apply to Hope Center, it did not reach Hope Center's constitutional arguments.[28]  Shortly after, the parties resolved the litigation with a consent decree in which the Municipality agreed to cease its enforcement actions and pay Hope Center $1.00 in nominal damages and $100,000 in attorney's fees and costs.[29]

### III.    Title 5 Revisions

The Anchorage Assembly began revising Title 5 in 2019 and completed the process on May 25, 2021 by enacting ordinance AO2021-30.[30]  The ordinance was designed in part to "address legal issues raised by the *Downtown Soup Kitchen* litigation, which resulted in a $100,001 settlement paid by the Municipality."[31]  Assembly members frequently referenced Hope Center and the prior litigation at the May 25 meeting, during which the Assembly discussed the proposed ordinance and amendments to it, heard testimony from members of the public, and questioned the AERC's Executive Director, Mitzi Bolaños Anderson, about the legal effects of changes made by the ordinance.[32]  Ms. Laurie, Hope Center's

---

[28] *Downtown Soup Kitchen*, 406 F. Supp. 3d at 794.

[29] *See* Joint Consent Decree (Oct. 2, 2019), *Downtown Soup Kitchen*, 406 F. Supp. 3d 776 (Case No. 3:18-cv-00190-SLG), ECF No. 102.

[30] *See* Docket 1-1; Docket 28 at 6; Docket 27-1 at 2, ¶ 2 (Bolaños Anderson Aff.).

[31] Docket 1-2 at 3.

[32] *See* Municipality of Anchorage Meetings, *Assembly Regular – May 25, 2021 – 2021-05-25 17:00:00*, YouTube (May 26, 2021), https://www.youtube.com/watch?v=cX06vb-mq2Y [hereinafter *May 25, 2021 Assembly Meeting*].

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 7 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 7 of 48

Executive Director, was among those who testified.[33]  Ultimately, the Assembly enacted an amended version of the ordinance with a 7–2 vote.[34]

Many of the changes made by the ordinance were procedural.  The Assembly overhauled the AERC's conciliation, litigation, and hearing procedures, as well as increased the Commission's oversight of the Executive Director.[35]  The ordinance made substantive changes as well; the three most relevant changes are detailed below.

*First*, the ordinance repealed chapter 5.25 of the old code, entitled "Fair Housing Act," in its entirety.[36]  The Municipality explains that this chapter was not used by the AERC because it had been adopted pursuant to a planned workshare agreement with the U.S. Department of Housing and Urban Development that never materialized.[37]  The homeless-shelter exemption that informed this Court's decision in the 2018 litigation was contained in chapter 5.25 and thus was repealed as a result of the chapter's removal.[38]

---

[33] *Id.* at 5:16:00–5:25:03.

[34] *Id.* at 3:56:59–3:57:27.

[35] *See* Docket 1-1; Docket 27-1 at 2, ¶¶ 3–4 (Bolaños Anderson Aff.).

[36] *See* Docket 1-1; Docket 28 at 7.

[37] Docket 28 at 7.

[38] *See* Docket 28 at 7; *Downtown Soup Kitchen*, 406 F. Supp. at 786–87; AMC § 5.25.30 (2020) (repealed 2021).

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 8 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 8 of 48

*Second*, the ordinance updated the code's definition of "public accommodation" in AMC section 5.20.010, impacting the reach of section 5.20.050. The former section 5.20.010 defined "public accommodation" as "any business or professional activity that is open to, accepts or solicits the patronage of, or caters or offers goods or services to the general public, subject only to the conditions and limitation established by law and applicable alike to all persons."[39] As revised, section 5.20.010 now defines "public accommodation" as "a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, (1) whose goods, services, facilities, privileges, advantages or accommodations are made available to the general public, or (2) that accepts public funds with non-discrimination contractual requirements." Section 5.20.050, which remained unchanged, provides in relevant part:

> A. It is unlawful for a person, whether the owner, operator, agent or employee of an owner or operator of a public accommodation, to:
>
>> 1. Refuse, withhold from or deny to a person any of its accommodations, advantages, facilities, benefits, privileges, services or goods of that place on account of . . . sex [or] gender identity . . . .
>>
>> 2. Publish, circulate, issue, display, post or mail a written or printed communication, notice or advertisement which states or implies that:
>>
>>> a. Any of the services, goods, facilities, benefits, accommodations, advantages or privileges of the public

---

[39] AMC § 5.20.010 (2020).

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 9 of 48

accommodation will be refused, withheld from or denied to a person of a certain . . . sex [or] gender identity . . . ; or

b. The patronage or presence of a person belonging to a particular . . . sex [or] gender identity . . . is unwelcome, not desired, not solicited, objectionable or unacceptable.

*Third*, the ordinance removed section 5.20.020's reference to the now-deleted section 5.25.030 and added an exemption to the section for "institutional places." The relevant parts of section 5.20.020 are outlined below; deleted portions are indicated with a strikethrough and new portions are underlined:

A. ~~With the exception of those conditions described in section 5.25.030A. as "lawful practices", it~~ It is unlawful for the owner, lessor, manager, agent, brokerage service, or other person having the right to sell, lease, rent, advertise, or an owner's association having the powers of governance and operation of real property to:

1. Refuse to sell, lease or rent, or to otherwise make unavailable, the real property to a person because of . . . sex [or] gender identity . . . .

2. Discriminate against a person because of . . . sex [or] gender identity . . . in a term, condition or privilege relating to the use . . . of real property . . . .

7. Circulate, issue or display, make, print or publish, or cause to be made or displayed, printed or published, any communication, sign, notice, statement or advertisement with respect to the use, sale, lease or rental of real property that indicates any preference, limitation, specification or discrimination based on . . . sex [or] gender identity . . . .

B. Notwithstanding the provisions of this section, this section does not apply where the renter or lessee shares common living areas in an individually or privately owned home or dwelling unit with the owner, lessor, manager, agent or other person and the owner, lessor, manager, agent actually occupies the home or dwelling unit as a resident. This section also does not apply to places which are institutional in nature and for which housing is merely incidental to a

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 10 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 10 of 48

broader purpose, such as rehabilitation or medical care. Such institutional places may still be covered under section 5.20.050.

## IV. Current Litigation

Hope Center initiated the current litigation against the Municipality in July 2021, alleging that sections 5.20.020 and 5.20.050 violate its free exercise, free speech, expressive association, private association, and due process rights under the First and Fourteenth Amendments.[40] The complaint alleges that Hope Center seeks to continue to exclude transgender women from its shelter and that it has taken down its admissions policies but would repost them on its website and premises if not for sections 5.20.020 and 5.20.050.[41] Hope Center seeks preliminary and permanent injunctive relief from the enforcement of sections 5.20.020 and 5.20.050, declaratory judgment stating that the sections are unconstitutional, and compensatory and nominal damages, including attorney's fees.[42]

The instant motion, the Municipality's 12(b)(1) motion to dismiss, asserts that the Court lacks subject matter jurisdiction over Hope Center's claims. The Municipality contends that Hope Center lacks standing to challenge sections 5.20.020 and 5.20.050 both because those sections are inapplicable to Hope Center's shelter operations and because the Municipality asserts that it has no

---

[40] *See* Docket 1 at 28–38.

[41] *See* Docket 1 at 26–28, 33, ¶¶ 117, 126–29, 157–58.

[42] Docket 1 at 38–39.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 11 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 11 of 48

plans to enforce the revised nondiscrimination code against Hope Center.[43] Accordingly, the Municipality asks that this Court dismiss Hope Center's claims for lack of standing.[44]

## LEGAL STANDARDS

### I. Dismissal Under Rule 12(b)(1)

Lack of standing necessitates dismissal under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.[45] "A Rule 12(b)(1) jurisdictional attack may be facial or factual."[46] In a facial attack, "the challenger asserts that the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction,"[47] whereas a factual attack entails "attack[ing] the substance of a complaint's jurisdictional allegations despite their formal sufficiency."[48] A factual attack may rely on "affidavits or any other evidence properly before the court."[49] When resolving a factual attack on jurisdiction, a court

---

[43] Docket 28 at 29.

[44] Docket 28 at 2, 16.

[45] *See Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).

[46] *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

[47] *Id.*

[48] *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989).

[49] *Id.*

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 12 of 48

may "review evidence beyond the complaint" and "need not presume the truthfulness of the plaintiff's allegations."[50]

Hope Center suggests that the instant motion constitutes a facial attack, asserting that the Municipality "treat[s] Hope Center's relevant factual allegations as true" and "ha[s] failed to offer any evidence in support of [its] motion."[51] It acknowledges that the Municipality's motion relies on an affidavit from Ms. Bolaños Anderson but asserts that the affidavit does not constitute evidence in support of the instant motion because the affidavit was filed in response to Hope Center's motion for a preliminary injunction.[52] It cites to *Courthouse News Services*, a case in which the defendant moved for dismissal on the basis of abstention without specifying the applicable rule of civil procedure.[53] In that case, the Ninth Circuit treated the motion as one under Rule 12(b)(6); however, the court noted that if it were a Rule 12(b)(1) motion, it would be a facial rather than factual challenge.[54] The court reasoned that the challenge would be facial because the motion

---

[50] *Safe Air for Everyone*, 373 F.3d at 1039.

[51] Docket 34 at 15. In a footnote, Hope Center alternatively asserts that "even in a factual challenge, the Court cannot resolve 'genuinely disputed facts' that are 'intertwined' with the merits of Hope Center's arguments. And it would be improper to dismiss the complaint without at least giving Hope Center the chance to conduct limited jurisdictional discovery." Docket 34 at 15 n.3 (citation omitted). The Court will not address these two arguments as they were not adequately developed by Hope Center. *See Maldonado v. Morales*, 556 F.3d 1037, 1048 n.4 (9th Cir. 2009) ("Arguments made in passing and inadequately briefed are waived.").

[52] Docket 34 at 15 (citing *Courthouse News Serv. v. Planet*, 750 F.3d 776, 780 (9th Cir. 2014)).

[53] *Courthouse News Serv.*, 750 F.3d at 779–80, 779 n.2.

[54] *Id.* at 780.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 13 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 13 of 48

"expressly treated the complaint's allegations as true"; the district court did not make findings of fact; and the only contrary evidence before the district court was submitted in response to a separate motion.[55]

The Municipality replies that its motion is a factual attack because it "identified material factual disputes," "pointed to evidence . . . that called into question Hope Center's asserted facts," and "cited to and relied upon the affidavit of AERC Executive Director Mitzi Bolaños Anderson."[56] It emphasizes that its "central argument" is a factual one: "that Hope Center is wrong when it alleges that the Title 5 revisions targeted it, in its assertion about the scope and reach of the revised ordinance, and in its belief that the Municipality intends to prosecute it under this law."[57] The Municipality also contends that Hope Center "misconstrues" *Courthouse News Service*, emphasizing that the defendant in that case "expressly treated the complaint's allegations as true and asked the court to do the same."[58] It maintains that the Bolaños Anderson affidavit should be considered "evidence before the court" regardless of whether it was filed in connection with the instant

---

[55] *Id.*

[56] Docket 40 at 3–4.

[57] Docket 40 at 5 ("The city is not now, and has never argued, that what Hope Center says is true but that the court nevertheless lacks jurisdiction.").

[58] Docket 40 at 2–3.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 14 of 48

motion, asserting that "no rules require parties to re-file identical documents with each motion" and that "[a]ny such rule would needlessly bloat the court's docket."[59]

The Court agrees with the Municipality that the instant motion constitutes a factual jurisdictional attack. Much of the motion is devoted to disputing Hope Center's factual allegations that it was targeted by the Title 5 revisions and that the Municipality will soon enforce sections 5.20.020 and 5.20.050 against Hope Center's shelter operations. The factual nature of the Municipality's attack is not undercut by the fact that the Bolaños Anderson affidavit was submitted in response to a separate motion. In *Courthouse News Service*, the Ninth Circuit seemingly only highlighted those circumstances because the defendant's motion to dismiss expressly treated the complaint's allegations as true and did not reference the previously submitted evidence.[60] When, as here, the movant expressly *disputes* certain of the complaint's allegations and cites to previously submitted evidence in the motion to dismiss, it is appropriate to treat the motion as a factual jurisdictional attack. Thus, this Court may review evidence beyond Hope Center's complaint and need not presume that all of the complaint's allegations are true when considering the instant motion.

---

[59] Docket 40 at 4 n.1. In its Reply, the Municipality also "formally incorporates by reference into its Motion to Dismiss all of its statements, arguments, authorities, factual and legal citations, and evidence presented at Dockets 27, 27-1, and 29, as well as the statements and arguments of undersigned counsel at the September 14, 2021 oral argument." *Id.*

[60] *See Courthouse News Serv.*, 750 F.3d at 780.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 15 of 48

## II.    Article III Standing

Under Article III of the Constitution, "[t]he jurisdiction of the federal courts is limited to 'cases' and 'controversies.'"[61]   Federal courts enforce this jurisdictional limitation through the doctrine of standing.[62]   Plaintiffs bear the burden of demonstrating the "irreducible constitutional minimum of standing," which requires three elements.[63]   A plaintiff must show (1) an injury in fact, meaning an "invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) causation; and (3) redressability, meaning that "the injury will likely be redressed by a favorable decision."[64]   Because a plaintiff "must demonstrate standing separately for each form of relief sought," Hope Center must establish standing separately for its claims for injunctive relief and its damages claims.[65]

Hope Center's claims constitute a pre-enforcement challenge to sections 5.20.020 and 5.20.050 because the Municipality is not currently enforcing those sections against Hope Center.[66]   To establish standing for a pre-enforcement

---

[61] *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1138 (9th Cir. 2013) (quoting U.S. Const. art. III, § 2).

[62] *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340–42 (2006).

[63] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

[64] *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013) (citing *Lujan*, 504 U.S. at 560–61).

[65] *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

[66] *See* Docket 28 at 25–26; Docket 27-1 at 5, ¶ 11 (Bolaños Anderson Aff.).

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 16 of 48

challenge, a plaintiff "must demonstrate 'a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.'"[67] That "realistic danger" exists if the plaintiff "intends to engage in 'a course of conduct arguably affected with a constitutional interest' and . . . there is a credible threat that the challenged provision will be invoked against the plaintiff."[68] By contrast, there is no realistic danger of injury if the plaintiff's fears of enforcement are merely "imaginary or speculative."[69] Pre-enforcement challenges alleging First Amendment violations "'present unique standing considerations' because of the 'chilling effect of sweeping restrictions' on speech."[70] For such challenges, the inquiry "tilts dramatically toward a finding of standing."[71] But even in the First Amendment context a plaintiff still must demonstrate a credible threat of adverse state action.

The Ninth Circuit examines three factors in determining whether a credible threat exists in the context of First Amendment challenges. First, a court considers the "likelihood that the law will be enforced against the plaintiff."[72] "[P]reliminary

---

[67] *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154 (9th Cir. 2000) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

[68] *LSO*, 205 F.3d at 1155 (quoting *Babbitt*, 442 U.S. at 298).

[69] *Id.* (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)).

[70] *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1171 (9th Cir. 2018) (quoting *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003)).

[71] *Italian Colors Rest.*, 878 F.3d at 1172 (quoting *LSO*, 205 F.3d at 1155).

[72] *Id.*

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 17 of 48

efforts to enforce a speech restriction," such as a warning or threat, and "past enforcement of a restriction" are strong—but not dispositive—evidence that a plaintiff faces a credible threat of enforcement.[73]   Past enforcement of the challenged law against similarly situated parties constitutes evidence of a credible threat, but "'general threat[s] by officials to enforce those laws which they are charged to administer' do not create the necessary injury in fact."[74]   Second, a court examines "whether the plaintiff has shown, 'with some degree of concrete detail,' that she intends to violate the challenged law."[75]   A plaintiff can satisfy this factor by showing that its policy is "presently in conflict" with the challenged law.[76] And third, a court analyzes whether "the plaintiff's intended speech arguably falls within the statute's reach."[77]   A challenged law may be inapplicable "either by its terms or as interpreted by the government,"[78] but in the latter case, "the government's disavowal must be more than a mere litigation position."[79]

---

[73] *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010) (citing *Younger*, 401 U.S. at 41–42; *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc); *Culinary Workers Union v. Del Papa*, 200 F.3d 614, 616, 618 (9th Cir. 1999) (per curiam)).

[74] *Lopez*, 630 at 786–87 (quoting *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 88 (1947)).

[75] *Italian Colors Rest.*, 878 F.3d at 1172 (quoting *Lopez*, 630 F.3d at 786).

[76] *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1236–37 (9th Cir. 2018).

[77] *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003).

[78] *Lopez*, 630 F.3d at 786, 788.

[79] *Id.* at 788; *see Am.-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 508 (9th Cir. 1991).

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 18 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 18 of 48

The Municipality contends that Hope Center cannot demonstrate a credible threat of enforcement because sections 5.20.020 and 5.20.050 do not apply to Hope Center's shelter operations and Anchorage does not intend to enforce them against Hope Center. Hope Center responds that it "faces a substantial and credible fear of enforcement," giving it standing to seek relief.[80] It asserts that both section 5.20.020 and section 5.20.050 apply to its shelter operations and that the Municipality's disavowal of an intent to enforce the nondiscrimination code is merely an illusory promise made as a litigation tactic.[81]

## DISCUSSION

## I. Does Hope Center's Shelter Fall Within the Reach of the Revised Provisions?

The Court begins by considering the third factor, the applicability of the challenged provisions, due to its determinative value to the credible-threat inquiry. For if sections 5.20.020 and 5.20.050 are not applicable to Hope Center's shelter operations, that also "weighs against . . . the plaintiffs' claims that they intend to violate the law, and . . . their claims that the government intends to enforce the law against them."[82]

---

[80] Docket 34 at 16.

[81] Docket 34 at 6.

[82] *Lopez*, 630 F.3d at 786.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 19 of 48

## A. Section 5.20.050

The Municipality contends that section 5.20.050 does not apply to Hope Center's shelter operations because the shelter does not constitute a "public accommodation" under the revised language of section 5.20.10.[83] Primarily, it asserts that the U.S. Supreme Court's recent decision in *Fulton v. City of Philadelphia*[84] "makes clear that Hope Center is not a public accommodation."[85] In *Fulton*, the Supreme Court considered whether Philadelphia violated the First Amendment by refusing to contract with a Catholic foster care agency unless the agency agreed to certify same-sex couples as foster parents.[86] Philadelphia asserted, *inter alia*, that the agency's conduct violated the city's Fair Practices Ordinance, which forbids "deny[ing] or interfer[ing] with the public accommodations opportunities of an individual or otherwise discriminat[ing]" based on several protected categories.[87] The ordinance defines a public accommodation as "[a]ny place, provider, or public conveyance, whether licensed or not, which solicits or accepts the patronage or trade of the public or whose goods, services, facilities,

---

[83] Docket 28 at 2, 18–23.

[84] 141 S. Ct. 1868 (2021).

[85] Docket 28 at 19.

[86] *Fulton*, 141 S. Ct. at 1874.

[87] *Id.* at 1880 (quoting Phila. Code § 9-1106(1) (2016)).

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 20 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 20 of 48

privileges, advantages or accommodations are extended, offered, sold, or otherwise made available to the public."[88]

The Supreme Court held that the Fair Practices Ordinance did not apply to the foster care agency, concluding that the agency's licensing scheme did not constitute a "public accommodation" under the ordinance because foster-parent certification is "not 'made available to the public' in the usual sense of the words."[89] Pointing to examples of public accommodations from a related Pennsylvania state antidiscrimination statute, the Supreme Court noted that "[t]he 'common theme' is that a public accommodation must 'provide a benefit to the general public allowing individual members of the general public to avail themselves of that benefit if they so desire.'"[90] By contrast, the foster-parent certification process involves "a customized and selective assessment that bears little resemblance to staying in a hotel, eating at a restaurant, or riding a bus."[91] The "uniquely selective" process lasts several months and involves background checks, a medical exam, and an "intensive home study" requiring subjective evaluation from foster agencies.[92]

---

[88] *Id.* (quoting Phila. Code § 9-1102(1)(w)).

[89] *Id.*

[90] *Id.* (quoting *Blizzard v. Floyd*, 613 A.2d 619, 621 (Pa. Commw. Ct. 1992)) (noting that a Pennsylvania antidiscrimination statute "fleshes out" the definition of "public accommodation" with "examples like hotels, restaurants, drug stores, swimming pools, barbershops, and public conveyances" (citing 43 Pa. Stat. and Const. Stat. Ann. § 954(*l*) (2009))).

[91] *Id.*

[92] *Id.* at 1880–81.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 21 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 21 of 48

The Municipality concedes that Hope Center's admissions process is "likely less onerous than a foster care home study" but contends that it "has much more in common with the foster care certification process . . . than it does with first-come, first-serve, open access to a public bus or swimming pool."[93] It notes that "shelter admission is available only to a small subset of the public who meet specified housing status, medical, psychological, gender, religious, and other criteria" and that "Hope Center actively investigates a person's eligibility under its published criteria and restricts access based on factors including the personal observations of staff, statements of other shelter guests, medical records, and government records and reports."[94] Thus, in the Municipality's view, under *Fulton*'s reasoning, Hope Center conducts a "customized and selective assessment" that places it outside the category of public accommodation.[95]

The Municipality also maintains that the legislative history of section 5.20.050 "supports the view that the Assembly did not intend for homeless shelters to be considered public accommodations under the revised definition."[96] It notes that at the May 25, 2021 Assembly meeting, one Assembly member proposed an amendment to the proposed ordinance that would change "public" to

---

[93] Docket 28 at 21.

[94] Docket 28 at 22.

[95] Docket 28 at 22 (quoting *Fulton*, 141 S. Ct. at 1880).

[96] Docket 28 at 20.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 22 of 48

"general public" in the definition of "public accommodation."[97]   The Assembly member explained that this change was intended to clarify that public accommodations are those "open to everybody essentially."[98]   The Assembly voted to adopt this change.[99]   The Municipality maintains that this action evidences the Assembly's intent to narrow the category of public accommodations.[100]   The Municipality also references that Assembly member's comment to Ms. Laurie later in the Assembly meeting stating that he believed Hope Center was not a public accommodation under the new code.[101]

In response, Hope Center asserts that "[t]here is no question that Hope Center's intended conduct and speech arguably falls within the public accommodation law's reach."[102]   It describes the Municipality's view as "an interpretive gloss under *Fulton*" but does not directly address why *Fulton*'s reasoning should not apply to Hope Center's shelter operations.[103]   Rather, it points to this Court's previous decision, which determined that the former section 5.20.050 arguably applied to Hope Center for purposes of standing but ultimately

---

[97] Docket 28 at 8; *see also May 25, 2021 Assembly Meeting*, *supra* note 32, at 2:42:19–2:42:36.

[98] *May 25, 2021 Assembly Meeting*, *supra* note 32, at 2:42:19–2:42:36.

[99] *See id.* at 3:01:16–3:01:46.

[100] *See* Docket 28 at 8 ("The word 'general' was also added before 'public'; one Assembly Member believed that this addition might narrow the category.").

[101] *See* Docket 28 at 9 (citing *May 25, 2021 Assembly Meeting*, *supra* note 32, at 5:19:19).

[102] Docket 34 at 19 (emphasis omitted).

[103] *See* Docket 34 at 17–19.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 23 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 23 of 48

concluded that Hope Center was not a public accommodation based on the homeless-shelter exemption incorporated into the former section 5.20.020.[104] Hope Center appears to suggest that this Court would have otherwise concluded that Hope Center was a public accommodation and thus asserts that section 5.20.050 now applies to Hope Center because chapter 5.25, which contained the homeless-shelter exemption, has been repealed.[105] Hope Center emphasizes that it need only demonstrate that section 5.20.050 is *arguably* applicable to satisfy the credible-threat inquiry.[106]

Hope Center also disputes the Municipality's characterization of the ordinance's legislative history, maintaining that the Assembly revised Title 5 to target Hope Center after the AERC's 2018 enforcement efforts were enjoined by this Court.[107]  It highlights the Assembly's repeal of the Fair Housing Act chapter of the old code, which eliminated the homeless-shelter exemption that informed this Court's previous decision.[108]  And it notes that Assembly members and Ms. Bolaños Anderson "repeatedly referenced Hope Center and the prior litigation" during the work sessions on the proposed ordinance and the May 25 Assembly

---

[104] *See* Docket 34 at 18; *Downtown Soup Kitchen*, 406 F. Supp. 3d at 792–96.

[105] Docket 34 at 17–18.

[106] Docket 34 at 19.

[107] Docket 34 at 11–12, 17–19.

[108] Docket 34 at 17–19; *Downtown Soup Kitchen*, 406 F. Supp. 3d at 794–97.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 24 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 24 of 48

meeting.[109]  Hope Center draws particular attention to a post-enactment comment from Assembly member Rivera as evidence of an intent to target Hope Center, contending that Mr. Rivera "expressed hostility to Hope Center, describing its beliefs as 'misinformed.'"[110]

By contrast, the Municipality maintains that "the legislative history does not reflect an intention to penalize or prosecute Hope Center."[111]  Rather, it asserts that the Assembly revised Title 5 in order to "resolve [the] problems" raised by the 2018 litigation: exposure to municipal liability, the "poorly and confusingly structured and drafted" nature of the code, and "the code's lack of sufficient checks and controls on the AERC Executive Director."[112]  Given these motivations, the Municipality contends, it was to be expected that "the legislative history of the code revision included discussion of both the prior litigation and how the new Code might

---

[109] Docket 34 at 12.

[110] Docket 34 at 18–19, 27–28.  Mr. Rivera's full comment was:

> First, sort of putting aside a lot of the issues that we've talked about with regard to Title 5.  Just generally, whenever these types of issues come up, whether it's a resolution supporting trans day of visibility or anything else, it's just really disappointing when I hear such misinformed comments, either from members of the body or members of the public, that really are misinformed and mischaracterizations of who transgender individuals are in our community.  It is 2021, and I would hope that we can move along with our collective education of what it means to be a transgender individual in our society.  So that is a hope that I have for our community.

*May 25, 2021 Assembly Meeting*, *supra* note 32, at 5:27:01–5:28:02

[111] Docket 28 at 9.

[112] Docket 28 at 6; Docket 40 at 6–8.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 25 of 48

affect Hope Center going forward."[113]  It explains that the Fair Housing Act chapter of the old code was repealed because it had been adopted in anticipation of a workshare agreement with the U.S. Department of Housing and Urban Development that never came to fruition.[114]  The Municipality credits the impetus for the repeal to this Court's previous decision, which it explains identified the "structural problem" that the chapter "was duplicative and related confusingly to other parts of the code."[115]  It suggests that the Assembly "compensate[d] for deletion of the [homeless-shelter] exception" in the former FHA chapter by adding the institutional-places exemption to the newly revised section 5.20.020—thus, the repeal was not intended to remove the protection the homeless-shelter exemption previously provided.[116]

The Municipality also highlights statements by Assembly members expressing regret for the AERC's 2018 enforcement attempts and hope that the revision would provide more protection to Hope Center through stronger controls on the AERC Executive Director and enhanced procedural safeguards—evidence it contends is inconsistent with Hope Center's narrative of an intent to punish or prosecute Hope Center.[117]  Finally, the Municipality asserts that Mr. Rivera's post-

---

[113] Docket 28 at 9.

[114] Docket 28 at 7 (citing Docket 27-1 at 3, ¶ 6 (Bolaños Anderson Aff.)).

[115] Docket 28 at 7.

[116] Docket 28 at 7–8, 9–10.

[117] *See* Docket 28 at 9 (citing *May 25, 2021 Assembly Meeting*, *supra* note 32, at 5:19:19,

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 26 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 26 of 48

enactment comment was simply "an aspirational call for civility and tolerance" and not intended as "an opinion on the legal intent or effect of the newly enacted code revision" on Hope Center's shelter operations.[118]

Determining whether section 5.20.050 applies to Hope Center requires interpretation of the Anchorage Municipal Code. The interpretation of municipal ordinances is "governed by rules of statutory construction" and federal courts apply state rules of statutory construction when interpreting municipal laws.[119] The Alaska Supreme Court has explained Alaska's rules of statutory construction as follows:

> "Interpretation of a statute begins with its text." In addition to the text, we also consider a statute's legislative history and purpose. In construing a statute, we have adopted a sliding scale approach whereby "[t]he plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be." Whenever possible "we interpret each part or section of a statute with every other part or section, so as to create a harmonious whole."[120]

Thus, the Court begins its interpretation of AMC section 5.20.050 with the provision's text but also will consider the section's legislative history. Section

---

5:22:55); Docket 40 at 7.

[118] Docket 40 at 9.

[119] *Canfield v. Sullivan*, 774 F.2d 1466, 1468–69 (9th Cir. 1985); *see also McGraw v. City of Huntington Beach*, 882 F.2d 384, 387–88 (9th Cir. 1989).

[120] *Mat-Su Valley Med. Ctr., LLC v. Bolinder*, 427 P.3d 754, 763 (Alaska 2018) (footnotes omitted) (first quoting *City of Kenai v. Friends of the Recreation Ctr., Inc.*, 129 P.3d 452, 458–59 (Alaska 2006); then quoting *State v. Alyeska Pipeline Serv. Co.*, 262 P.3d 593, 597 (Alaska 2011); and then quoting *McDonnell v. State Farm Mut. Auto. Ins. Co.*, 299 P.3d 715, 721 (Alaska 2013)).

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 27 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 27 of 48

5.20.050 prohibits discrimination in public accommodations. In turn, the newly revised section 5.20.010 defines "public accommodation" as "a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not . . . whose goods, services, facilities, privileges, advantages or accommodations are made available to the general public."[121]

Whether Hope Center is covered under section 5.20.050 depends on whether it is considered a "public accommodation" as defined by the newly revised section 5.20.010 of the code. As the Municipality notes, whether homeless shelters are public accommodations is largely an unsettled question, although at least one court has determined that they are.[122] However, whether a homeless shelter is a public accommodation depends on the definition of "public accommodation" in the relevant jurisdiction, as well as the details of that particular shelter's operations. *Fulton* provides some clarity to this landscape by suggesting that a benefit is only "available to the public" if "individual members of the general public [can] avail themselves of that benefit if they so desire."[123] By contrast, a

---

[121] *See* Docket 1-1 at 6.

[122] *See* Docket 28 at 10–11 (citing *Hunter ex rel. A.H. v. D.C.*, 64 F. Supp. 3d 158, 177 (D.D.C. 2014) (holding that homeless shelter was a public accommodation under D.C. Code); *Boykin v. Gray*, 895 F. Supp. 3d 199, 217 n.16 (D.D.C. 2012) (holding that "place of public accommodation" would include homeless shelters)).

[123] *Fulton*, 141 S. Ct. at 1880 (quoting *Blizzard*, 613 A.2d at 621).

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 28 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 28 of 48

benefit is "not readily accessible to the public" when it "involves a customized and selective assessment."[124]

Section 5.20.010's definition of public accommodation is quite similar to that of the ordinance at issue in *Fulton*. Both contain the phrase "whose goods, services, facilities, privileges, advantages or accommodations are . . . made available to the . . . public."[125] Given the similar wording of the ordinances, *Fulton*'s analysis is highly relevant to the instant motion. Under *Fulton*'s reasoning, Hope Center's shelter services are not "available to the public" in the manner characteristic of public accommodations. "[I]ndividual members of the general public" cannot avail themselves of Hope Center's services because shelter guests must satisfy an extensive list of criteria to qualify for admission—a list that would exclude the vast majority of the general public.[126] Further, potential guests must undergo a multifactor evaluation that requires Hope Center staff to exercise meaningful discretion given the subjectivity of many of the evaluation factors. While this admissions process is certainly less demanding than the foster-parent certification process considered in *Fulton*, it is still a "customized and selective assessment" that excludes most members of the general public. Thus, the text of the Assembly ordinance indicates that Hope Center's shelter is not a public

---

[124] *Id.*

[125] *See* Docket 15-2 at 6; *Fulton*, 141 S. Ct. at 1880; *supra* text accompanying note 88.

[126] *See supra* note 13.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 29 of 48

accommodation as defined in 5.20.010 and therefore is not included in section 5.20.050.

Turning to the legislative history, this Court finds that it is unclear whether the Assembly intended section 5.20.050 to apply to Hope Center. On one hand, Ms. Bolaños Anderson's testimony during the May 25 Assembly meeting clearly evinced her belief at the time that the provision would apply to Hope Center and other homeless shelters. When asked how the AERC would approach a "situation similar to what happened at the Hope Center" under the revised code, she replied that the AERC "would bring in the case . . . probably under public accommodation."[127] Several Assembly members' statements at the May 25 meeting reflect similar understandings of section 5.20.050's applicability to Hope Center. For example, Assembly member Allard, who voted against the ordinance, appeared to believe that Hope Center would be covered under the revised ordinance due to the removal of the homeless exemption.[128] In light of these facts, the Municipality's assertion that "the revision was intended to *prevent* [prosecution

---

[127] *May 25, 2021 Assembly Meeting*, *supra* note 32, at 3:28:20–3:29:12; *see also id.* at 3:24:58–3:25:18 (statement of Ms. Bolaños Anderson) ("I think homeless shelters still have an array of ways to exclude people who are actually threats, right, who are violent, who may be under the influence, who may be exhibiting threatening behavior, but that can't be an assumption based on the individual's gender identity."); *id.* at 3:34:18–3:24:30 (statement of Ms. Bolaños Anderson) ("If a transgender female arrives at a women's shelter and asks for services, and there is no other nondiscriminatory reason to exclude that person, that person, yes, must be included.").

[128] *See id.* at 3:23:55–3:24:48.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 30 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 30 of 48

of Hope Center] from re-occurring in the future" is dubious.[129]  Setting aside the question of whether the Municipality "targeted" Hope Center with the ordinance, at least some of those involved in the Assembly's deliberations believed that Hope Center would fall under the revised public accommodation provision.

On the other hand, some Assembly members appeared to believe that Hope Center would not constitute a public accommodation under the revised code.  This confusion seemingly stemmed from the mistaken belief that an amendment to the ordinance proposed by Assembly member Weddleton was accepted in full when in reality only part of the amendment was adopted.[130]  The rejected portion of the amendment would have limited public accommodations to "business establishments" or entities that accept public funds, likely excluding Hope Center.[131]  Mr. Weddleton, for example, told Ms. Laurie post-enactment that Hope Center "should not be covered by public accommodation" and that he would not have voted for the ordinance if it was.[132]  Earlier in the meeting, Assembly member Dunbar stated: "I was under the impression that it was already the case that . . . Hope Center could limit access in this way, because it was found not to be a public accommodation under the old title, and I didn't think anything that was being

---

[129] Docket 40 at 7 (emphasis added).

[130] *See May 25, 2021 Assembly Meeting*, *supra* note 32, at 2:52:33–2:57:33.

[131] *See id.* at 2:51:26–2:52:14.

[132] *See id.* at 5:19:19–5:20:25.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 31 of 48

changed in this ordinance was changing that."[133]  When Mr. Dunbar followed up by asking whether the ordinance would alter the effect of this Court's previous order, Ms. Bolaños Anderson implied that homeless shelters would only be covered under the public accommodations provision if they received public funds.[134]

Given the conflicted nature of the legislative history, there is not sufficiently "convincing . . . evidence of contrary legislative purpose or intent" to overcome the plain text of the revised code's definition of "public accommodation,"[135] which, under *Fulton*'s reasoning, does not encompass Hope Center's homeless shelter. Therefore, section 5.20.050 is not applicable to Hope Center's shelter operations.

## B. Section 5.20.020

The Municipality contends that the revised section 5.20.020 does not apply to Hope Center's shelter operations for two reasons.[136]

First, the Municipality highlights this Court's conclusion in the 2018 litigation that "Hope Center is [] likely to succeed as to its contention that AMC § 5.20.020 does not apply to Hope Center's homeless shelter."[137]  The Court's primary basis

---

[133] *See id.* at 2:46:34–2:46:59.

[134] *See id.* at 2:48:24–2:48:36 ("So we removed 5.25 that had those housing exemptions, and then we added here 'that accepts public funds,' and possibly with this amendment, that could address, then, homeless shelters that receive public funds.").

[135] *See Bolinder*, 427 P.3d at 763.

[136] *See* Docket 28 at 26–28.

[137] Docket 28 at 27 (alteration in original) (quoting *Downtown Soup Kitchen*, 406 F. Supp. 3d at

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 32 of 48

for that decision was the homeless-shelter exemption previously codified at section 5.25.030,[138] which has since been repealed. However, the Municipality notes that the Court also reasoned that enforcing section 5.20.020 against Hope Center would not further the code's purpose as articulated by the Alaska Supreme Court in *Swanner v. Anchorage Equal Rights Commission*: "prohibit[ing] discrimination in the rental housing market."[139] The Municipality asserts that "[t]his alternative holding continues to apply with full force to the revised code."[140] Second, the Municipality contends that the Assembly's addition of the institutional-places exemption to section 5.20.020 "illustrates the legislative body's continuing intent to restrict the reach of this law to 'discrimination in the retail [sic] housing market.'"[141] The Municipality suggests that the institutional-places exemption "may well apply" to Hope Center's shelter operations depending on the extent to which those operations are "'incidental' to the other aspects of its religious ministry."[142]

In response, Hope Center asserts that section 5.20.020 arguably applies because "the main basis for exempting Hope Center from the law in the previous

---

795).

[138] *See Downtown Soup Kitchen*, 406 F. Supp. 3d at 795–97.

[139] Docket 28 at 27 (quoting *Downtown Soup Kitchen*, 406 F. Supp. 3d at 795); *Swanner v. Anchorage Equal Rts. Comm'n*, 874 P.2d 274, 280 (Alaska 1994) ("The purpose of AMC 5.20.020 and AS 18.80.240 is to prohibit discrimination in the rental housing market.").

[140] Docket 28 at 27.

[141] Docket 28 at 27–28.

[142] Docket 28 at 28.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 33 of 48

litigation (*i.e.*, homeless-shelter exemption) is no longer available."[143]     It

acknowledges the Alaska Supreme Court's statement in *Swanner* regarding the

purpose of section 5.20.020, but maintains that a "law's application can reach

'beyond the principal evil' that the legislators intended to address."[144]  Hope Center

also contends that the institutional-places exemption does not apply to exempt it

from section 5.20.020 because "housing is not 'merely incidental' to a *homeless*

shelter's operations" but rather is "central to Hope Center's mission."[145]

As with interpreting the definition of public accommodation in the revised

code, the Court begins with the text of section 5.20.020.  In relevant part, the

provision states:

> It is unlawful for the owner, lessor, manager, agent, brokerage
> service, or other person having the right to sell, lease, rent, [or]
> advertise . . . real property to . . . [r]efuse to sell, lease or rent, or to
> otherwise make unavailable, the real property to a person because of
> race, color, sex, sexual orientation, gender identity, religion, national
> origin, marital status, age, familial status, or physical or mental
> disability . . . [or] [d]iscriminate against a person because of race,
> color, sex, sexual orientation, gender identity, religion, national origin,
> marital status, age, familial status, or physical or mental disability.[146]

Similarly to section 5.20.050, the provision also forbids communications "that

indicate[] any preference, limitation, specification or discrimination based on race,

---

[143] Docket 34 at 20.

[144] Docket 34 at 20 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)).

[145] Docket 34 at 20.

[146] AMC § 5.20.020(A)(1)–(2).

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 34 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 34 of 48

color, sex, sexual orientation, gender identity, religion, national origin, marital status, age, familial status, or physical or mental disability."[147]

The title of section 5.20.020 is "[u]nlawful practices in the sale, rental or *use* of real property." Subsection A(2) also mentions the "*use*, sale, lease or rental of real property," and subsection A(1) uses the phrase "[r]efuse to sell, lease or rent, or *otherwise make unavailable*."[148] All these formulations would appear to encompass Hope Center; operating a homeless shelter involves the "use of real property" and the "mak[ing] []available" of real property. Yet other portions of section 5.20.020 indicate that the provision is geared primarily toward addressing discrimination in the sale, lease, and rental of real property, which would not include Hope Center's shelter operations. Subsection A(5), for example, forbids discriminatorily "[r]epresent[ing] to a person that real property is not available for inspection, sale, rental or lease when in fact it is available." And subsection A(6) forbids "blockbusting for profit," a practice that involves the purchase and sale of real property.[149]

Subsection B, containing the newly enacted institutional-places exemption, introduces further ambiguity. The exemption provides that section 5.20.020 "does

---

[147] *Id.* § 5.20.020(A)(7).

[148] *Id.* § 5.20.020(A)(1)–(2) (emphases added).

[149] *See Blockbusting*, Black's Law Dictionary (11th ed. 2019) ("The act or practice, usu. by a real-estate broker, of persuading one or more property owners to sell their property quickly, and often at a loss, to avoid an imminent influx of minority groups.").

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 35 of 48

not apply to places which are institutional in nature and for which housing is merely incidental to a broader purpose, such as rehabilitation or medical care." The meaning of "institutional in nature" is not clear, and it is ambiguous whether Hope Center is a "place . . . for which housing is merely incidental to a broader purpose." This question may depend on the unit of analysis; housing is not "merely incidental to a broader purpose" if the women's shelter is the "place" in question, but might be "merely incidental" if the "place" is Hope Center as a whole—an organization that offers many services in addition to its shelter operations. Thus, the plain text of section 5.20.020, including the institutional-places exemption, does not clearly indicate whether Hope Center's shelter operations would be covered under the provision.

The legislative history of section 5.20.020 is also ambiguous on this point. After further consideration following the 2018 Hope Center litigation, this Court does not find the Alaska Supreme Court's statement in *Swanner* to be determinative. The Supreme Court's assertion as to the purpose of section 5.20.020 was made in a different context: determining whether that section and a similar state nondiscrimination law were neutral laws of general applicability.[150] The Supreme Court concluded that both laws were neutral because their language did not "singl[e] out any religious group or practice" and because their purpose was

---

[150] *See Swanner*, 874 P.2d at 279–80.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 36 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 36 of 48

"to prohibit discrimination in the rental housing market."[151]  For the latter proposition, the Supreme Court cited AS 18.80.200, which at the time stated that "the purpose of this chapter [is] to eliminate and prevent discrimination in employment, in credit and financing practices, in places of public accommodation, in housing accommodations and *in the sale, lease, or rental of real property*."[152] *Swanner* did not cite to AMC section 5.10.010, and yet similarly to AS 18.80.200, that section provides that the purpose of Title 5 is to prohibit "invidious discrimination in *the sale or rental of real property*, financing practices, employment practices, public accommodations, educational institutions, and practices of the municipality."  However, Hope Center is correct in asserting that a statute can apply beyond its primary purpose,[153] and the Alaska Supreme Court has explained that statements of legislative purpose are just one element of statutory construction.[154]  As noted above, the plain text of several provisions of section 5.20.020 would appear to include Hope Center.  Moreover, section 5.20.020 was narrower in some respects at the time of *Swanner*—for example, subsection A(1) forbid "[r]efus[ing] to sell, lease or rent the real property"; it did not include the

---

[151] *Id.* at 280.

[152] *Id.* at 280 n.8 (emphasis added) (quoting Alaska Stat. § 18.80.200 (1994)).

[153] *See Oncale*, 523 U.S. at 79.

[154] *See State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019) ("[T]he plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be." (alteration in original) (quoting *State v. Fyfe*, 370 P.3d 1092, 1095 (Alaska 2016))).

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 37 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 37 of 48

"otherwise make unavailable" language included in the current provision.[155]  Thus, *Swanner* is not determinative.

The legislative history of the recent revisions to section 5.20.020 also fails to clarify whether the provision applies to Hope Center's shelter.  As discussed above, several Assembly members appeared to believe that the revised code— whether through its public accommodations provision or real property provision— would apply to Hope Center, whereas others did not.  Ms. Bolaños Anderson, in contrast to her statements about the public accommodations provision, was equivocal when asked by Assembly members whether section 5.20.020 would apply to Hope Center.  Regarding the repeal of chapter 5.25, including its homeless-shelter exemption, she noted that the new institutional-places exemption "brought in a lot of those places that were under those exemptions," but did not specify whether homeless shelters were covered by the new exemption.[156]  At another point during the meeting, Ms. Bolaños Anderson stated that she was unsure whether Hope Shelter would be covered under section 5.20.020.[157]  Even now, the Municipality only asserts that the institutional-places exemption "may well

---

[155] *Compare* AMC § 5.20.020 (1994), *with* AMC § 5.20.020.

[156] *May 25, 2021 Assembly Meeting*, *supra* note 32*,* at 3:24:12–3:24:32 (statement of Ms. Bolaños Anderson).

[157] *See id.* at 3:29:05–3:29:29 ("We would bring it in probably under public accommodation, maybe under housing.  And that's again going to depend on the specific shelter, and I don't know . . . enough about the Hope Shelter to actually know if they would meet all these factors, right, that the courts look at to see if they are housing or not.").

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 38 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 38 of 48

apply" to Hope Center depending on "facts regarding to what extent Hope Center's homeless sheltering is 'incidental' to the other aspects of its religious ministry."[158]

In sum, the plain text and legislative history of revised section 5.20.020 do not clearly indicate that the provision is inapplicable to Hope Center's homeless shelter, and Hope Center has offered a colorable argument that the provision applies. Thus, for purposes of the credible-threat inquiry, section 5.20.020 "arguably applies" to Hope Center.

## II. Does Hope Center Intend to Violate the Challenged Provisions?

The Court next addresses the second factor of the credible-threat inquiry: "whether the plaintiff has shown, 'with some degree of concrete detail,' that she intends to violate the challenged law."[159] The Municipality asserts that Hope Center cannot make this showing because neither provision applies to Hope Center's conduct.[160] Hope Center responds that its admissions policy is "presently in conflict" with the challenged provisions and that it has shown a concrete plan to violate the revised code's communications bans because it would "once again 'make its admissions policy clear by posting it on its grounds and on its website'" if not for those provisions.[161]

---

[158] Docket 28 at 28.

[159] *Italian Colors Rest.*, 878 F.3d at 1172 (quoting *Lopez*, 630 F.3d at 786); *see also supra* text accompanying notes 75–76.

[160] Docket 28 at 24.

[161] Docket 34 at 21 (first quoting *City & County of San Francisco*, 897 F.3d at 1237; then quoting Docket 1 at 28, ¶¶ 127–31).

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 39 of 48

As discussed above, this Court has found that Hope Center is not a public accommodation as defined in section 5.20.050; therefore, Hope Center has not demonstrated that its intended actions will be in violation of that section. However, Hope Center's current admissions policy and plans to post its admissions policy online may violate section 5.20.020 if Hope Center's shelter does not fall within the institutional-places exemption. Unless that exemption applies, denying transgender women admission to a homeless shelter could constitute both "mak[ing] unavailable . . . real property to a person" and "discriminat[ing] against a person . . . in a term, condition, or privilege relating to the use . . . of real property" on the basis of a protected characteristic.[162] And unless the exemption applies, publishing a policy stating that "guests of the shelter must be biological females" could constitute "issu[ing] . . . [a] communication, sign, notice, statement or advertisement with respect to the use . . . of real property that indicates any preference, limitation, specification or discrimination" based on a protected characteristic, which is prohibited by section 5.20.020(A)(7).[163] Thus, Hope Center

---

[162] *See* AMC § 5.20.020(A)(1)-(2).

[163] It is somewhat unclear whether Hope Center's actions constitute sex discrimination or gender identity discrimination. In its verified complaint, Hope Center asserts that its policy does not prohibit "biological women who identify as men" from accessing its shelter and that it has previously accepted such shelter guests. *See* Docket 1-1 at 13, ¶ 56. In that case, Hope Center's policy would constitute sex discrimination because it would be rooted in barring shelter guests that Hope Center considers men rather than barring all transgender individuals. The Municipality asserts that Hope Center requires shelter guests to "present as female and have been assigned a female gender identity at birth," which, if true, would bar both transgender women and transgender men who present as such, pointing toward gender identity discrimination rather than sex discrimination. *See* Docket 28 at 3 (citing Docket 1-3 at 4–5). However, Hope Center's admissions policy only requires that shelter guests "be biological

---

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 40 of 48

has shown with concrete detail that it intended actions may violate section 5.20.020.

### III. What Is the Likelihood That the Challenged Provisions Will Be Enforced Against Hope Center?

Lastly, the Court considers the first factor of the credible-threat inquiry: the "likelihood that the law will be enforced against the plaintiff." [164] The Municipality maintains that Hope Center cannot show a likelihood that the challenged provisions will be enforced against it. It notes that the AERC has not "communicated a specific warning or threat to initiate proceedings."[165] Rather, Ms. Bolaños Anderson has "disavow[ed] [] prosecutorial intent"; there are "no pending or threatened enforcement matters"; and the AERC has not received any complaints or initiated any proceedings against Hope Center under the revised versions of sections 5.20.020 and 5.20.050.[166] The Municipality concedes that there has been a past history of enforcement, as evidenced by the 2018 litigation, but it notes that "the Ninth Circuit has cautioned that the historical enforcement factor should be given 'little weight' where, as here, 'the challenged law is relatively new and the record contains little information as to enforcement or

---

females, meaning they were born with, and currently have, only anatomical and genetic characteristics of a woman." Docket 1-3 at 4. It is unnecessary to determine whether Hope Center's policy constitutes sex or gender identity discrimination at this juncture as both would violate AMC § 5.20.020 unless the institutional-places exemption applies.

[164] *Italian Colors Rest.*, 878 F.3d at 1172; *see also supra* text accompanying notes 72–74.

[165] Docket 28 at 24 (quoting *Thomas*, 220 F.3d at 1139).

[166] Docket 28 at 25.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 41 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 41 of 48

interpretation.'"[167]  Highlighting the recent changes to the nondiscrimination code and shifts in the "governing law on public accommodations" wrought by *Fulton*, the Municipality contends that these factors "diminish the relevance and weight that the Court should afford pre-2018 enforcement efforts."[168]

In response, Hope Center asserts that there is a "substantial likelihood of enforcement."[169]  It highlights the AERC's previous attempt to enforce the nondiscrimination code against Hope Center, noting that "'the threat of future enforcement . . . is substantial' when there is 'a history of past enforcement.'"[170]  In addition, Hope Center contends that "Defendants' newfound willingness to leave Hope Center alone should carry little weight" for several reasons.[171]  First, quoting the Fourth Circuit's decision in *Bryant v. Woodall*, Hope Center asserts that "[u]nofficial and non-binding statements . . . 'cannot override the plain text of the [laws] when it comes to establishing a credible threat of enforcement.'"[172]  However, *Bryant*'s statement concerned representations made in an email and an op-ed—sources more "unofficial" than Ms. Bolaños Anderson's affidavit.[173]

---

[167] Docket 28 at 25 (quoting *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021), *petition for cert. filed*, No. 21-194 (Aug. 11, 2021)).

[168] Docket 28 at 25–26.

[169] Docket 34 at 22.

[170] Docket 34 at 22 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014)).

[171] Docket 34 at 6.

[172] Docket 34 at 23 (quoting *Bryant v. Woodall*, 1 F.4th 280, 288 (4th Cir. 2021)).

[173] *See Bryant*, 1 F.4th at 288–89.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 42 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 42 of 48

Moreover, this Court has determined that section 5.20.050 is inapplicable to Hope Center's shelter by its plain text and that the text of section 5.20.020 is ambiguous.

Second, Hope Center maintains that the Municipality's disavowal is "not legally binding" and that "nothing prevents this Director, or the next, from changing his or her mind about enforcement and again turning on Hope Center."[174] The Municipality responds that "the concession that the AERC will follow federal law is not . . . a license for the Executive Director to change her mind at will" but rather "a recognition that the AERC must continue to follow controlling federal law, an uncontroversial position."[175] Disavowals need not be legally binding to carry import in the credible-threat inquiry—they are simply one "indicat[ion] that plaintiffs' claims of future harm lack credibility."[176] Particularly when, as here, the enforcing

---

[174] Docket 34 at 7, 24; *see also* Docket 34 at 20 ("Defendants reserved the right to change their minds about this interpretation depending on 'facts regarding to what extent Hope Center's homeless sheltering is 'incidental' to Hope Center's ministry." (quoting Docket 28 at 28)).

[175] Docket 40 at 14–15 (footnote omitted); *see also* Docket 27-1 at 5, ¶ 12 (Bolaños Anderson Aff.) ("Because Hope Center's services fall outside of the scope of the public accommodations category as described by *Fulton*, the AERC has no basis to and does not intend to enforce Title 5's gender identity or sex discrimination provisions against Hope Center's overnight shelter operations unless . . . the federal law changes in such a way as to allow a more expansive definition of the public accommodations category.").

[176] *Lopez*, 630 F.3d at 788; *see also Johnson v. Stuart*, 702 F.2d 193, 195 (9th Cir. 1983) (holding plaintiffs lacked standing to challenge a statute when the enforcing authority and its legal counsel "disavowed any interpretation of [the statute] that would make it applicable"); *cf. LSO*, 205 F.3d at 1155 (collecting cases in which "[c]ourts have . . . considered the Government's failure to disavow application of the challenged provision as a factor in favor of a finding of standing"). *But see Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000) ("The State also argues that VRLC's fear of suit could not possibly be well-founded because the State has no intention of suing VRLC for its activities. While that may be so, there is nothing that prevents the State from changing its mind. It is not forever bound, by estoppel or otherwise, to the view of the law that it asserts in this litigation.").

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 43 of 48

authority's disavowal is based on interpreting the challenged law as inapplicable to the plaintiff's conduct, it indicates a low likelihood of enforcement.

Third, Hope Center asserts that even if Ms. Bolaños Anderson's disavowal is genuine, it "promises little in view of the overall enforcement scheme."[177] It notes that the AERC Commissioners have not issued a disavowal and contends that this undermines the Municipality's position because the Commission has "unfettered discretion to initiate its own investigations, apart from the Executive Director" and can "reconsider the Director's decision to close a complaint, and may reverse the decision if it believes there has been 'a mistake . . . in the application of the law.'"[178] Hope Center also points out that anyone can file a complaint under Title 5, "subjecting Hope Center to a 'universe of potential complainants,' a mandatory investigation process, and potential civil and criminal sanctions—no matter the Acting Director's current interpretation of the laws."[179] The Municipality replies that Hope Center misunderstands Title 5's enforcement scheme because the "executive director—not the Commission—has the power to dismiss complaints at any time . . . if she determines that 'the commission lacks jurisdiction over the subject matter' of the complaint."[180]

---

[177] Docket 34 at 24.

[178] Docket 34 at 6, 24 (citations omitted) (quoting AMC § 5.60.030(E)).

[179] Docket 34 at 7 (quoting *Susan B. Anthony List*, 573 U.S. at 164).

[180] Docket 40 at 13 (citing AMC § 5.60.020(A)(4)).

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 44 of 48

The Court is persuaded that the Executive Director's administrative closure power mitigates Hope Center's concerns about a "universe of potential complainants." If a member of the public were to file a complaint against Hope Center under section 5.20.020 or section 5.20.050, the Executive Director could dismiss that complaint before the investigation process commences. As Hope Center correctly notes, this administrative closure power is still subject to the Commission's reconsideration.[181] But the first factor of the credible-threat inquiry assesses the "likelihood" of enforcement—not whether there is a certainty that the challenged law will or will not be enforced.[182] Given that the Executive Director exercises primary responsibility for screening out non-cognizable complaints, the Bolaños Anderson affidavit is sufficient to establish that enforcement against Hope Center is unlikely.

## IV. Standing for Injunctive Relief

The Court finds that Hope Center has failed to show a credible threat of enforcement for section 5.20.050 because the provision does not apply to Hope Center's shelter operations. As the Ninth Circuit noted in *Lopez v. Canele*, when the challenged law is inapplicable, that also "weighs against . . . the plaintiffs' claims that they intend to violate the law, and . . . their claims that the government

---

[181] *See* AMC § 5.60.030(A) (stating that reconsideration is permissible when "a complaint has been closed pursuant to subsection 5.60.010C. or 5.60.020A.1.–5."); *id.* § 5.60.030(E).

[182] *See Italian Colors Rest.*, 878 F.3d at 1173.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 45 of 48

intends to enforce the law against them."[183]  The Court's conclusion is bolstered by, but does not rely on, the fact that the Municipality interprets section 5.20.050 as inapplicable and the Executive Director of the AERC has disavowed any intent to prosecute Hope Center under it.

Hope Center has also failed to show a credible threat of enforcement for section 5.20.020.  Although that provision "arguably" applies to Hope Center's conduct,[184] there is a low likelihood of enforcement because the Municipality has maintained that the provision does not apply, and the Executive Director of the AERC has disavowed any intent to enforce it.  Together, the provision's uncertain applicability and the Municipality's disavowal are sufficient to extinguish a credible threat of enforcement.  Because there is not a credible threat that either provision will be enforced moving forward, Hope Center lacks standing to pursue its claims for injunctive relief.

## V.    Standing for Damages

Hope Center asserts that even if injunctive relief is not warranted, it still has standing to seek damages because it has already suffered a constitutional injury due to "reasonably respond[ing] to Defendants' repeal of the homeless-shelter exemption by self-censoring," which cannot be undone by an "after-the-fact

---

[183] 630 F.3d at 786.

[184] *See Getman*, 328 F.3d at 1095.

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 46 of 48

disavowal."[185]  In reply, the Municipality contends that Hope Center lacks such standing because "its self-censorship was not rooted in a well-founded fear of prosecution."[186]

When a plaintiff's exercise of First Amendment rights has been chilled, "such self-censorship is a constitutionally sufficient injury as long as it is based on an actual and well-founded fear that the challenged statute will be enforced."[187]  This Court found above that Hope Center has failed to establish a credible threat that section 5.20.050 will be enforced against it because the provision is not applicable. Thus, even before the Municipality's disavowal, Hope Center's fear of prosecution under section 5.20.050 was not well-founded.  However, the Court's conclusion that Hope Center has failed to establish a credible threat with regard to section 5.20.020 relies in part on the Municipality's disavowal, filed with this Court on August 16, 2021,[188] as the provision itself is ambiguous and arguably applies to Hope Center's conduct.  Thus, from May 25 to August 16, 2021, Hope Center had a well-founded fear of prosecution under section 5.20.020.  As a result, it has

---

[185] Docket 34 at 7, 16, 28.

[186] Docket 40 at 16; *see also* Docket 40 at 17 ("Standing for past self-censorship harm only exists where the self-censorship 'is based on an actual and well-founded fear that the challenged statute will be enforced' against it." (quoting *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013))).

[187] *Bowen*, 709 F.3d at 870 (quoting *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1000 (9th Cir. 2010)); *see also Bayless*, 320 F.3d at 1006.

[188] *See* Docket 27-1 at 5 (Bolaños Anderson Aff.).

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 47 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 47 of 48

standing to seek damages for its self-censorship based on section 5.20.020 during that limited time period.

## CONCLUSION

Hope Center lacks standing to pursue a pre-enforcement challenge to AMC sections 5.20.050 and 5.20.020. However, because section 5.20.020 arguably applies to Hope Center's conduct, Hope Center may seek damages for its self-censorship based on that provision for the limited time period between the ordinance's passage and the Municipality's disavowal of prosecutorial intent. For the foregoing reasons, Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing at Docket 28 is GRANTED in part and DENIED in part as set forth herein. Further, because Hope Center lacks standing to pursue its claims for injunctive relief, its Motion for Preliminary Injunction at Docket 15 is DENIED.

DATED this 20th day of December, 2021, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

Case No. 3:21-cv-00155-SLG, *Downtown Soup Kitchen v. Municipality of Anchorage, et al.*
Order re Defendants' 12(b)(1) Motion to Dismiss for Lack of Standing
Page 48 of 48

Case 3:21-cv-00155-SLG   Document 41   Filed 12/20/21   Page 48 of 48